JOHN C. CRUDEN,
Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
RICKEY D. TURNER, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1373

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| WESTERN RANGELAND CONSERVATION ASSOCIATION, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> S.M.R. JEWELL, in her official capacity as Secretary of the U.S. Department of the Interior, *et al.*, <br><br> Federal Respondents, <br><br> and <br><br> AMERICAN WILD HORSE PRESERVATION CAMPAIGN, *et al.*, <br><br> Defendant-Intervenor. | CASE NO. 2:14-cv-327-PMW <br><br> **FEDERAL RESPONDENTS' OPPOSITION TO PETITIONERS' OPENING BRIEF [ECF No. 103]** |

1

**INTRODUCTION**

Petitioners, Western Rangeland Conservation Association, *et al*., challenge the Bureau of Land Management's (the Bureau) implementation of its Wild Horse Management Program as authorized by the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (Wild Horse Act).[1] *See* Petitioners' Opening Brief (Pet. Br.), ECF No. 103. The crux of Petitioners' case is that the Bureau has unreasonably delayed removing wild horses from nine specific areas of Federal public, State, and private lands. As explained in more detail below, Petitioners' assertions are inaccurate. First, the Bureau has no duty to remove horses on four of the nine areas of Federal public land at issue (Choke Cherry, Muddy Creek, North Hills, and Swasey herd management areas). Second, in the remaining five areas of Federal public land (Frisco, Blawn Wash, Four Mile, Bible Springs, and Sulphur herd management areas) and the State and private lands at issue, where it does currently have a duty to remove horses, the Bureau has diligently secured appropriated funds, conducted the necessary environmental reviews, scheduled removals, and removed wild horses when warranted. Petitioners are obviously dissatisfied with the Bureau's management priorities and removal schedules, but they cannot demonstrate that the agency has unreasonably delayed any action it was required to take. Therefore, the Court should reject Petitioners' invitation to judicially manage the Bureau's Wild Horse Program and deny their requested relief.

**BACKGROUND**

**I.    Statutory and Regulatory Background**

**A. Federal Land Policy and Management Act**

The Bureau manages public lands pursuant to the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787, which directs the Secretary of the Interior,

---

[1] Pursuant to *Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the Administrative Procedure Act] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." *Id*. at 1580.

acting through the Bureau, to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed by the agency. 43 U.S.C. § 1732(a). Multiple-use management is a "deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish[.]'" *Norton v. S. Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)). While the statute requires the Bureau to follow multiple-use principles in general terms, it imposes few, if any, specific directions on how the agency allocates resources among competing uses. The Tenth Circuit thus has recognized that multiple-use statutes like the Federal Land Policy and Management Act are broad grants of discretion to agencies like the Bureau. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1268 (10th Cir. 2011).

**B. The Wild Free-Roaming Horses and Burros Act**

The Bureau's multi-use management of Federal public lands under the Federal Land Policy and Management Act must also take into account the Bureau's responsibilities under statutes like the Wild Horse Act. Enacted in 1971, Congress intended the Wild Horse Act to address concerns that wild horses were vanishing from the West, and to preserve them as "living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. But within a few years after the Act's enactment, the situation had reversed itself "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)). As a result, Congress later amended the Wild Horse Act to provide the Bureau with greater authority and discretion to carry out the Wild Horse Act's statutory mandate. *Id.*

There are two distinct obligations under the Wild Horse Act—one relating to federally managed lands, and one to private land—that are relevant here. With respect to Federal public lands, Section 3 of the Wild Horses Act grants the Bureau authority over

3

wild horses on Federal lands under its jurisdiction and directs the agency to protect and manage these animals "as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance" on those lands. 16 U.S.C. § 1333(a); *see generally Wyoming v. U.S. Dep't of Interior,* -- F.3d --, No. 15-8041, 2016 WL 5920744, at *1 (10th Cir. Oct. 11, 2016)*; Fund for Animals v. U.S. Bureau of Land Mgmt*. The Bureau implements the Wild Horse Act by establishing localized herd management areas and generally through land-use planning under the Federal Land Policy and Management Act, setting appropriate management levels for the wild horse populations within each area. 16 U.S.C. §§ 1332(c), 1333(b)(1); 43 C.F.R. §§ 4710.1, 4710.3-1; *see also Wyoming,* 2016 WL 5920744, at *1. The Bureau typically defines a management range—bounded by a "low appropriate management level" and "high appropriate management level"—for each area that has wild horses. *Id*. at *2. In conjunction with a requirement that the Bureau maintain a current inventory of wild horses, the Wild Horse Act authorizes the Bureau to use a variety of methods to achieve appropriate management levels, including (but not limited to) the removal and destruction of "excess animals." 16 U.S.C. § 1333(b)(1). As relevant, the Wild Horse Act defines "excess animals" as those "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f).

Before the Bureau may remove wild horses from a given herd management area, the Wild Horse Act requires the Bureau to use current information to make two determinations: first, "an overpopulation exists on a given area of the public lands," *id*. § 1333(b)(2); and second, that instead of addressing overpopulation through options "such as sterilization, or natural controls on population levels," *id*. § 1333(b)(1), "that action is necessary to remove excess animals," *id*. § 1333(b)(2); *see also Wyoming,* 2016 WL

5920744, at *4-5.[2] Once the Bureau makes these determinations, the Wild Horse Act provides that the Bureau "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). The Wild Horse Act establishes an order of priorities when removing excess horses but does not establish a specific statutory deadline for the completion of any particular removal action. *Id.*

With respect to private land, the Bureau's obligations are different. Under Section 4 of the Act, 16 U.S.C. § 1334, if wild horses "stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshal or agent of the Secretary, who shall arrange to have the animals removed." The Bureau has interpreted this statutory provision by promulgating implementing regulations, which provide: "Upon written request from the private landowner to any representative of the Bureau of Land Management, the authorized officer shall remove stray wild horses and burros from private lands as soon as practicable." 43 CFR § 4720.2-1. Unlike Section 3, Section 4 of the Act does not require the Bureau to determine that an overpopulation exists or that action is necessary to remove stray horses before initiating a removal action.

Congress has provided the Bureau with significant discretion as to how it manages wild horses. *See, e.g., Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975). In short, the Bureau, in its expert capacity as the federal agency in charge of implementing the Wild Horse Act, is entitled to deference in deciding the timing, pace, and methods of removing wild horses from the range. *Am. Horse Prot. Ass'n*, 694 F.2d at 1318.

## II.    Factual Background

### A. Current Horse Population Numbers

Currently, there is an estimated population of 67,000 wild horses and burros on Federal public, State, and private lands spread throughout 10 western states (this estimate

---

[2] These excess and removal determinations most often occur as part of the Bureau's environmental review process mandated by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

does not include the 2016 population increase or foal crop of 15-20%). ECF No. 115-2 at 14 (Exh. 2 to State of Utah's Amicus Brief). This total is more than twice the number of horses on the open range recommended by the relevant Bureau land use plans. *Id*. And, due to rapid reproduction rates, horse population numbers double approximately every four years. *See* AR015799; AR015211.[3]

## B. Challenges Facing Wild Horse Management and Removal Efforts

Although the Wild Horse Act's management direction to the Bureau appears straightforward, reality introduces significant complexity into the management equation. This is especially the case with respect to the Bureau's ability to remove additional horses from the western range.

The Bureau's ability to remove additional horses from the open range is primarily limited by the current budget expenditures and lack of capacity associated with boarding already removed horses at off-range facilities. Over the past two decades, the Bureau has removed over 165,000 wild horses from the open range and now pays to board approximately 50,000 of these horses at off-range facilities. Due to the decrease in market demand for horses in general, *see* AR010674-89; ECF No. 115-2 at 5, the Bureau is increasingly unable to find suitable homes for healthy excess horses through its adoption program. And, to further complicate this problem, the Bureau is not permitted to humanely destroy healthy, unadopted horses or conduct any sale that results in their destruction. AR015213; *see also* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399 (Dec. 16, 2014) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products."); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014). This means

---

[3] References to "AR######" refer to the bates-stamp numbering in the lower-right corner of each page in the administrative record.

6

that the Bureau must pay these boarding expenses over the entire lifetime of the vast

majority of these horses, at a staggering and escalating cost. ECF No. 115-2 at 2 ("Costs

for lifetime care in a corral approaches $50,000 per horse. With nearly 50,000 horses and

burros already in off-range corrals and pastures, this means that without new

opportunities for placing these animals with responsible owners, the [Bureau] will spend

more than a billion dollars to care for and feed [those animals currently in holding] over

the remainder of their lives."). As a result, much of the Bureau's horse-management

budget is now fixed and committed to off-range boarding costs. AR015213 (explaining

that boarding costs consumed approximately 60% of the Bureau's Horse Management

budget in 2012); AR015799 (explaining that boarding costs consumed approximately

74% of the Bureau's Horse Management budget in 2008).

    The Bureau's ability to remove additional horses from the open range is also

limited by the lack of boarding space at off-range facilities. Many of the current boarding

facilities are at or near maximum capacity. *See* Victor August Warr Declaration (Warr

Decl.) at ¶¶ 9-12.[4] Furthermore, procuring additional off-range facilities is a difficult and

long process. *Id.* Relatively few facilities meet the Bureau's quality-control standards

and, of the facilities that meet the appropriate standards, the Bureau is often at a bidding

disadvantage due to the abilities of cattle companies to pay a higher price. *Id.* Also, if the

---

[4] Generally, review of final agency action is limited to the record directly or indirectly before the agency at the time a final decision was made. But this case does not involve final agency action; rather, this case involves the Bureau's alleged failure to act and continuing failure to act. In these types of cases, the Tenth Circuit has recognized several exceptions to the Administrative Procedure Act's limitation that courts should restrict review of agency action to the administrative record. *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985); *see also Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001). Two of these exceptions are relevant here: Courts have allowed consideration of extra-record materials when: (1) "agency action is not adequately explained and cannot be reviewed properly without considering the cited materials . . ."; and (2) "evidence [has] com[e] into existence after the agency acted demonstrates that the actions were right or wrong . . ." *Am. Mining Cong.*, 772 F.2d at 626 (citations omitted). For these reasons, the Court's consideration of the Bureau's declaration is appropriate.

7

Bureau is able to secure additional space, it takes about two years to finalize the procurement process. *Id*.

As a result of the significant boarding costs and the lack of boarding space at off-range facilities, the Bureau only removes approximately 3,500 horses a year from the open range throughout the West. ECF No. 115-2 at 2. This rate is generally equivalent to the number of horses that annually leave the Bureau's off-range facilities by sale, adoption, or death. *Id*. This average yearly removal of horses from the western range is allocated among all 10 western states according to the most pressing and urgent needs at any given time. ECF No. 115-2 at 4, Table 1.

**C. Efforts to Bring the Bureau's Wild Horse Program onto a Sustainable Path**

Due to these well-documented difficulties in managing wild horses, strategies for managing horse populations are at the forefront of discussion. *See, e.g.*, AR015185. After covering boarding costs, the Bureau has chosen to focus its remaining wild horse-related budget on efforts it feels will most effectively bring its Wild Horse Program onto a fiscally and ecologically sustainable path: (1) the Bureau has recently sponsored a significant research program focused on developing an effective, easily delivered, long-lasting, and affordable fertility control; (2) the Bureau has started transitioning horses from off-range corrals to more cost-effective pastures; (3) the Bureau has worked to increase and incentivize adoptions with new programs and partnerships; and (4) the Bureau has requested legislative authority to allow for the immediate transfer of horses to other agencies that have a need for work animals. ECF No. 115-2 at 2-3. Not only are these efforts designed to free up funding and boarding space for more removal efforts, they also aim to significantly reduce the need for removal efforts. Once it has addressed these top priorities, the Bureau surveys the removal needs among all 10 western states and removes horses from the most problematic areas.

**D. The Bureau's Removal Efforts In Utah On Public Land**

**1. Removal Decisions and Efforts from 2004-2014**

8

1       There are nine herd management areas largely on Federal public lands at issue in
2   this case – Frisco, Blawn Wash, Four-Mile, Bible Springs, Sulphur, Choke Cherry,
3   Muddy Creek, North Hills, and Swasey. Each herd management area also contains some
4   portion of private and State of Utah lands. Warr Decl. ¶¶14-16. As demonstrated by the
5   table below, from 2004 to April 2014, after analyzing the horse-removal needs across all
6   10 western states, the Bureau completed the required analyses under the Wild Horse Act
7   and the National Environmental Policy Act and conducted the approved removals in each
8   of these herd management areas. Also, as noted below, these removals from these areas
9   also resulted in removals from private and State lands in differing degrees. *Id.*

| Herd Management Area (% Private/State Land) | Excess / Removal Determination Date | Record Cite For Decision Document | Completed Gather Date / Number of Removals | Record Cite For Removal Numbers |
|---|---|---|---|---|
| Frisco (19%) | Signed Oct. 2012 | AR001477 | Nov. 2012 114 horses removed | AR003195 |
| Frisco (19%) | Signed Aug. 2005 | AR001464 | Aug. 2006 36 horses removed | AR003190 |
| Blawn Wash (43%) | Signed June 2009 | AR000783 | July 2009 139 horses removed | AR003187 |
| Blawn Wash (43%) | Signed April 2005 | AR001359 | July 2007 40 horses removed | AR003178 |
| Blawn Wash (43%) | Signed Oct. 2005 | AR000898 | Oct. 2005 112 horses removed | AR003184 |
| Four-Mile (14%) | Signed June 2009 | AR000783 | July 2009 88 horses removed | AR003187 |
| Four-Mile (14%) | Signed Oct. 2005 | AR000898 | Oct. 2005 30 horses removed | AR003184 |
| Bible Springs (9%) | Signed June 2009 | AR000783 | July 2009 116 horses removed | AR003187 |
| Bible Springs (9%) | Signed Oct. 2005 | AR000898 | Oct. 2005 46 horses removed | AR003184 |
| Sulphur (13%) | Signed Nov. 2008 | AR001984 | Dec. 2010 30 horses removed | AR003224 |
| Sulphur (13%) | Signed Nov. 2008 | AR001983 | Nov. 2008 333 horses removed | AR003232 |
| Sulphur (13%) | Signed June 2006 | AR002125 | July 2006 186 horses removed | AR003221 |

9

| Choke Cherry (17%) | Signed Oct. 2010 | AR016150 | Jan. 2011 57 horses removed | AR016231 |
|---|---|---|---|---|
| Muddy Creek (5%) | Signed July 2009 | AR011005 | July 2009 87 horses removed | AR011123 |
| Muddy Creek (Sinbad Horses) | Signed July 2008 | AR011073 | July 2008 54 horses removed | AR011122 |
| North Hills (17%) | Signed Nov. 2010 | AR001742 | Dec. 2010 97 horses removed | AR003206 |
| North Hills (17%) | Signed July 2007 | AR001920 | July 2007 88 horses removed | AR003178 |
| North Hills (17%) | Signed Jan. 2012 | AR001818 | Sept. 2005 18 horses removed | AR003209 |
| Swasey (5%) | Signed Dec. 2012 | AR016233 | Feb. 2013 160 horses removed | AR010637 |

The removal actions contemplated by and analyzed in each decision document listed above are now complete. In other words, for the Bureau to remove any additional horses in any of these herd management areas, it must conduct some sort of additional environmental review under the National Environmental Policy Act and make the required removal determinations under Section 3 of the Wild Horse Act. *See, e.g.,* Warr Decl. ¶¶ 21-22.

## 2. Post-2014 Removal Decisions and Efforts

At the time of Petitioners' complaint, filed in April 2014, there was only one operative and current removal determination out of the nine herd management areas at issue. *See* AR001477 (Frisco herd management area).[5] Since the time of Petitioners' complaint, however, the Bureau has made overpopulation and removal determinations for an additional four herd management areas (Blawn Wash, Four-Mile, Bible Springs, and Sulphur).  The Bureau has initiated removal efforts pursuant to those determinations in all five herd management areas:

---

[5] This was the Bureau's first phased-in environmental assessment and removal decision in Utah that contemplated and analyzed multiple removals over a 6-10 year period.

10

| Herd Management Area (% Private/State Land) | Excess / Removal Determination Date | Cite For Decision Documents | Completed Gather Date / Number of Removals | Cite For Removal Numbers | Planned Future Gather Date |
|---|---|---|---|---|---|
| Frisco (19%) | Signed May 2016 | Exh. B to Warr Decl. | July 2016 113 horses removed | Exh. C to Warr Decl. | January 2017 |
| Blawn Wash (43%) | Signed June 2014 | AR001350 | Aug. 2016 158 horses removed | Exh. D to Warr Decl. | January 2018 |
| Blawn Wash (43%) | Signed June 2014 | AR001350 | Aug. 2014 143 horses removed | AR003181 | January 2018 |
| Four-Mile (14%) | Signed June 2014 | AR001350 | N/A | N/A | July 2017 |
| Bible Springs (9%) | Signed June 2014 | AR001350 | Sept. 2014 39 horses removed | AR016259 | July 2017 |
| Sulphur (15%) | Signed May 2016 | Exh. E to Warr Decl. | N/A | N/A | January 2017 |
| Sulphur (15%) | Signed July 2014 | AR002137 | Feb. 2015 103 horses removed | AR003230 | January 2017 |
| Sulphur | Signed July 2014 | AR002137 | July 2014 36 horses removed | AR003180 | January 2017 |

### E.  The Bureau's Removal Efforts In Utah On Private and State Land

In addition to the private and State land removals that resulted from the removal efforts in the nine herd management areas documented above, the Bureau continually attempts, as soon as practicable, to address wild horse concerns from private and State land owners as they arise. With respect to the private lands, this effort is done continually as the Bureau receives phone calls and letters from private landowners.

| Private Land Removals Identified in the Administrative Record | | | | |
|---|---|---|---|---|
| Associated Herd Management Area | Private Land Owner Removal Requestor | Date of Removal | Number of Horses Removed | Cite For Removal Numbers |
| Bible Springs | Robert Holt – Holt Farms LLC | May 2010 | 11 horses removed | AR003210 |

11

| Bible Springs | Fred Woods | July 2010 | 12 horses removed | AR003211 |
|---|---|---|---|---|
| North Hills | Dave Terry | October 2010 | 1 horses removed | AR003212 |
| North Hills | Dave Terry | June 2012 | 6 horses removed | AR003214 |
| Four-Mile | Mackray Wood | January 2012 | 9 horses removed | AR003215 |
| Bible Springs | Fred Woods/Jared Holt | May 2010 | 16 horses removed | AR003216 |
| Multiple private land removals or movement of animals off private lands | | 2013-2016 | 179 horses moved or removed | Exh. F to Warr Decl. |

With respect to the State lands, in February 2016, the Bureau entered into a cooperative settlement agreement with the State of Utah concerning wild horse management activities on lands managed by Utah's School & Institutional Trust Lands Administration. Warr Decl. ¶ 17; Exh. G to Warr Decl. Under this agreement, the Bureau agreed to work cooperatively to manage wild horses on State lands. Warr Decl. ¶ 17. The agencies will meet annually to identify priority removal areas, ensure appropriate environmental review, jointly conduct aerial population surveys, and monitor rangeland resources and improvements. *Id*. The agreement, which is subject to congressional appropriations, places priority on managing herd management areas in the south-central and southwest areas of state. *Id*. However, the agreement also calls for additional efforts in the remainder of the state where other horse challenges arise between State and Bureau. *Id*. Since the agreement, the Bureau has completed the removal of 158 wild horses from the Blawn Wash area. *Id*. Pursuant to the agreement, the Bureau will make reasonable attempts to remove horses on State lands within Blawn Wash and Muddy Creek areas every two years; and, beginning in fiscal year 2017, remove up to 50 horses from State lands on an annual basis. *Id*.

## STANDARD OF REVIEW

Because the Wild Horse Act does not contain an independent grant of jurisdiction or cause of action, the Administrative Procedure Act governs judicial review of the

Bureau's compliance with the Wild Horse Act. *See In Def. of Animals*, 751 F.3d at 1061. A failure-to-act claim "under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. Courts cannot under Section 706(1) compel agencies to comply with "broad statutory mandates" that are "mandatory as to the object[s] to be achieved" but that leave agencies with "discretion in deciding how to achieve" those objectives. *Id.* at 66–67; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). The Administrative Procedure Act imposes this strict limit on a court's jurisdiction "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66.

Thus, relief under Section 706(1), is "reserved only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000); *see also SUWA*, 542 U.S. at 63. Although courts may sometimes compel an agency to "act within a reasonable time," *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982), they are "ill-suited to review the order in which an agency conducts its business" and "hesitant to upset an agency's priorities by ordering it to expedite one specific action." *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987). Thus, the circumstances in which judicial intervention is appropriate are "very limited." *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (limiting review of delayed agency action claims to "extraordinary circumstances").[6]

---

[6] The crux of Petitioners' case clearly centers on "unreasonable delay" under Section 706(1). Petitioners allude to Section 706(2)(A), but never identify final agency action on the part of the Bureau. This is a pre-requisite to bringing suit under the Administrative Procedure Act and the failure to identify final agency action is fatal to any attempted claim under this statutory provision. 5 U.S.C. § 704; *Colorado Farm Bureau Federation v. U.S. Forest Service*, 220 F.3d 1171, 1173-74 (10th Cir. 2000).

1

**ARGUMENT**

2

**I.     Judicial Management of the Bureau's Wild Horse Program is Improper.**

3          Petitioners first argue that, because the Bureau made overpopulation and removal

4     determinations on each of the nine herd management areas on Federal public lands, the

5     Bureau has a mandatory duty to remove horses under Section 3 of the Wild Horse Act

6     and it has failed to do so. Pet. Br. at 8-48. Petitioners also argue that, because the Bureau

7     has received multiple requests from private and State landowners, it has a mandatory duty

8     under Section 4 of the Act to remove horses and has also failed to comply. *See also* Pet.

9     Br. at 49-52. As their requested relief, Petitioners demand that this Court compel the

10    Bureau to immediately remove horses on Federal public lands to within established

11    appropriate management levels. ECF No. 2 at 20-21. And, with respect to the private and

12    State lands, Petitioners demand that the Court not only compel the Bureau to remove the

13    stray horses but also for the Court to force the Bureau to remove the horses to off-range

14    facilities – *i.e.*, not allow the Bureau to move the horses from private/State lands back

15    onto Federal public lands. *Id.*; *see also* Pet. Br. at 51.

16         As explained in more detail below, Petitioners' arguments are without merit.

17    At this time, the Bureau has no duty to remove horses on four of the nine areas of Federal

18    public land at issue (Choke Cherry, Muddy Creek, North Hills, and Swasey herd

19    management areas) because removals have already occurred pursuant to the

20    overpopulation and removal determinations. And, in the remaining five areas of Federal

21    public land (Frisco, Blawn Wash, Four Mile, Bible Springs, and Sulphur herd

22    management areas) and the State and private lands at issue, where a duty to remove

23    horses currently exists, the Bureau has diligently worked to remove horses. Petitioners

24    cannot demonstrate that the agency has unreasonably delayed these actions and their

25    demands for relief ultimately – and inappropriately – invite this Court to judicially

26    manage the Bureau's Wild Horse Program. Therefore, the Court should reject Petitioners'

27    petition and deny their requested relief.

28

14

1

2

**A. With Respect to the Federal Public Lands at Issue, No Duty to Remove Horses Exists on the Choke Cherry, Muddy Creek, North Hills, and Swasey Herd Management Areas Because the Bureau Has Not Made the Required Section 3 Removal Determinations.**

3

4

Petitioners first argue mistakenly that, with respect to the Federal public lands at

5

issue, the Bureau has made overpopulation and removal determinations as required by

6

Section 3 of the Act in and around each of the nine herd management areas. Pet. Br. at 8-

7

48. It is true that the Bureau has made those determinations in five of the nine herd

8

management areas at issue. *See* "Background" Section II.D, above. Those removal

9

determinations are operative and, as further explained below, the Bureau is diligently

10

working to remove horses in those areas. But, contrary to Petitioners' assertion, the

11

Bureau has not made the required removal determination on the remaining four areas –

12

Choke Cherry, Muddy Creek, North Hills, and Swasey. *See* "Background" Section II.D,

13

above. The removal actions contemplated by and analyzed in the decision documents for

14

the Choke Cherry, Muddy Creek, North Hills, and Swasey areas cited by Petitioners are

15

now complete and no longer operative. *See* Pet. Br. at 17-21 (2010 environmental review

16

for North Hills); 22 (2009 environmental review for Muddy Creek); 23-25 (2012

17

environmental review for Swasey); 27-29 (2010 environmental review for Choke

18

Cherry); *see also* Warr Decl. ¶ 21. In other words, for the Bureau to remove any

19

additional horses in any of these herd management areas, it must conduct some sort of

20

additional environmental review under the National Environmental Policy Act and make

21

the required removal determinations under the Wild Horse Act. The mandatory duty to

22

remove horses is not triggered until the Bureau makes the removal determination. *See*

23

*Wyoming*, 2016 WL 5920744, at *4-5.

24

To the extent that Petitioners argue in response that the Bureau still has a duty to

25

remove horses from these four herd management areas because the current numbers

26

(even after the completed removals) still exceed the maximum appropriate management

27

level, that argument must be rejected consistent with recent and binding Tenth Circuit

28

15

precedent. *See Wyoming*, 2016 WL 5920744, at *4-5. The Tenth Circuit held that even where the Bureau has determined that an overpopulation exists, the Wild Horse Act gives the Bureau the discretion to choose the appropriate tools to address that situation. *Id.*; *see also In Def. of Animals*, 751 F.3d at 1060 (noting that the Bureau considered an "alternative that would use only fertility control measures but no herd thinning or relocation"). The Act states that the Bureau has the discretion to determine "whether action should be taken to remove excess animals" and "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1).

The Bureau acknowledges that the horse numbers in these four areas still exceed the appropriate management levels. But, a mandatory duty to remove horses from these four areas will arise only if and when the Bureau, after reviewing the most current information, makes another removal determination concerning these areas. 16 U.S.C. § 1333(b)(1); *Wyoming,* 2016 WL 5920744, at *4-5. Until that time, the Bureau has the discretion to prioritize its horse management actions and decide how best to proceed. Therefore, no mandatory duty to remove exists with respect to these four areas and Petitioners' claims of unreasonable delay must be rejected. *Id.*; *see also SUWA*, 542 U.S. at 63-64 (explaining that unreasonable delay claims require the identification of a "specific, unequivocal command" that the agency is failing to perform as a "ministerial" matter).[7]

**B. Where a Mandatory Duty to Remove Excess Horses Has Been Present on Federal Public, State, and Private Lands, The Bureau's Actions Have Been Reasonable.**

---

[7] Even if there were current and operative removal decisions on these four areas (there is not), Petitioners' unreasonable delay arguments still fail because, as explained below, the Bureau is taking reasonable action to remove horses.

The Bureau's Wild Horse Program faces significant challenges. First, the current on-range horse population totals more than 67,000 and is spread across Federal, State, and private lands among 10 western states. This number is more than twice the amount of horses recommended in the Bureau's land use plans covering the western range and, due to rapid reproduction rates, the on-range horse numbers continue to quickly increase. Second, the Bureau has already removed over 165,000 horses from the western range and currently boards approximately 50,000 of these horses in off-range facilities due to decreased market demand for horse sales and adoption. The Bureau estimates a significant cost of over a billion dollars of its budget to board these horses for life. Third, off-range boarding facilities that meet the appropriate criteria are difficult to procure and current facilities are now at or near maximum capacity. *See* "Background" Section II.B, above.

For these reasons, removing wild horses from the range is simply not a sustainable management option. The significant – and now fixed – cost of boarding nearly 50,000 horses for life combined with limited available boarding space at off-range facilities have severely limited the Bureau's ability to remove additional horses from the western range. In order to bring its Wild Horse Program onto a fiscally and ecologically sustainable path, the Bureau has exercised its broad discretion under the Wild Horse Act to prioritize its remaining available budget in the following order: (1) allocate budget to research and development of technologies that would reduce the on-range horse numbers without the need to physically remove horses and board them for life in off-range facilities; (2) allocate budget to streamline and incentivize the horse adoption program (and other programs) to free up space in the off-range boarding facilities; and (3) allocate budget to remove horses from the most problematic areas within 10 western states. *See* "Background" Section II.C. With this backdrop, the Bureau's work to remove horses and its planned removal work with respect to the areas at issue, *see* "Background" Section II.D & E, have been reasonable.

**1.  Unreasonable delay is determined on a case-by-case basis and is unique in every situation.**

Petitioners do not attempt to quantify a period of time that constitutes unreasonable delay but argues nonetheless that this case qualifies. Pet. Br. at 36-52. Contrary to Petitioners' implication, there is no "*per se* rule as to how long is too long to wait for agency action." *In re Core Commc'ns*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citation omitted); *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). This is especially true in this case where the Wild Horse Act does not impose any specific statutory deadlines. Rather, courts apply the "*TRAC*" factors to determine, on a case-by-case basis, whether an agency's delay is so egregious as to warrant judicial intervention. *In re Cal. Power*, 245 F.3d at 1124 (citing *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*)); *Forest Guardians v. Babbitt*, 164 F.3d 1261, 1272 (10th Cir. 1998), as amended by 174 F.3d 1178 (10th Cir. 1999) (noting the usefulness of the *TRAC* factors in cases, like the one at hand, where a statute sets a "discretionary time schedule" in which the agency can complete its action). When assessing these factors, a court "must remember that, '[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a . . . proceeding is entitled to considerable deference.'" *Sierra Club*, 828 F.2d at 797 (citation omitted).

The *TRAC* factors are: "(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed … , that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) . . . the effect of expediting delayed action on agency activities of a higher or competing priority; (5) . . . the nature and extent of the interests prejudiced by the delay; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'" *Brower v. Evans*, 257 F.3d 1058,

18

1068 (9th Cir. 2001) (citations omitted). Unreasonable delay is determined on a case-by-case basis, is unique in every circumstance, and, as explained further below, not present in this case.

### 2. The Bureau's actions with respect to Federal public lands on the Frisco, Blawn Wash, Four Mile, Bible Springs, and Sulphur herd management areas have been reasonable.

#### a. The pace and timing of the Bureau's removals are discretionary.

The first *TRAC* factor provides that "the time agencies take to make decisions must be governed by a 'rule of reason.'" *Brower*, 257 F.3d at 1068. This factor must be read in concert with the second *TRAC* factor, which states that "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed . . . , that statutory scheme may supply content for this rule of reason." *Id*. Here, the lack of specific statutory deadlines for removal provides context for the Bureau's removal work, endowing the agency with significant latitude when planning and executing gathers and removals. This is especially so where, as here, the Wild Horse Act, while mandating that the removal process begin "immediately" once certain determinations have been made, also mandates that the removal work be prioritized and proceed in stages until the removal is complete. *See* 16 U.S.C. § 1333(b)(2). Additionally, the Act's mandate to "immediately" remove horses must take into account that removals can take years due to limited resources, competing removal needs across 10 western states, the significant lead time needed to organize a removal, and the fact that removals cannot happen during certain times of year like winter and foaling season. Because the Wild Horse Act imposes no specific timetable for removing horses after the Bureau has made the required removal determinations, especially when taking into account all the complex and competing factors surrounding removal actions, there has been no "delay" in this case, much less unreasonable delay.

Petitioners' claim that there has been unreasonable delay with respect to these management areas because the Bureau did not "immediately" remove horses erroneously

presumes that the Bureau was required to remove all excess horses down to the appropriate management levels within a relatively short time, a presumption that is not supported by the Wild Horse Act or any other authority. *See* Pet. Br. at 30-48. Of the five herd management areas with operative overpopulation and removal determinations, the oldest determination was made in May 2014 for the Frisco herd management area. Even assuming that Petitioners' alleged "delay" is measured from May 2014, Petitioners are incorrect that a delay of years – even two years or more – is necessarily unreasonable or unlawful. *Core Commc'ns*, 531 F.3d at 855 (noting no "per se rule as to how long is too long to wait for agency action") (citation omitted). Delays spanning years may be necessary for relief under 5 U.S.C. § 706(1), *In re Cal. Power*, 245 F.3d at 1125-26, but they are not sufficient. *See, e.g., In re United Mine Workers of Am.*, 190 F.3d 545, 546-51 (D.C. Cir. 1999) (eight-year delay did not warrant equitable relief); *Mashpee Wampanoag*, 336 F.3d at 1100-01 (vacating district court's determination that five-year delay was unreasonable); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action despite 10-year delay in issuing rule and 20-year delay in achieving rule's statutory objective).

Here, Petitioners cannot point to any specific statutory or regulatory deadline for the Bureau to remove excess horses down to an appropriate management level. Those deadlines simply do not exist. Contrary to Petitioners' implications, "[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a . . . proceeding is entitled to considerable deference.'" *Sierra Club*, 828 F.2d at 797 (citation omitted). Without a specific statutory timeline to enforce (or at least a regulatory or internal agency deadline to put the question of "delay" into context for the Court), the Bureau's timeline with respect to excess horse removals is entitled to considerable deference.

### b. The Bureau's Wild Horse Program is guided by a rule of reason.

As noted, the first *TRAC* factor considers whether "the time agencies take to make decisions" is governed by a "rule of reason.'" *Brower*, 257 F.3d at 1068. Just as the

timing of agency action is *per se* discretionary absent explicit statutory deadlines (or at least a regulatory or internal agency deadline to put the question of "delay" into context for the Court), an agency's rationale for its chosen timing is itself entitled to deference. *In re Pesticide Action Network N. Am.*, 532 Fed. App'x 649, 650-51 (9th Cir. 2013); *In re Cal. Power*, 245 F.3d at 1125-26. Even where courts have compelled agency action because of some extenuating factor not present in this case (such as the agency's noncompliance with prior court orders), they have explicitly refrained from opining on the wisdom of policy judgments that underscore the pace of agency work. *Core Commc'ns*, 531 F.3d at 859.

Consistent with its significant discretion under the Wild Horse Act, the Bureau's Wild Horse Program has been guided by a rule of reason. The Bureau's budget has never provided sufficient funds to cover the costs of all the competing needs within in its Wild Horse Program. This has forced the Bureau to prioritize its workload and management efforts. As explained above, wild horses multiply rapidly with current population numbers at approximately 67,000 spread across 10 western states, ECF 115-2 at 2-4, and using its limited wild horse-related funds to conduct removal actions only is not a viable management strategy. For these reasons, the Bureau, in ordering its priorities with a limited budget, has decided to take a multi-pronged approach with the goal of obviating or significantly reducing the need for removal actions and boarding horses in off-range corrals, freeing up budget for future removal efforts, and addressing the most problematic areas as needed. Additionally, as explained above, the Bureau has removed horses from the areas at issue and will continue to do so within its multi-faceted management approach. *See* "Factual Background" Section D, *supra*. Given the unique circumstances and challenges facing its Wild Horse Program, the Bureau's management decisions and actions have been reasonable.

       **c.   The Bureau's Wild Horse Program reflects a reasonable allocation of limited agency resources.**

21

The next relevant *TRAC* factor, the fourth factor, considers "the effect of expediting delayed action on agency activities of a higher or competing priority." *Brower*, 257 F.3d at 1068; *Mashpee Wampanoag*, 336 F.3d at 1102 (noting that the issue of unlawful delay depends "in large part . . . upon . . . the resources available to the agency"). As explained above, the Bureau has exercised its considerable discretion and appropriately prioritized its actions to provide the best chance for a long-term solution.

Dissatisfied with the Bureau's prioritization and reasoning, the State of Utah (and Petitioners to a certain extent) argues mistakenly that the Bureau's lack of budget to undertake the removals the State desires is the product of the Bureau's own budget requests. ECF No. 115 at 12-15. The State of Utah even suggests that the Bureau need only ask for additional funding, and then the funds would be appropriated. *Id*. This argument, however, is speculative and overly simplistic. As a practical matter, the Bureau's annual wild horse-related budget request is only one piece of a much larger budgetary puzzle. As relevant here, Bureau budget requests are the product of a careful priority-setting process based on, among other things, historical funding levels and other wild horse-related commitments made by the President, the Secretary, and the Bureau's Director. Because these agency funding requests are impacted by numerous factors, the Bureau's wild horse-related budget request cannot simply be raised unilaterally, as the State of Utah suggests.

In any event, the Bureau does not argue that these budgetary constraints relieve the agency of its duties under the Wild Horse Act, but rather that these constraints are among many factors that must be considered in exercising its discretion to prioritize actions within its Wild Horse Program. Any argument by Petitioners or the Amicus parties that the Bureau cannot rely on budgetary constraints in setting its wild horse priorities is inconsistent with the Wild Horse Act, which implies that the Bureau does not have unlimited resources. 16 U.S.C. §1333(b)(2) (authorizing the Bureau to set priorities). Indeed, if such constraints were irrelevant, there would be no need for Section 3(b)(2) of the Wild Horse Act, which reflects the reality that the Bureau must prioritize its actions

within the budgetary constraints imposed by Congress. *See* 31 U.S.C. §1341(a)(1)(A) (stating an agency cannot make or authorize an expenditure exceeding the appropriation). Thus, the Bureau's consideration of these budgetary constraints was not only appropriate, it was essential in prioritizing its wild horse actions to develop a long-term solution to the growing horse numbers and to be able to address the most pressing needs at any given time among 10 western states all experiencing wild horse problems. The Bureau has reasonably allocated and prioritized limited agency resources.

> **d.  There is no prejudice to warrant judicial intervention in the Bureau's Wild Horse Program.**

The last *TRAC* factor relevant to this case examines the nature and extent of the interests prejudiced by an alleged delay. *Brower*, 257 F.3d at 1068. Contrary to Petitioners' assertion, *see* Pet. Br. at 30-48, the Bureau's decisions and prioritization in executing its Wild Horse Program does not unduly prejudice Petitioners. First, the Bureau must spread its limited wild horse-related funds among 10 western states. Second, forcing the Bureau to make Utah a higher priority takes time, resources, and budget away from the Bureau's efforts to pursue other horse management efforts that are likely to not only free up the budget to conduct more removals in the future but to possibly obviate or significantly reduce the need for future removal efforts. *See* Warr Decl. ¶ 19. In short, giving Utah a higher priority in the Bureau's Wild Horse Program not only is unfair to the other states with wild horse problems but will ultimately prejudice Utah in the long run by delaying research and development of technology that would be more effective in keeping horses populations within appropriate management levels without the need for removals. There is simply no undue prejudice to Petitioners under these circumstances and their argument must fail.

In sum, Petitioners fail to demonstrate a claim for unreasonable delay with respect to the five herd management areas for which the Bureau has made operative removal determinations. As explained above, there is no specific statutory deadline for the completion of removal actions, the Bureau's delay in conducting those removal actions is

reasonable, and there are good reasons for the priorities the Bureau has set. After a fair consideration of these unique circumstances, *see Core Commc'ns*, 531 F.3d at 855, the Bureau's wild-horse decisions and priorities are reasonable and entitled to deference. Petitioners' request that the Court usurp control of the Bureau's Wild Horse Program is inappropriate, unwarranted, and should be rejected.

### 3. Where a Mandatory Duty to Remove Excess Horses Has Been Present on Private and State Lands Under Section 4, The Bureau's Actions Have Been Reasonable.

Petitioners next argue that the Bureau has unreasonably delayed the removal of horses under Section 4 of the Act from several parcels of private land and land owned by the State of Utah School & Institutional Trust Lands Administration. Pet. Br. at 49-52. Like the unreasonable delay claims concerning the Federal public lands, Petitioners' State and private land claims also fail under a *TRAC* factor analysis.

With respect to the first *TRAC* factor, the statute does not provide a specific statutory deadline for horse removal from non-federal lands. Like Section 3 discussed above, Section 4 of the Wild Horse Act also grants the Bureau the discretion to set the timing and pace of horse removals. The Act only states that after receiving the appropriate notice from private landowners, the Bureau "shall *arrange* to have the animals removed." 16 U.S.C. § 1334 (emphasis added). The Bureau's horse removal regulations, 43 C.F.R. § 4720.2-1, further clarify that horse removals from these areas are to occur "*as soon as practicable*." (emphasis added). While a reasonable reading suggests that the Bureau has a duty to eventually remove the wild horses when requested pursuant to Section 4, there can be no dispute that the statutory language requires the Bureau to only make arrangements. The term "arrange" itself evidences clear Congressional intent to provide the Bureau with the utmost discretion to comply with the difficult task of entering private lands and gathering wild horses throughout a multitude of geographical locations and conditions. And the regulatory language leaves the timing of removal to whenever it is "practicable" for the agency.

24

With respect to the remaining relevant *TRAC* factors, the Bureau's approach with the private and State lands has been reasonable. As discussed above, see "Factual Background" Section E, the Bureau, even with the significant challenges facing its Wild Horse Program, has diligently worked to remove horses from the private and State lands at issue in this case. The Bureau continually addresses wild horse concerns from private land owners as they arise on a regular basis. It has been documented that just since 2010, the Bureau has removed numerous horses from the private lands and, depending on available boarding space at off-range facilities, has removed horses from the range or hazed them from private/State lands back onto Federal public lands. *Id*. Additionally, in February 2016, the Bureau entered into a settlement agreement with the State of Utah concerning wild horse issues on State lands. Warr Decl. ¶ 17; Exh. G to Warr Decl. Under this agreement, the Bureau has agreed to work cooperatively with the State of Utah to manage wild horses on State lands. Warr Decl. ¶ 17. The Bureau has already removed horses from State lands pursuant to the agreement and will continue to do so subject to congressional appropriations. *Id*. The Bureau has been diligent in its removal efforts with respect to the private and State lands at issue and, given the unique and challenging circumstance with horse management, its actions have been reasonable. Petitioners' claims of unreasonable delay should be rejected.

## CONCLUSION

Petitioners ask this Court to force the Bureau to move the Federal public, State, and private lands most important to Petitioners to the front of the line – irrespective of the Bureau's higher priorities (that ultimately aim to significantly reduce the need for future removals) or the more urgent and pressing needs of the other western states facing similar problems. But Petitioners provide no basis to justify their extraordinary demands. As explained above, the Bureau had no duty to remove horses on Choke Cherry, Muddy Creek, North Hills, and Swasey herd management areas on Federal public land. And, in the instances where it did have a duty to remove horses from Federal public, State, and private lands, the Bureau has and continues to appropriately exercise its discretion in the

timing, pace, and methods of removal. Given the challenges facing its Wild Horse Program and its management priorities, the Bureau has reasonably acted to remove horses from the areas where a duty to remove exists. Therefore, the Court should reject Petitioners' inappropriate invitation to usurp control of the Bureau's Wild Horse Program and deny their requested relief.

Dated:        October 28, 2016                    Respectfully Submitted,


                                                  JOHN C. CRUDEN,
                                                  Assistant Attorney General
                                                  SETH M. BARSKY, Section Chief
                                                  S. JAY GOVINDAN,
                                                  Assistant Section Chief

                                                  */s/ Rickey D. Turner, Jr.*
                                                  RICKEY D. TURNER, JR.
                                                  Trial Attorney
                                                  U.S. Department of Justice
                                                  Environ. & Natural Resources Division
                                                  Wildlife & Marine Resources Section
                                                  999 18th Street
                                                  South Terrace, Suite 370
                                                  Denver, CO 80202
                                                  Telephone: (303) 844-1373

                                                  *Attorneys for Federal Respondents*

26