William Nicholson Lawton (OR Bar 143685, admitted *pro hac vice*)
Katherine A. Meyer (DC Bar 244301, admitted *pro hac vice*)
Meyer Glitzenstein & Eubanks LLP
(202) 588-5206 (phone)
(202) 588-5049 (fax)
nlawton@meyerglitz.com
kmeyer@meyerglitz.com

Joel Ban (Utah Bar 10114)
Ban Law Office, P.C.
234 E. 2100 S.
Salt Lake City, UT 84115

Attorneys for Defendant-Intervenors
American Wild Horse Preservation Campaign,
The Cloud Foundation, Return to Freedom,
John Steele, and Lisa Friday

## IN THE UNITED STATES DISTRICT COURT – DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| WESTERN RANGELAND CONSERVATION ASSOCIATION, *et al.*,<br>        Plaintiffs,<br><br>v.<br><br>SALLY JEWELL, *et al.*<br>        Defendants,<br>and<br><br>AMERICAN WILD HORSE PRESERVATION CAMPAIGN, *et al.*<br>        Defendant-Intervenors | No. 2:14-cv-00327-JNP-EJF |

## **DEFENDANT INTERVENOR'S RESPONSE BRIEF**

*Oral Argument Requested*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF FACTS ................................................................... 1

   I.    STATUTORY AND REGULATORY BACKGROUND ............................ 2

      A.   The Federal Land and Policy Management Act ....................................... 2

      B.   The Taylor Grazing Act ............................................................. 3

      C.   The Wild Free-Roaming Horses and Burros Act ..................................... 4

      D.   Administrative Procedure Act ....................................................... 9

   II.  FACTUAL BACKGROUND ....................................................... 10

      A.   BLM Favors Livestock Over Wild Horses On Utah's Public Lands. .... 11

      B.   BLM Routinely Removes Wild Horses From Public And Private Lands In Utah, As Well As Implements Fertility Control Measures To Control Wild Horse Population Growth ............................................................. 13

      C.   BLM Regularly Removes Wild Horses From Private Lands. ............... 18

      D.   Prior Proceedings In This Case ........................................... 19

ARGUMENT ..................................................................................... 21

   I.   PLAINTIFFS' FAILURE TO ACT CLAIMS ABOUT REMOVAL OF WILD HORSES FROM PUBLIC LANDS ARE NOT JUSTICIABLE BECAUSE BLM HAS ACTED AND CONTINUES TO ACT. ................. 22

      A.   Plaintiffs' Claims Regarding Decisions BLM Made Before 2012 Are Moot Because BLM Fully Implemented Those Decisions. ................... 23

      B.   Plaintiffs' Claims About BLM Decisions From And After 2012 Are Not Ripe. ......................................................................... 27

i

II.   PLAIN STATUTORY LANGUAGE AND BINDING PRECEDENT
      FORECLOSE PLAINTIFFS' FAILURE TO ACT CLAIMS REGARDING
      PUBLIC LANDS. ................................................................................ 31

   A.   Binding Precedent And The WHA's Plain Language Establish That
        BLM Has Discretion To Decide Whether Or Not To Make The Excess
        Determinations That Trigger Any Duty To Remove Wild Horses From
        Public Lands. ................................................................................ 32

   B.   Plaintiffs Cannot Use Outdated Decision Records To Compel Any
        Further Removals Of Wild Horses From HMAs In Utah. ..................... 36

   C.   This Court May Not Compel BLM To Remove Horses From Public
        Lands Outside HMAs. ........................................................................ 37

III.  PLAINTIFFS CANNOT SHOW BLM HAS UNREASONABLY
      DELAYED ANY WILD HORSE MANAGEMENT ACTIONS ON
      PUBLIC OR PRIVATE LANDS. ......................................................... 40

   A.   BLM Has Not Unreasonably Delayed Implementation Of The Decision
        Records On Which Plaintiffs Rely. ...................................................... 43

   B.   BLM Has Not Unreasonably Delayed Action On Any Valid Request To
        Remove Wild Horses From Private Lands. ........................................... 45

   C.   In Light Of The Complexity And Administrative Difficulties Inherent In
        BLM's Management Of Wild Horse Populations, The Pace Of BLM's
        Actions Is Reasonable. ....................................................................... 50

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..................................... 59

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS 59

CERTIFICATE OF SERVICE ............................................................................ 60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Wild Horse Pres. Campaign v. Jewell*,
  No. 15-8033, slip op. (10th Cir. Oct. 24, 2016)............................................*passim*

*Anderson v. U.S. Dept. of Labor*,
  422 F.3d 1155 (10th Cir. 2005) ...........................................................................32

*Ash Creek Mining Co. v. Lujan*,
  934 F.2d 240 (10th Cir. 1991) .............................................................................28

*Clappier v. Flynn*,
  605 F.2d 519 (10th Cir.1979) ..........................................................................4, 17

*Coal. for Sustainable Res. v. U.S. Forest Serv.*,
  259 F.3d 1244 (10th Cir. 2001) ...........................................................................30

*Disability Law Ctr. v. Millcreek Health Ctr.*,
  428 F.3d 992 (10th Cir. 2005) .............................................................................23

*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999) ....................................................................*passim*

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006)...................................................................7, 27, 36

*Gordon v. Norton*,
  322 F.3d 1213 (10th Cir. 2003) ......................................................................28, 30

*In Def. of Animals v. U.S. Dept. of Interior*,
  751 F.3d 1054 (9th Cir. 2014) .............................................................................35

*Lujan v. Nat'l Wildlife Fedn.*,
  497 U.S. 871 (1990)..............................................................................10, 40, 48

*Pittsburg & Midway Coal Mining v. Watchman*,
  52 F.3d 1531 (10th Cir. 1995) .............................................................................33

*Public Lands Council v. Babbitt,*
    529 U.S. 728 (2000)..................................................................................3

*Qwest Commc'n Intern., Inc. v. FCC,*
    398 F.3d 1222 (10th Cir. 2005) ...........................................................*passim*

*Rio Grande Silvery Minnow v. Bureau of Reclamation,*
    601 F.3d 1096 (10th Cir. 2010) ...........................................................23

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996)................................................................................33

*SITLA v. Jewell,*
    No. 2:15-cv-00076-BCW, ECF No. 26 (D. Utah Feb. 4, 2016)........................47

*Southern Utah Wilderness Alliance v. Babbitt,*
    No. 2:99-cv-852, 2000 WL 33347722 (D. Utah Dec. 22, 2000)......................41

*Southern Utah Wilderness Alliance v. Smith,*
    110 F.3d 724 (10th Cir. 1997) ...........................................................23, 26, 36

*State of Wyoming v. U. S. Dept. of Interior,*
    No. 15-8041, slip. op. (10th Cir. Oct. 11, 2016).........................................*passim*

*Tokoph v. U.S.,*
    774 F.3d 1300 (10th Cir. 2014) ...........................................................33

*United States v. Martinez,*
    518 F.3d 763 (10th Cir. 2008) ...........................................................40

*United States v. Fuller,*
    409 U.S. 488 (1973).............................................................................3

*Wyandotte Nation v. Salazar,*
    939 F. Supp. 2d 1137 (D. Kan. 2013).......................................................54, 55

*Wyoming v. U.S. Dept. of Agr.,*
    414 F.3d 1207 (10th Cir. 2005) ...........................................................23

*Wyoming v. U.S. Dept. of Agriculture,*
    661 F.3d 1209 (10th Cir. 2011) ...........................................................2

**Statutes**

5 U.S.C. § 706(1) ...................................................................................*passim*

5 U.S.C. § 706(2)(A)........................................................................10, 39, 40

16 U.S.C. § 1331 .....................................................................................51, 53

16 U.S.C. § 1332 ............................................................................................38

16 U.S.C. § 1333 ....................................................................................*passim*

16 U.S.C. § 1334 ....................................................................................*passim*

43 U.S.C. § 315b ..........................................................................................3, 4

43 U.S.C. § 315f ...............................................................................................3

43 U.S.C. § 1712(a) .........................................................................................5

**Regulations**

40 C.F.R. § 1502.14(a) ....................................................................................6

43 C.F.R. § 4700.0-2 .......................................................................................5

43 C.F.R. § 4700.0-5(d) ...................................................................................6

43 C.F.R. § 4710.1 ......................................................................................6, 11

43 C.F.R. §§ 4710.2 .........................................................................................6

43 C.F.R. § 4710.3-1 ........................................................................................6

43 C.F.R. § 4710.5(a) ...................................................................................3, 8

43 C.F.R. § 4710.5(c) .................................................................................8, 30

43 C.F.R. § 4720.2-1 .............................................................................*passim*

## STATEMENT OF FACTS

This case reflects the livestock industry's misguided attempt to wrest away from the Bureau of Land Management ("BLM") the extremely complicated, technical, and discretionary task of multiple-use management of public lands under BLM's jurisdiction.  Plaintiffs are a collection of members of, and advocates for, the livestock industry which, as the Court of Appeals for this Circuit recently explained, are permitted to graze their sheep and cattle on public lands "at rates far below market value." *Am. Wild Horse Pres. Campaign v. Jewell*, No. 15-8033, slip op. at 9-10 (10th Cir. Oct. 24, 2016).  Despite the fact that Plaintiffs' grazing permits create no right or title to public lands, Plaintiffs view wild horses as unwanted competition for the limited forage and water on public lands.  As such, Plaintiffs now ask this Court to compel BLM to remove wild horses from certain public lands in Utah in order to promote cattle grazing.  However, Plaintiffs deeply misconstrue both the law and facts in advancing arguments that are clearly foreclosed by plain statutory language and extremely clear precedent in the Supreme Court and the Court of Appeals for this Circuit.  Therefore, for reasons described more fully below, this Court should enter judgment in favor of Defendants, including Defendant-Intervenors American Wild Horse Preservation Campaign ("AWHPC"), The Cloud Foundation, Return to Freedom, John Steele,

and Lisa Friday (collectively referred to as "AWHPC" or "Defendant-Intervenors").

## I.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Federal Land and Policy Management Act

BLM's general charter derives from the Federal Land and Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1787, which directs BLM to manage public lands "on the basis of multiple use," *id.* § 1701(a)(7), a duty BLM discharges through a comprehensive land use planning process, *id.* § 1712.  BLM's planning process yields Resource Management Plans ("RMPs"), which are extensive documents that consider the bevy of resources and uses on public lands, including—among many other issues—livestock grazing and wild horses.  *E.g.*, BLM, Price Field Office, *Record of Decision and Approved Resource Management Plan* (Oct. 2008) [hereinafter "Price RMP"].[1]  BLM's multiple use land management planning in RMPs requires the agency to balance numerous technical issues and, accordingly, is extremely discretionary.  *See*, *e.g.*, *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1235 (10th Cir. 2011) (noting that multiple use

---

[1] Although the Price RMP appears in the index for the Administrative Record, it is not Bates numbered.  The AR index links to the BLM's website, where the entire Price RMP is available at http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.58259.File.dat/Price%20Final%20Plan.pdf

management "breathes discretion at every pore") (quoting *Perkins v. Bergland*, 608 F.2d 803, 806–07 (9th Cir. 1979)).

### B.   **The Taylor Grazing Act**

Congress passed the Taylor Grazing Act ("TGA"), 43 U.S.C. §§ 315-315r, "to stop injury to the lands from overgrazing and soil deterioration" and to "stabilize the livestock industry," which in the absence of regulation had wrought havoc on the public range. *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000). Under the TGA, the Secretary of the Interior, through BLM, is "authorized" to issue permits for the grazing of livestock on public lands "upon the payment . . . of reasonable fees." 43 U.S.C. § 315b. However, as the statute's text specifies, "the creation of a grazing district or the issuance of a [grazing] permit . . . *shall not create any right, title, interest, or estate in or to*" public lands. *Id.* (emphasis added); *see also United States v. Fuller*, 409 U.S. 488, 494 (1973) ("The provisions of the [TGA]... make clear the congressional intent that *no compensable property right be created in the permit lands themselves as a result of the issuance of the permit.*") (emphasis added). The TGA further provides that the Secretary "is authorized, in his discretion, to . . . classify any lands . . . within a grazing district" as "*more valuable or suitable for any other use,*" 43 U.S.C. § 315f (emphasis added), including use by wild horses. 16 U.S.C. § 1333(a); *see also* 43 C.F.R. § 4710.5(a) (stating that BLM may prohibit grazing on public lands where necessary

to protect wild horses).  As mentioned *supra*, the Court of Appeals recently observed that BLM administers the TGA to allow livestock owners to graze their animals on public lands "at rates far below market value." *AWHPC v. Jewell*, No. 15-8033, slip op. at 9-10; *see also* 43 U.S.C. § 315b (authorizing collection of grazing fees).[2]

### C.     The Wild Free-Roaming Horses and Burros Act

Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340, in 1971, proclaiming that wild horses are "living symbols of the rugged independence and tireless energy of our pioneer heritage" and "a national esthetic resource."  S. Rep. No. 92-242, at 2149 (1971).  Congress further declared that wild free-roaming horses and burros "contribute to the

--------

[2] According to a recent study by the Congressional Research Service, BLM charged $1.35 per animal unit month ("AUM")—a month's use and occupancy of the range by one animal— through February 2013, which is the "lowest fee that can be charged" and far below market value. Carol Hardy Vincent, Cong. Research Serv., RS21232, *Grazing Fees: Overview And Issues* 1 (2012), *available at* http://fas.org/sgp/crs/misc/RS21232.pdf. This report also explains that BLM "typically spend[s] far more managing their grazing programs than they collect in grazing fees," with one study estimating that "the federal cost of an array of BLM" and other agency programs "that benefit grazing or compensate for the impacts of grazing" is roughly $500 million annually in taxpayer dollars. *Id*. at 2; *see also Clappier v. Flynn,* 605 F.2d 519, 535 (10th Cir.1979) (courts may properly take notice of official government publications).  The price per AUM was recently increased to a mere $1.69, only 34 cents more than the minimum as set in 1986. AR015891.

diversity of life forms within the Nation and enrich the lives of the American people."  16 U.S.C. § 1331.  Thus, Congress sought to guarantee that "wild free-roaming horses and burros *shall be protected* from capture, branding, harassment, [and] death," and "be considered in the area where presently found, as an integral part of the natural system of the public lands."  *Id.* (emphasis added). As the Court of Appeals recently reiterated, the Act "is nothing more than a land-use regulation authorized by Congress to ensure the survival of a particular species of wildlife." *AWHPC v. Jewell*, No. 15-8033, slip op. at 4 (quoting *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1435 (10th Cir. 1986).

The WHA directs the Secretary of the Department of Interior, through BLM, "to protect and manage wild free-roaming horses and burros as components of the public lands."  16 U.S.C. § 1333(a); § 1331 (stating that the animals "are to be considered . . . as an integral part of the natural system of the public lands"); 43 C.F.R. §§ 4700.0-2 (instructing BLM to manage wild horses and burros "under the principle of multiple use").  As a result, BLM must consider protection of wild horses when preparing or amending RMPs under FLPMA.  *See* 43 U.S.C. § 1712(a); *see also* AR010799-AR010800 (BLM Handbook requiring consideration of wild horses when formulating land use plans).

The WHA further mandates that the Secretary "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a

thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a).  To

achieve this directive, the WHA provides that the Secretary "shall maintain a

current inventory of wild free-roaming horses and burros on given areas of public

lands," *id*. § 1333(b)(1), which BLM does for individual herd management areas

("HMA").  43 C.F.R. §§ 4710.2, 4710.3-1; AR010822-AR010827 (BLM

Handbook).  BLM establishes HMAs "for the maintenance of wild horse and burro

herds," 43 C.F.R. § 4710.3-1, based on the geographic areas that wild horses used

when Congress enacted the WHA in 1971.  43 C.F.R. § 4700.0-5(d).  BLM

designates and modifies HMAs when preparing RMPs. 43 C.F.R. § 4710.1;

AR010799-AR010800 (BLM Handbook).  HMAs are also subject to Herd

Management Area Plans ("HMAP"). 43 C.F.R § 4710.3-1; AR010828-AR010835

(BLM Handbook).

BLM sets an appropriate management level ("AML") for each HMA

through the RMP planning process governed by FLPMA, as well as through

compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

4321-4370, which requires all agencies to examine the environmental impacts of

their decisions and to "[r]igorously explore" alternative actions that would have

less adverse impacts, 40 C.F.R. § 1502.14(a); AR 010810.  "AMLs are determined

through revisions to the applicable [RMP]."  As the Court of Appeals recently

affirmed, BLPMA "prohibits BLM 'from modifying AMLs until [it] has evaluated

specific evidence and data as part of an extensive notice-and-comment RMP

amendment process.'" *AWHPC v. Jewell*, No. 15-8033, slip op. at 31 (quoting

AWHPC's position on this issue with which the Court agreed).

Because the WHA requires that "[a]ll management activities shall be at the

minimal feasible level," 16 U.S.C. § 1333(a), BLM aims to maintain a "thriving

natural ecological balance" on the public range, *id.*, by, in part, expressing AMLs

"as a population range within which [wild horses] can be managed for the long

term" in a given HMA.  AR010808-AR010809 (BLM Handbook); *see also*

*AWHPC v. Jewell*, No. 15-8033, slip op. at 5 (explaining how BLM calculates

AML).  Local BLM offices "have significant discretion to determine their own

methods of computing AML[s] for the herds they manage."  *Fund for Animals,*

*Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006).  Thus, as the

Supreme Court observed in *Norton v. Southern Utah Wilderness Alliance*

("*SUWA*"), the WHA provides BLM with a "broad statutory mandate" to carry out

its duties under the WHA, 542 U.S. 55, 66–67 (2004).

The WHA further allows—but does not require—BLM to manage wild

horses by removing "excess" animals from public lands.  However, as the Court of

Appeals for this Circuit recently held in *two* separate wild horse cases,  BLM may

do so only after it has determined *both* that (1) "an overpopulation [of wild horses]

exists on a given area of the public lands" and (2) "action is necessary" to remove

7

such animals to maintain a "thriving natural ecological balance." 16 U.S.C. §

1333(b)(2); *Wyoming v. U. S. Dept. of Interior*, No. 15-8041, slip. op. at 12-14

(10th Cir. Oct. 11, 2016); *AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27.

Further demonstrating that BLM *may*—but is not *required* to—remove "excess"

wild horses from public lands, the WHA expressly allows BLM to use "other

options" to manage wild horse populations, such as the use of fertility control, sex

ratio management, or the introduction of predators.  *See Wyoming.*, No. 15-8041,

slip op. at 12 (quoting 16 U.S.C. § 1333(b)(1)).

In addition to removing "excess" wild horses from public lands—or using

"other options" to manage wild horse populations—BLM has discretion to "close

appropriate areas of the public lands to grazing use by all or a particular kind of

livestock" if "necessary to provide habitat for wild horses."  43 C.F.R. § 4710.5(a).

BLM may also close public lands to grazing permanently or temporarily "[a]fter

appropriate public consultation," *id.* § 4710.5(c), which entails a "site-specific

environmental analysis and issuance of a proposed and final decision." AR010801

(BLM Handbook).  Once that process has been completed, BLM must then issue a

formal "Notice of Closure" to the "affected and interested parties."  43 C.F.R. §

4710.5(c).

In addition to vesting BLM with authority and discretion to manage wild

horses on public lands, Section 4 of the WHA also protects wild horses that stray

onto private lands.  16 U.S.C. § 1334.  Thus, landowners may not remove or kill

such horses.  *Id.*  Instead, a landowner may inform BLM that wild horses have

strayed onto its private land, and BLM "shall arrange to have the animals

removed."  *Id.*  To trigger this requirement, a landowner must provide a "written

request" to BLM indicating "the numbers of wild horses or burros, the date(s) the

animals were on the land, legal description of the private land, and any special

conditions that should be considered."  43 C.F.R. § 4720.2-1.  After BLM receives

that request, it will arrange to remove wild horses from such private lands "as soon

as practicable."  *Id.*; *see generally AWHPC v. Jewell*, No. 15-8033, slip op. at 6–7

(explaining BLM's authority under Section 4 of the Act).

### D.   __Administrative Procedure Act__

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides

for judicial review of administrative agencies' actions and failures to act.  Under

Section 706(1) of the APA, "[t]he reviewing court shall…compel agency action

unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  As the

Supreme Court has explained, claims to compel agency action "unlawfully

withheld" or "unreasonably delayed" under 706(1) "can proceed only where a

plaintiff asserts that an agency failed to take a *discrete* agency action that it is

*required to take*."  542 U.S. at 63–64 (emphasis in original).  In the Tenth Circuit,

when an agency does not face a "date-certain deadline" for a discrete, non-

discretionary duty, courts must consider whether the action has been "unreasonably delayed" (as opposed to "unlawfully withheld").  *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).  To determine whether a delay is "unreasonable," courts consider several factors, including the extent and consequences of delay, "the reasonableness of the delay in the context of the legislation authorizing agency action," "administrative difficulties bearing on the agency's ability to resolve an issue," and "the complexity of the task envisioned by a court's remand order."  *Qwest Commc'ns Int'l., Inc. v. FCC*, 398 F.3d 1222, 1238–39 (10th Cir. 2005).  Additionally, Section 706(2) of the APA allows courts to consider whether final agency actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 882 (1990) ("'[A]gency action' . . . must be 'final agency action.'").

## II.   <u>FACTUAL BACKGROUND</u>

Plaintiffs are a collection of members of, and advocates for, the livestock industry who view wild horses as competition for forage and water on rangelands in Utah.  Essentially, Plaintiffs believe that there are too many wild horses on certain public lands in Utah and are upset that BLM has not acted more quickly to correct this perceived problem.  Because Plaintiffs have misleadingly portrayed

wild horses as voraciously overrunning the range and BLM as an agency asleep at the reins, a brief recounting of the actual underlying facts is in order.

### A.   BLM Favors Livestock Over Wild Horses On Utah's Public Lands.

The lands at issue in this case are a collection of seven HMAs in Utah, as well as a smattering of private ranch lands situated in close proximity to these HMAs.  BLM manages the public lands at issue, including public lands within and outside HMAs, under multiple use principles the agency establishes through the RMP process under FLPMA.  *E.g.*, 43 C.F.R. § 4710.1; *see also AWHPC v. Jewell*, No. 15-8033, slip op. at 31.  Although BLM manages the public lands to allow a population of roughly 4,550 wild horses in all HMAs throughout Utah, AR 010646, BLM also allows the livestock industry to graze a vastly greater number of cattle on a much larger amount of public lands, *See* BLM, *Utah Grazing*.[3]  As a typical example, one RMP in Utah allocates 33 times more forage to livestock as to wild horses.  *See* Price RMP, *supra* note 1, at 88, 100.  In managing public lands largely for the benefit of the livestock industry, and at rates subsidized by the U.S. taxpayers, BLM spends far more taxpayer funds on projects that benefit livestock

---

[3] BLM provides general information about grazing in Utah on its website at http://www.blm.gov/ut/st/en/prog/grazing.html.  BLM allows grazing on 22 million acres of public lands in Utah. *Id.*

industry members such as Plaintiffs than it recovers from the collection of nominal

below- market grazing fees. AR 015884.

As a result of extensive grazing mostly by livestock, and to a far lesser

extent wild horses, BLM must routinely expend taxpayer funds on rangeland

improvement projects that increase the amount of forage and water available to

users of the range.  For example, in 2010 BLM initiated the Hamlin Valley

Resource Protection and Habitat Improvement Project based on monitoring data

that revealed that numerous livestock allotments—including several allotments

grazed by Plaintiffs—were not meeting rangeland health guidelines due largely to

excessive livestock grazing.  AR 013088, 013094, 013142–43.  For example, BLM

noted that "historic and current livestock management" contributed to rangeland

degradation, AR 015954, and that "excessive livestock use" had occurred in

several areas, AR 007664.  In fact, the record shows that certain of the Plaintiffs in

this case have specifically contributed to rangeland degradation through excessive

livestock grazing.  *See*, *e.g.*, AR 016117 (noting grazing in violation of permit

terms by Plaintiff Escalante Farms); AR 016118 (noting Plaintiff Escalante Farms

indicating it would likely continue excess grazing).  Consequently, BLM is forced

to expend taxpayer funds on implementing rangeland improvement projects to

correct overgrazing by livestock and to ensure progress toward meeting rangeland

health standards.  AR 013142.

**B.    BLM Routinely Removes Wild Horses From Public And Private Lands In Utah, As Well As Implements Fertility Control Measures To Control Wild Horse Population Growth.**

Despite the extreme degree to which livestock outnumber wild horses in Utah, BLM intensively manages wild horse populations in the state by regularly removing wild horses from the range.  Moreover, because BLM removes far more wild horses than it is able to place through its wild horse adoption program, *e.g.* AR 010688 (showing removal of 313 wild horses and adoption of only 64), BLM's regular removals of wild horses from public lands in Utah contribute to the nationwide problem of overcrowding in BLM's long-term wild horse holding facilities, *see* AR 012173 (showing BLM seeking new holding facilities in response to overcrowding). Of particular relevance to this case, BLM has implemented the following decisions to remove wild horses *from the very areas about which Plaintiffs allege failure to act in this case.*

*1.    Muddy Creek*

With respect to the Muddy Creek HMA, BLM decided on July 9, 2009 that a removal of wild horses was necessary.  AR 011008.  In addition to removing horses to achieve the relevant AML, BLM decided to administer a safe, effective, and humane form of fertility control to any mares that it rounded up and subsequently returned to the range.  AR 011006.  Between July 12 and 15, 2009, BLM implemented this decision and removed 87 wild horses.  AR 0011124.

13

BLM's action resulted in the relevant wild horse population falling *below* the relevant AML—an action that is not supposed to occur without a formal amendment to the relevant RMP under FLPMA.  *See* AR 011171; *see also AWHPC v. Jewell*, at 31 (agreeing that "BLM was required to go through the formal RMP amendment process under FLPMA in order to reduce the AMLs").

### 2.    *Chokecherry*

With respect to the Chokecherry HMA, on October 21, 2010, BLM decided to remove wild horses to bring the population within the relevant AML.  AR 016154.  In addition to removing horses, BLM decided to administer fertility control and alter the herd's natural sex ratio for the stated purpose of reducing its population growth rate and "to extend the time before another gather to remove excess wild horses would be needed."  AR 016151.  Between January 5 and 18, 2011, BLM removed wild horses from this HMA and fully achieved the agency's goals for this decision.  AR 016228–29; *compare* AR 016161 (proposing to remove 49 wild horses) *with* AR 010640 (showing BLM removed 57 wild horses).

### 3.    *North Hills*

On November 1, 2010, BLM decided to remove wild horses from the North Hills Wild Horse Management Plan Area ("North Hills").  AR 001746.  BLM also decided to administer fertility control and manipulate the herd's sex ratio for the stated purpose of reducing its population growth rate.  AR 001743.  On December

2, 2010, BLM implemented this decision, removing 97 horses and reducing the herd's population to within AML.  AR 003205.[4]

### 4.   Sulphur

On November 4, 2010, BLM decided to remove wild horses from the Sulphur HMA and bring the herd's population within AML.  AR 002151.  BLM also decided to treat mares with contraceptive fertility control and manage the herd's sex ratio to "slow population growth" and extend the amount of time before another removal would be necessary.  AR 002148.  Between December 13 and December 18, 2010, BLM removed precisely the targeted number of horses. *Compare* AR 002147 (authorizing removal of 30 horses) *with* AR 003224 (showing BLM removed 30 horses).

### 5.   BLM's Phased Approach

In addition to the specific measures described above, in 2012 BLM began a "phased-in" approach to the management of wild horse populations in the remaining three decisions Plaintiffs cite in their opening brief. *E.g.* AR 001477. The agency designed this phased approach as a way to manage wild horse

---

[4] *See also* BLM, *North Hills Wild Horse Gather*, http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/northHillsGather/gatrepo rts.html (noting on December 2, 2010 that BLM "reached the Appropriate Management Level . . . and [] ceased operations on the North Hills gather").

populations by "gradually removing excess animals, implementing fertility control, and adjusting sex ratios" over a span of years. *Id.* Within the span of years for each phased decision, the particular schedule for implementation actions depends on facts on the ground, including the effectiveness of fertility controls, population growth rates, and actual populations of wild horses in each HMA. *E.g.* AR 001478. BLM designed this phased approach both to reduce "disturbance to individual horses and the herd[s]" and to reduce pressure on BLM's overtaxed holding facilities and the wild horse "adoption or sale pipelines." AR 001478–79.

Indeed, three of the decision documents that Plaintiffs cite as examples of BLM's ostensible failure to act reflect BLM's new phased approach to wild horse population management in various HMAs in Utah. Thus, on October 17, 2012, BLM issued a decision for a "phased-in approach" to managing wild horses in the Frisco HMA. AR 001477. BLM designed this approach to last between 6 to 10 years—until at earliest 2018—with the schedule of particular implementing actions dependent upon conditions on the ground. AR 10478–79. Only a month later, BLM began implementing this phased approach by rounding up wild horses between November 27 and December 6, 2012, removing some from the range and administering fertility control to others. AR 003195. BLM has also continued to implement this phased approach. For example, as recently as July 2016, BLM

implemented a wild horse roundup in the Frisco HMA that removed 113 wild horses from the range.  *See* BLM, *Conger Frisco Wild Horse Gather*.[5]

Similarly, on December 14, 2012, BLM issued a decision to adopt a phased approach to managing wild horse populations in the Swasey HMA.  AR 016240. As with the prior phased approach, BLM decided not only to remove wild horses, but also to administer fertility control and manipulate sex ratios to reduce how often roundups would be necessary and to reduce the pressure on BLM's overtaxed wild horse holding and adoption facilities.  AR 016233–34.  BLM scheduled this phased approach to management in the Swasey HMA to last between 5 to 10 years—until at earliest December 2017—with the schedule of particular implementing actions dependent upon various conditions on the ground.  AR 016234.  Roughly a month later, between February 11 and 16, 2013, BLM began implementing this phased approach by rounding up wild horses, removing some, and administering fertility control to the population it released back onto the range. AR 016242.

---

[5] This record is available on BLM's website at http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/conger-frisco_gather.html. *See Clappier*, 605 F.2d at 535 (approving judicial notice of official government publications).

Completing the list of the decision records that Plaintiffs cite as ostensible examples of BLM's failure to act, on June 23, 2014, BLM decided that a phased approach to wild horse population management would also be appropriate for the Bible Springs Complex (which includes the Blawn Wash HA and the Bible Springs, Four Mile, and Tilly Creek HMAs).  AR 001355, 001350.  As with the other phased approaches, BLM decided to adopt various wild horse population management methods, including not only removals but also fertility control and sex ratio alteration, over a span of 6 to 10 years—lasting until at earliest 2020.  AR 001352.  The particular schedule for implementing actions would depend, as with the other decisions, on various factors such as "gather success, holding capacity limitations, population growth rates [and] other national gather priorities or other circumstances."  AR 001174.  Roughly a month later, between July 27 and August 1, 2014, BLM began implementing this decision by removing horses from the range and by administering fertility control and altering the sex ratio of the horses returned to the range.  AR 003180–82.

### C.   BLM Regularly Removes Wild Horses From Private Lands.

In addition to complaining about BLM's ostensible delay in managing wild horses on public lands, Plaintiffs complain about ostensible delay in removing wild horses from private lands as well.  However, the record is replete with examples of BLM acting promptly to remove wild horses from private lands.  *See* AR 005597,

003210, 005647, 003215 003218, 003212–14, 005593, 005623.  Additionally, the record clearly reflects that any delay in such removals from private lands is due to BLM's administrative difficulties that include a need to prioritize other removals on the basis of health and safety, as well as the obstacles of lacking resources to conduct roundups and lacking space for removed horses in BLM's long-term holding facilities.  AR 011735.  The record also reflects that BLM has clearly and repeatedly communicated these difficulties to private landowners.  *See* AR011475 (letter from BLM to Plaintiff Platt explaining budget and holding facility challenges); AR011473 (similar letter to Plaintiff Wintch); AR005582 (similar letter to Plaintiff Wood).  Accordingly, the record reflects prompt agency action to remove wild horses from private lands on a regular basis, and "as soon as practicable" as required by the agency's own regulations.  43 C.F.R. § 4720.2-1.

## D.    <u>Prior Proceedings In This Case</u>

On April 30, 2014 Plaintiffs filed a Complaint, ECF No. 2, seeking to compel BLM to remove wild horses from public and private lands in Utah, and filed an amended Complaint on January 30, 2015, ECF No. 51, seeking the same remedies but removing some Plaintiffs and adding others.  On September 5, 2014, this Court granted intervention to Defendant-Intervenors AWHPC et al, ECF No. 40.  On October 21, 2014, AWHPC filed a motion for judgment on the pleadings, ECF No. 45, arguing that Plaintiffs had failed to state a cognizable claim for

19

removal of wild horses from public lands because BLM has no *mandatory* duty to remove wild horses in the absence of a *discretionary* determination the removal of excess wild horses is necessary—which, at that stage, Plaintiffs had not identified. Similarly, AWHPC argued that Plaintiffs had failed to state a cognizable claim with regard to private lands because BLM had not unreasonably delayed any action.  Plaintiffs filed an opposition to AWHPC's motion on November 18, 2014, ECF No. 47.

On March 25, 2015, Judge Dee Benson held an oral argument on AWHPC's motion for judgment on the pleadings, *see* ECF No. 55.  Both in Plaintiffs' opposition to AWHPC's motion and at oral argument, Plaintiffs took the position that BLM has a duty to remove wild horses any time wild horse populations are above the AML for a parcel of public lands.  AWHPC consistently explained that, to the contrary, the plain text of the WHA establishes that BLM does not incur any duty to remove wild horses from public lands until it has determined *both* that (1) an overpopulation exists *and* that (2) action is necessary to remove wild horses to maintain a thriving natural ecological balance.  AWHPC further explained that a population over AML is relevant only to the first determination, and that the second determination—which also *must* be made—is completely discretionary on the part of the agency, particularly in light of all of the factors that the agency is

required to balance when making such decisions.  However, on April 3, 2015,

Judge Benson denied AWHPC's motion, ECF No. 63.

## ARGUMENT

In their opening brief, Plaintiffs abandon their main argument against

AWHPC's motion for judgment on the pleadings.  Evidently conceding that BLM

incurs a duty to remove wild horses from public lands only *after making a*

*discretionary determination* that removal is necessary, Plaintiffs no longer argue

BLM must remove all horses above AML, but instead point to seven decisions

BLM made from 2009 to 2014 as ostensible examples of formal "excess"

determinations BLM has failed to implement.  Ironically, however, Plaintiffs' own

brief shows BLM's implementation of these same decisions, which the record

reveals has been prompt and thorough.  Therefore, because BLM has fully

implemented, or is continuing to implement, these decisions, Plaintiffs' claims

about BLM's failure to remove wild horses from public lands simply are not

justiciable.

Moreover, any further argument that BLM is violating any mandatory duty

to remove horses from public lands in Utah has now been squarely rejected by not

only the Supreme Court, *SUWA*, 542 U.S. at 66–67, but also by two recent Tenth

Circuit decisions.  *Wyoming*, No. 15-8041, slip op. at 12–14; *AWHPC v. Jewell*,

No. 15-8033, slip op. at 28-32.  Indeed, the Tenth Circuit has definitively ruled that

21

there is no mandatory duty to remove wild horses merely because populations are above AML, holding to the contrary that the WHA "quite clearly affords the BLM with discretion to decide whether or not to remove excess animals," *Wyoming*, No. 15-8041, slip op. at 12, or to instead use "other options," *id.*, such as the types of fertility control and phased management that BLM has used in this case.

To the extent that Plaintiffs can show *any* delay in BLM's wild horse management—whether on public or private lands—the record clearly shows that BLM's pace has been eminently reasonable in light of the complexity of its task and the numerous administrative and practical challenges to its implementation of the National Wild Horse and Burro Program.

## I. PLAINTIFFS' FAILURE TO ACT CLAIMS ABOUT REMOVAL OF WILD HORSES FROM PUBLIC LANDS ARE NOT JUSTICIABLE BECAUSE BLM HAS ACTED AND CONTINUES TO ACT.

Plaintiffs argue that BLM has unlawfully failed to take required actions to remove wild horses from seven HMAs in Utah. Pls.' Op. Br. 8–30. Ironically, to support claims of BLM's *failure to act*, Plaintiffs offer a litany of BLM's *actions*—in particular, a series of decision documents that BLM issued—*and that Plaintiffs concede BLM implemented*—between 2009 and 2014, and which *BLM will continue implementing* in coming years. *See* Pls.' Op. Br. 30–36. Therefore, because BLM has already acted on each decision document on which Plaintiffs rely—and because BLM's implementation of certain decisions will last for many

more years—Plaintiffs' claims regarding removals from the seven Utah HMAs are either moot or unripe.

### A.    Plaintiffs' Claims Regarding Decisions BLM Made Before 2012 Are Moot Because BLM Fully Implemented Those Decisions.

"'Mootness is a threshold issue because the existence of a *live* case or controversy is a constitutional prerequisite to federal court jurisdiction.'" *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (emphasis added).  Regarding mootness, "[t]he crucial question is whether granting a *present* determination of the issues offered *will have some effect in the real world*." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (emphasis added).  Plaintiffs may not merely bring "free-floating ethereal grievances," but must instead ground their claims in "a concrete and particularized factual context" that allows a court to "afford them meaningful relief."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 110-11 (10th Cir. 2010).  Of particular relevance here, the question of mootness is "set in a time frame" that requires a plaintiff's claims to be *current*; where an agency has already taken the actions plaintiffs seek, "[t]here is no point in ordering an action that has already taken

place." *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727–28 (10th Cir. 1997).[6]

BLM's actions on four HMAs at issue have rendered moot Plaintiffs' claims regarding those lands.  Thus, although Plaintiffs attempt to assert that the BLM has failed to take action on various excess determinations, Pls.' Op. Br. 39, Plaintiffs' *own brief* flatly contradicts this claim by citing the very actions BLM has taken *to implement those same excess determinations*, *id.* at 8–35 (citing each decision record and describing the actions taken to implement each one).  Plaintiffs' claims ring especially hollow for the Muddy Creek, North Hills, Chokecherry, and Sulphur HMAs, where BLM has *fully implemented* each of its decisions in short order.

In the Muddy Creek HMA, BLM made an excess determination on July 9, 2009, AR 011010, and implemented that decision between July 12 and July 14, 2009, AR 011123–24.  Although BLM initially estimated that it would remove 100 horses, AR 011006, and actually removed 87, AR 011123, BLM fully achieved the goal of reducing the population to within the AML, AR 011124.  Indeed, a

---

[6]  The fact that Plaintiffs' Complaint initially sought declaratory judgment is of no moment, because "[d]eclaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit." *Rio Grande*, 601 F.3d at 1110.

subsequent census in 2009 revealed that after the 2008 roundup the wild horse population in the Muddy Creek HMA was actually *below* AML.  AR 011171. Thus, contrary to Plaintiffs' claims, BLM fully discharged—and even exceeded— any duty to act based on its 2009 decision record for the Muddy Creek HMA.[7]

BLM also fully discharged its 2010 excess determination for the North Hills Wild Horse Management Plan Area ("North Hills").  BLM made an excess determination for North Hills on November 1, 2010, AR 001748, and removed wild horses on December 2 and 3, 2010, AR 003207.  A February 2011 inventory revealed a wild horse population within AML.  AR 000578–80.  Thus, BLM fully discharged any duty to act on its 2010 excess determination in North Hills.  *See supra* note 4.

So too in the Chokecherry HMA, BLM made an excess determination on October 21, 2010, AR 016154, and removed wild horses between January 4 and January 19, 2011, reducing the wild horse population to within AML.  AR 016231–22.  Indeed, a 2015 survey revealed that this HMA was *still within AML*

---

[7] The discrepancy between BLM's initial estimate of the proper number of horses to remove and the number that it actually did remove are also of no moment. During roundups, BLM routinely bases its implementation on actual conditions on the range, where the actual number of horses present may deviate from initial estimates.  *E.g.* AR 003205 (showing BLM basing actual removal numbers on "pre-gather inventor[ies]" of horses actually present on the range at the time).

*four years later*.  AR 012678.  Accordingly, BLM fully implemented its 2010 decision record for the Chokecherry HMA.

In the Sulphur HMA as well, BLM fully implemented its 2010 decision record.  BLM made an excess determination for the Sulphur HMA on November 4, 2010, AR 002151, and between December 13 and December 18, 2010, BLM removed precisely the number of horses it said it would remove.  *Compare* AR 002147 (authorizing removal of 30 horses) *with* AR 003224 (stating BLM removed 30 horses).  Thus, BLM fully discharged any duty it had under the 2010 decision record for the Sulphur HMA.[8]

Because BLM fully discharged any duties deriving from its decisions in the Muddy Creek, North Hills, Chokecherry, and Sulphur HMAs, Plaintiffs' claims relating to these areas are moot.  *See Smith*, 110 F.3d at 728 ("There is no point in ordering an action that has already taken place.").  Moreover, as the Court of Appeals has now explained in two recent decisions, any future removals must be based on more than a mere finding of overpopulations, because "the language of Section 3 [of the WHA] clearly requires both a determination by the BLM 'that an

------

[8] Additionally, BLM has subsequently removed wild horses as it deemed necessary for safety on nearby highways.  *See* AR 002137, 003226, 002239, 003229 (showing that BLM decided to, and then did, remove wild horses for highway safety).

26

overpopulation exists on a given area of the public lands *and* that action is necessary to remove excess animals." *Wyoming*, No. 15-8041, slip op. at 14 (emphasis in original); *see also AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27 (reiterating these dual requirements).  Because the WHA "quite clearly affords the BLM with discretion to decide whether or not to remove excess animals," *Wyoming*, No. 15-8041, slip op. at 12, Plaintiffs' attempt to compel BLM to remove wild horses on the basis of decisions the agency has already fully implemented must fail as moot.  *See*, *e.g.*, *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 23 (D.C. Cir. 2006) (noting that gathers are "highly fact-specific" and unlikely to be repeated based on old facts).

## B.   Plaintiffs' Claims About BLM Decisions From And After 2012 Are Not Ripe.

Plaintiffs point to three decisions for the Bible Spring Complex and the Frisco and Swasey HMAs, which BLM issued in or after 2012.  However, each decision records indicates that BLM began "phased" approaches to wild horse population management, using various management tools including not only removing horses from the range, but also administering fertility control and altering herd sex ratios for the stated purpose of reducing population growth rates. *E.g.* AR 001477.  In fact, BLM is *still* acting on its phased decisions for these HMAs, and intends to *continue* doing so *for years to come*.  *See* AR 001477 (planning action in the Frisco HMA starting in 2012 and lasting "over the next six

27

(6) to ten (10) years" based on population levels, until at earliest 2018); AR 016324 (planning action in the Swasey HMA beginning in 2012 and lasting 5 to 10 years, until at earliest December 2017); AR 001352 (planning action in Bible Springs beginning in 2014 and lasting 6 to 10 years, until at earliest 2020). Because BLM is in fact continuing to implement these decisions, Plaintiffs' claim of BLM's failure to act is not ripe.

In the Tenth Circuit, four factors indicate that a claim is not ripe: (1) the claim is not purely legal; (2) the action involved is not "final agency action"; (3) the action does not directly and immediately impact the plaintiff; and (4) resolution of the claim will not promote effective agency administration. *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 243 (10th Cir. 1991). Here, all four factors reveal that Plaintiffs' claims regarding the decision records for the Bible Springs Complex and the Swasey and Frisco HMAs are not ripe. First, these claims are not purely legal because the *factual* question of whether BLM successfully fulfills these decision records for these public lands will depend on actions that the agency takes in the next several years. *See, e.g.*, *Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003) (concluding that "what constitutes . . . satisfactory removal" of wildlife "require[s] further factual development" and thus "does not involve purely legal issues").

28

Second, BLM's actions in these HMAs are ongoing rather than final. Although inaction can become "final agency action" based on "unreasonable delay," *id.*, such is not the case here.  Instead, BLM acted *promptly* to begin its phased implementation of each decision.  *See e.g.* AR 016242 (reflecting a 2013 roundup from the Swasey HMA within two months); AR 003195 (reflecting a 2015 roundup from the Frisco HMA within one month); AR 003180 (reflecting a roundup in the Bible Springs Complex in 2016 within one month).  In each roundup, BLM also administered fertility controls and altered herd sex ratios to reduce population growth and the need for, and frequency of, future roundups.  AR 016242, 003195, 003180.  Therefore, to the extent Plaintiffs complain of a lack of further "phased" implementation actions, these claims fail because BLM has not unreasonably delayed any action, as described in greater detail *infra*.

Third, BLM's ongoing actions cannot be said to have a direct and immediate impact on Plaintiffs.  Indeed, to the extent Plaintiffs complain that BLM allows too many wild horses on public lands, the fact that BLM intends to continue to act for years to come to reduce wild horse populations actually *benefits* Plaintiffs. Moreover, the closest Plaintiffs come to identifying a direct or immediate impact is to point to *requests* from the BLM that certain Plaintiffs *temporarily and voluntarily* reduce grazing on these public lands, *e.g.* AR 011475, but the Tenth Circuit has made clear that "the possibility of short-term [] use restrictions is not

29

enough to make [a] case fit for immediate judicial resolution" where ongoing "factual issues" indicate a "lack of finality." *Coal. for Sustainable Res. v. U.S. Forest Serv.*, 259 F.3d 1244, 1252 (10th Cir. 2001).[9]

Fourth, resolving Plaintiffs' claims would *preclude*, rather than promote, effective administration of the public lands. As the Tenth Circuit has made clear, the agency to which Congress delegated responsibility for implementing the statute "should be allowed a first chance to balance the competing interests at stake and choose a course of action." *Id.* at 1253. Here, BLM is balancing competing interests by choosing to manage wild horse populations over a span of years using multiple population management tools based on population trends, *e.g.* AR 001477—a strategy the WHA expressly allows, *see* 16 U.S.C. § 1333(b)(1) (allowing BLM to use "other options" than removals to manage horse populations); *Wyoming*, No. 15-8041, slip op. at 12. Therefore, because BLM will continue to monitor these populations and "to evaluate whether to take future action" based on population trends, "[e]xercising jurisdiction over this case . . . will only undermine these efforts." *Gordon*, 322 F.3d at 1221–22. Accordingly,

---

[9] As noted above, BLM must issue a formal Notice of Closure to *actually* cease grazing on public lands, 43 C.F.R. § 4710.5(c), but Plaintiffs cite no such Notice.

"addressing the merits of this case at this time will not increase the efficacy of the administration" of the WHA. *Id.* at 1222.[10]

Therefore, because BLM has begun a phased approach to managing wild horse populations on the Bible Springs Complex and the Swasey and Frisco HMAs—which the BLM has begun to implement promptly and which the agency *continues to implement*—Plaintiffs' claims relating to these areas of the public lands are simply not ripe for adjudication.

## II.   PLAIN STATUTORY LANGUAGE AND BINDING PRECEDENT FORECLOSE PLAINTIFFS' FAILURE TO ACT CLAIMS REGARDING PUBLIC LANDS.

As explained above, Plaintiffs' attempt to tether their claims to BLM's seven older decision records must fail because BLM has fully implemented, or is continuing to implement, all of the decision records on which Plaintiffs rely in their opening brief. As such, BLM has no further duty to act on the basis of those old decisions. To the extent Plaintiffs or Amici attempt to go beyond these older documents to argue that BLM has a non-discretionary duty to remove wild horses

---

[10] Based on population trends, BLM has in fact chosen to implement further actions, such as a wild horse roundup in the Frisco HMA in 2016. *See* BLM, *Conger-Frisco Wild Horse Gather*, http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/conger-frisco_gather.html. This ongoing action further illustrates that Plaintiffs' claims are not ripe, because BLM is continuing to act and should remain free to determine the best way to do so.

31

from public lands as a general matter, their arguments are completely at odds with the plain text of the WHA, as well as binding precedent from the Supreme Court and recent decisions by the United States Court of Appeals for the Tenth Circuit construing that plain language.  Accordingly, Plaintiffs' failure to act claims must themselves fail as a matter of law.[11]

### A.   Binding Precedent And The WHA's Plain Language Establish That BLM Has Discretion To Decide Whether Or Not To Make The Excess Determinations That Trigger Any Duty To Remove Wild Horses From Public Lands.

The Supreme Court and the Tenth Circuit have both construed the WHA's plain text to forbid plaintiffs from compelling BLM to fulfill the Act's broad statutory mandate in any particular manner.  In *SUWA*, the Supreme Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  542 U.S. at 64 (emphasis in original).  The Court explained that "[t]he principal purpose" of this limitation is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both information and expertise to resolve."  *Id.* at

---

[11] Plaintiffs have waived—and thus cannot raise in their reply brief—any arguments that rely on other decisions than those cited in their opening brief.  *See Anderson v. U.S. Dept. of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.")

66.  This limitation further guarantees that claims like Plaintiffs' do not make it "the task of the supervising court, rather than the agency, to work out compliance with [a] broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* at 66–67.  Further, as an example of a "broad statutory mandate" with which plaintiffs cannot compel compliance under Section 706(1) of the APA, the Supreme Court *specifically identified the WHA*, noting that plaintiffs could not successfully "allege that the Secretary had failed to 'manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance.'" *Id.* at 67 (quoting 16 U.S.C. § 1333(a)).  Noting that the "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA," *id.*, the Court squarely foreclosed Plaintiffs' failure to act claims under Section 706(1) of the APA in this case.[12]

---

[12] At oral argument on AWHPC's motion for judgment on the pleadings, Plaintiffs argued that the Court's holding in *SUWA* is non-binding dicta.  However, because the Court's discussion of the WHA was central to the "rationale upon which the Court based [its] result," its reasoning is clearly binding upon this Court.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996).  Moreover, the Tenth Circuit "considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings." *Pittsburg & Midway Coal Mining v. Watchman*, 52 F.3d 1531, 1540 n.10 (10th Cir. 1995); *see also Tokoph v. U.S.*, 774 F.3d 1300, 1303-04 (10th Cir. 2014).

Similarly, the Tenth Circuit recently confirmed—*twice*—that the WHA's plain text forecloses claims like Plaintiffs'. *Wyoming*, No. 15-8041, slip op. at 13–15; *AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27.  In a case very similar to this one, the State of Wyoming, together with a coalition of livestock grazing interests, attempted to assert under Section 706(1) of the APA that BLM had failed to remove wild horses from seven HMAs in Wyoming despite requests for removal from the State noting that horse populations were above relevant AMLs for those areas.  *Wyoming*, No. 16-8041, at 5–7.  The Tenth Circuit closely reviewed the plain language of the WHA and concluded that it "plainly affords the BLM with discretion to decide whether or not to remove excess animals."  *Id.* at 12 (citing 16 U.S.C. § 1333(b)(1)).  Further, the Tenth Circuit specifically found that in order to trigger any duty to act, the WHA's plain language "clearly requires both a determination by the BLM that an overpopulation exists on a given area of the public lands *and* that action is necessary to remove excess animals."  *Id.* at 14 (citing 16 U.S.C. § 1333(b)(2)); *see also AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27 (same).  Where BLM has only made the first determination that an overpopulation exists, BLM "is under no statutory duty to remove animals" from public lands.  *Wyoming*, No. 15-8041, slip op. at 14–15.  Moreover, BLM has no duty to make excess determinations, both because it has discretion to decide *not to*

34

*remove* wild horses, *id.* at 12, and because "there is nothing in the statute that obligates the BLM to make an immediate [excess] determination," *id.* at 15.[13]

As these binding precedents from the Supreme Court and the Tenth Circuit make clear, BLM has extensive discretion under the WHA's broad statutory mandate to determine how to manage public lands to achieve and maintain a thriving natural ecological balance. This discretion allows the agency "to decide whether or not to remove excess animals." *Id.* at 12. Accordingly, there is no legitimate basis to Plaintiffs' claim that the agency *must* remove horses based solely on population figures.

---

[13] Plaintiffs' sole ostensible authority for the proposition that BLM must remove wild horses any time populations exceed AML is based on a serious misunderstanding of *In Def. of Animals v. U.S. Dept. of Interior*, 751 F.3d 1054, 1065 (9th Cir. 2014). That case does not stand for the proposition Plaintiffs advance. To the contrary in that case the court confirmed "the discretion which courts have recognized that BLM has to remove excess animals from an HMA." *Id.* There, the Ninth Circuit affirmed BLM's *discretionary* decision to remove horses based on findings that horse populations exceeded AMLs and that horses were causing damage to the range, *id.* at 1063, but certainly did not decide that BLM *must* make an excess determination or remove horses on the basis of AMLs alone. Moreover, the Tenth Circuit's rulings in both *Wyoming* and *AWHPC v. Jewell* now squarely foreclose Plaintiffs' reading of *In Defense of Animals*, as well as the entire argument advanced in the State of Utah's *amicus* brief that BLM has a duty to remove horses based on nothing more than wild horse populations being above AML.

**B.     Plaintiffs Cannot Use Outdated Decision Records To Compel Any Further Removals Of Wild Horses From HMAs In Utah.**

As documented extensively *supra*, BLM has fully and promptly discharged any duty it created in the decision records on which Plaintiffs rely in their opening brief.  Because BLM has already fulfilled any duty under those decisions, there is no basis for this Court to compel them to do so.  *See Fund for Animals*, 460 F.3d at 22 (holding that where wild horse "gathers have already been completed . . . [i]t is impossible for the court to grant any effectual relief whatever"); *Smith*, 110 F.3d at 727 ("There is no point in ordering an action that has already taken place.").

Plaintiffs' requested relief and opening brief make clear that they simply are not satisfied with BLM's actions and their goal is to compel BLM to undertake *further* actions to remove *additional* wild horses from HMAs in Utah because Plaintiffs believe that those HMAs have too many wild horses.  *See* Pls.' Op. Br. 8–30.  However, BLM not only has *no duty* to remove wild horses from public lands based on a mere overpopulation, but *cannot* remove wild horses from public lands without first making a *discretionary* determination that removal is necessary. *Wyoming*, No. 15-8041, slip op. at 12; *AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27.  The Tenth Circuit has confirmed that BLM has ample discretion *not* to remove horses and instead to use "other options" to achieve and maintain a thriving natural ecological balance.  *Wyoming*, No. 15-8041, slip op. at 12. Because BLM has extensive discretion to implement this "broad statutory

36

mandate," Plaintiffs simply cannot use Section 706(1) of the APA to compel BLM to take the actions Plaintiffs desire.  *SUWA*, 542 U.S. at 66–67.

Here, the record plainly shows that BLM is in fact exercising its discretion to use "other options" to achieve and maintain a thriving natural ecological balance in the HMAs at issue in this case.  As described *supra*, in 2012 BLM began to implement a "phased" approach to wild horse population management, which is still underway, *e.g.* AR 001477.  That "phased" approach involves more than just the removal of wild horses from the range.  In addition to such removals, BLM is administering a proven, effective method of fertility control to mares, as well as altering herds' natural sex ratios for the stated purpose of reducing population growth rates and the need for, and frequency of, further roundups.  *Id*. Therefore, far from effectuating the WHA's goals or promoting effective agency management of public lands, Plaintiffs' requested relief in this case would *thwart* BLM's efforts to exercise the discretion Congress provided the agency—as noted by both the Supreme Court and the Tenth Circuit—to decide how best to achieve and maintain a thriving natural ecological balance.  Accordingly, Plaintiffs' attempt to have this Court compel BLM to remove wild horses from HMAs in Utah must fail.

### C.  This Court May Not Compel BLM To Remove Horses From Public Lands Outside HMAs.

Plaintiffs' argument that this Court should order BLM to remove horses from public lands outside of designated HMAs, Pls.' Op. Br. 47, is also ill-

founded.  The WHA does not limit BLM's discretion to managing wild horse

populations within HMAs.  Instead, the WHA defines "public lands" to include

"*any* lands administered by . . . the [BLM]."  16 U.S.C. § 1332(e) (emphasis

added).  Similarly, the WHA expressly placed "*all* wild free-roaming horses . . .

under the jurisdiction of the [BLM] for the purpose of management and protection

in accordance with the provisions of this act."  16 U.S.C. § 1333(a) (emphasis

added).  Accordingly, Congress clearly intended the WHA's statutory procedures

to apply to wild horses on public lands *regardless* of whether they are inside or

outside of an official HMA.  Thus, as the Tenth Circuit has held, regardless of

whether wild horses are inside or outside an HMA, the WHA's plain text "quite

clearly affords the BLM with discretion whether or not to remove excess animals,"

*Wyoming*, No. 15-8041, slip op. at 12, and BLM may remove them "only after

BLM 'determines that . . . an overpopulation exists on a given area of the public

lands *and* that action is necessary to remove excess animals," *id.* at 13 (emphasis in

original); *see also AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27.

Moreover, Plaintiffs vainly attempt to support this argument by citing the

same agency decisions that defeat their arguments about found *within* HMAs.  Pls.'

Op. Br. 47.  However, as described above, BLM has either fully implemented these

decision records (in the case of the Muddy Creek, North Hills, Chokecherry, and

Sulphur HMAs), or is currently pursuing a phased approach to their

38

implementation (in the case of the Bible Springs Complex and the Frisco and Swasey HMAs). To the extent Plaintiffs complain specifically of the presence of wild horses in Blawn Wash, Pls.' Op. Br. 48, that area is within the Bible Springs Complex, where BLM continues to pursue its phased implementation its 2014 decision, including a removal of 158 wild horses *from Blawn Wash* as recently as August 2016. *See* BLM, *Blawn Wash Wild Horse Gather 2016*.[14] Again, because BLM has fully implemented or is continuing to implement these decisions, claims related to these decision records are nonjusticiable on either mootness or ripeness grounds. *See supra* p. 16–22. To the extent Plaintiffs argue that BLM has some further "removal obligations" regarding public lands outside HMAs, this argument fails for the same reasons as Plaintiffs' claims regarding further future removals from HMAs—i.e., the plain text of the WHA, as construed by both the Supreme Court and the Tenth Circuit, squarely foreclose these arguments. *SUWA*, 542 U.S. at 66–67; *Wyoming*, No. 15-8041, slip op. at 10–14; *AWHPC v. Jewell*, No. 15-8033, at 26-27.[15]

---

[14] This gather report is available on BLM's website at http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/blawn_wash_gather/gather_report.html.

[15] Plaintiffs' cursory attempt to invoke Section 706(2) of the APA must fail as well. In concluding their arguments regarding BLM's ostensible duties to remove wild horses from within and outside HMAs, Plaintiffs state in passing, and without

## III.    PLAINTIFFS CANNOT SHOW BLM HAS UNREASONABLY DELAYED ANY WILD HORSE MANAGEMENT ACTIONS ON PUBLIC OR PRIVATE LANDS.

Because the WHA does not establish a "date-certain deadline" for removing

wild horses from public lands *or* private lands, even if Plaintiffs could demonstrate

that BLM has not fulfilled a non-discretionary duty, Plaintiffs would still have the

burden of showing that any delay in BLM's removal actions is unreasonable to

invoke this Court's review under 5 U.S.C. 706(1).  *Forest Guardians*, 174 F.3d at

1190.  However, as the record reveals, the pace of BLM's wild horse population

management has been eminently reasonable in light of the complexity of BLM's

task of multiple-use land management, the need to prioritize agency actions based

on importance and urgency, and the numerous administrative and financial

difficulties that attend the agency's administration of its Wild Horse and Burro

-------------------

citing any authority or developing the argument, that "[t]o the extent[] the issues
are reviewable under Section 706(2)(A), the Secretary's and BLM's failure to
remove the excess wild horses is both contrary to law and is arbitrary and
capricious."  Pls. Op. Br. at 46, 48.  However, this argument must fail because it is
waived and because it defies both law and logic.  *See U.S. v. Martinez*, 518 F.3d
763, 768 (10th Cir. 2008) (holding that where a "contention appears only in a
fleeting sentence at the conclusion of [an] opening brief, supported by no analysis
or citation . . . our precedent instructs us to deem the point waived").  As a matter
of law, agency action challenged under Section 706(2)(A) must be "final agency
action," *Lujan*, 497 U.S. at 882, yet Plaintiffs fail to identify a *single* final agency
action to which they object.  Instead, Plaintiffs consistently *rely* on BLM's final
agency actions, such as the stale decision records which Plaintiffs repeatedly (and
misguidedly) cite.

Program.  Accordingly, because BLM has acted at a reasonable pace in fulfilling

its complex, multifarious duties, Plaintiffs cannot show that BLM has

unreasonably delayed any wild horse population management action. *See Qwest*

*Commc's*, 398 F.3d at 1239 (declining to "impose an arbitrary deadline" where an

agency faces a "complex" decision); *see also Southern Utah Wilderness Alliance v.*

*Babbitt*, No. 2:99-cv-852, 2000 WL 33347722, at * 9 (D. Utah Dec. 22, 2000)

(declining to find unreasonable delay and stating that courts are "hesitant to upset

an agency's priorities by ordering it to expedite one specific action and thus give it

precedence over others").

Plaintiffs' attempt to show an unreasonable delay on BLM's part relies on a

fundamental misunderstanding of Tenth Circuit precedent.  Plaintiffs misguidedly

rely on *Forest Guardians* for the proposition that administrative difficulties such as

a lack of resources or conflicting priorities cannot justify an agency's delay in

taking agency action as "reasonable."  Pls.' Op. Br. 46.  However, in *Forest*

*Guardians*, the Tenth Circuit created a significant "distinction between agency

action 'unlawfully withheld' and 'unreasonably delayed' . . . [based] on *whether*

*Congress imposed a date-certain deadline on agency action*."  174 F.3d at 1190

(emphasis added).  The Tenth Circuit found that an agency's "practical

predicament" would not excuse a failure to act under Section 706(1) of the APA

only where "*Congress has established a specific, non-discretionary time within*

41

which the agency must act." *Id.* at 1191–92 (emphasis added).  *Forest Guardians* provides *a perfect example* of what constitutes a "*date-certain deadline*," because that case concerned the agency's failure to act by a "final statutory deadline" on *a specific date*.  *Id.* at 1189 n.4 (noting the "final statutory deadline" for action was "March 1, 1995").  In contrast, where a statute merely requires an agency to act "within an expeditious, prompt, or reasonable time, § 706(1) leaves in the courts discretion to decide whether agency delay is unreasonable." *Id.* at 1190.  And, in determining whether delay is "unreasonable," within the meaning of Section 706(1), the Tenth Circuit directs courts to consider several factors, including "the reasonableness of the delay in the context of the legislation authorizing agency action" and "administrative difficulties." *Qwest Commc'ns*, 398 F.3d at 1238–39.

Here, because the WHA does not establish any "date-certain deadline" for taking *any* wild horse management action—whether on public or private land—this case falls squarely within the Tenth Circuit's framework for "unreasonable delay." *See Forest Guardians*, 142 F.3d at 1190.  Although the WHA's provision regarding removals of wild horses from public lands does state that *after* BLM has made its *discretionary* determinations that (1) an overpopulation exists, and (2) action is necessary to remove excess animals, it shall act "immediately," 16 U.S.C. § 1333(b)(2), this statutory language is in line with the Tenth Circuit's reasoning that statutory language requiring "expeditious [or] prompt" action still leaves

42

courts with discretion to determine whether the agency has unreasonably delayed action, *Forest Guardians,* 142 F.3d at 1190.

As for private lands, the WHA itself creates *no time frame at all* for removal, 16 U.S.C. § 1334, and BLM's implementing regulations merely state that, upon written notice from the landowner, it will remove horses from private lands "as soon as practicable," 43 C.F.R. § 4720.2-1.  Accordingly, for both public and private lands, the dispositive question in this case is whether—in light of the complexity of multiple-use public land management and the numerous administrative difficulties BLM faces in administering the Wild Horse and Burro Program—BLM has unreasonably delayed any action here.  As described in greater detail below, the record clearly establishes that the pace of BLM's action has been eminently reasonable.

### A.    BLM Has Not Unreasonably Delayed Implementation Of The Decision Records On Which Plaintiffs Rely.

Based on the factual record that applies here there can be no legitimate question that BLM has not unreasonably delayed taking actions to remove wild horses from either public or private lands.  As described above, BLM fully—and expeditiously—implemented four of the seven decision records on which Plaintiffs rely.  Indeed, in the Muddy Creek HMA, BLM implemented its 2009 decision record in *a mere 5 days*.  *See* AR 01105 (decision made on July 9, 2009); AR 011123–24 (decision implemented July 12 to 14, 2009).The longest it took for

43

BLM to fully implement any of these decisions was a little over two months.  *See* AR 016154 (decision made for Chokecherry HMA October 1, 2010); AR 016231–32 (decision implemented January 4 to 19, 2010).  Therefore, the record clearly establishes that—far from unreasonably delaying implementation of these decision—BLM acted quite promptly with regard to these decisions to remove wild horses from the HMAs at issue.

Similarly, as regards BLM's phased approach to wild horse population management in the remaining three decision records on which Plaintiffs rely, the record unequivocally establishes that BLM also began and continues to engage in prompt implementation.  *See* AR 016242 (reflecting a 2013 roundup from the Swasey HMA two months after the decision); AR 003195 (reflecting a 2015 roundup from the Frisco HMA the month after the decision); AR 003180 (reflecting a roundup in the Bible Springs Complex in 2016 the month after the decision).  In each of these decision records, BLM has stated that it will continue to implement actions for several more years based on population trends and conditions on the ground.  *E.g.* AR 001477.

And, in fact, based on such considerations, BLM *has continued to act*.  For example, in the Frisco HMA, BLM removed 95 wild horses as recently as July

2016.  *See* BLM, *Frisco Gather Report*.[16]  Similarly, in the Bible Spring Complex,

BLM removed 158 wild horses from Blawn Wash as recently as August 2016.  *See*

BLM, *Blawn Wash Wild Horse Gather 2016*.[17]  Thus, with regard to these decision

records as well, the record indisputably reveals a history of prompt *and ongoing*

action.  Under these circumstances, this Court has no basis for finding that BLM

has unreasonably delayed the implementation of the decision records on which

Plaintiffs rely.

### B.   BLM Has Not Unreasonably Delayed Action On Any Valid Request To Remove Wild Horses From Private Lands.

Nor has BLM unreasonably delayed removing wild horse from any *private*

lands at issue here.  As discussed, *supra* p. 6–7, the WHA balances the protection

of wild horses and private landowners by forbidding private landowners from

harassing wild horses but stating that BLM "shall arrange to have the animals

removed" from private lands upon receipt of a valid request.  16 U.S.C. § 1334.

Under BLM's implementing regulations, a landowner must provide a "written

---

[16] This gather report is available at
http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/conger-
frisco_gather/gather_report_frisco.html.

[17] This gather report is available on BLM's website at
http://www.blm.gov/ut/st/en/prog/wild_horse_and_burro/blawn_wash_gather/gath
er_report.html.

request" to BLM indicating "the numbers of wild horses or burros, the date(s) the animals were on the land, legal description of the private land, and any special conditions that should be considered." 43 C.F.R. § 4720.2-1. After BLM receives a valid request, it will arrange to remove wild horses from those private lands "as soon as practicable." *Id.*

Plaintiffs argue that several "removal requests have remained unfulfilled," Pls.' Op. Br. 52, but Plaintiffs' arguments are riddled with logical and legal defects. For example, Plaintiffs rely heavily on two instances in which BLM purportedly merely opened gates between private and public land to allow horses to leave the private land. *Id.* at 51. However, Plaintiffs conveniently neglect to mention that in *both* instances, BLM *actually physically removed wild horses* from the private lands. *See* AR 005647 ("A total of 19 head of wild horses *were capture[d] or moved off the private lands*.") (emphasis added); AR 005640 (noting that BLM removed 9 horses from private lands and shipped them to a holding facility).

Moreover, to the extent Plaintiffs attempt to argue that opening fences to allow wild horses to leave private lands and return to public lands is a legally insufficient remedy, their argument also fails on both factual and legal grounds. As a matter of fact, the record reveals that BLM "worked *with the landowner* to open the gates for a few weeks," AR 005640, which is entirely consistent with the

46

WHA's provision allowing landowners to permit wild horses to remain on private property, 16 U.S.C. § 1334.  As a matter of law, the only authority Plaintiffs cite for the proposition that BLM must provide for more than "movement of horses from private lands to adjacent public lands" is the district court opinion in *AWHPC v. Jewell*, Pls.' Op. Br. 51, 52, which has now been reversed.  *AWHPC v. Jewell*, No. 15-8033, slip op. at 31.

Plaintiffs' claims regarding lands owned by Utah's School & Institutional Trust Lands Administration ("SITLA") are similarly foreclosed by more recent legal developments.  SITLA's dispute with the BLM over wild horses on private SITLA lands was the subject of a separate lawsuit, which was recently dismissed by stipulation of the parties based on certain BLM commitments regarding those lands.  *See SITLA v. Jewell*, No. 2:15-cv-00076-BCW, ECF No. 26 (D. Utah Feb. 4, 2016).  Therefore, because SITLA has reached an agreement with BLM regarding the management of wild horses on SITLA's lands, and because *SITLA is not a party to this litigation*, Plaintiffs' arguments regarding SITLA's lands are without merit.[18]

---

[18] Because SITLA resolved its dispute with BLM in February 2016 and Plaintiffs filed their brief in August 2016, Plaintiffs had ample opportunity to determine that these claims had no legal viability before filing their opening brief.

Similar factual problems foreclose Plaintiffs' claims regarding requests for removal of wild horses from the private lands of Plaintiff Mark Winch.  BLM's regulations require a legal description of the private lands that are the subject of a removal request, 43 C.F.R. 4720.2-1, but the record does not reveal any such request by Plaintiff Winch.  *Compare* AR 013059–60 (Winch request merely describing horses "at the bucket ranch on private ground" or "on my private land as well as the SITLA land") *and* AR 013053 (Winch request noting "horses on the skyline [and] more over the horizon . . . on my private land") *with* AR 005560 (Woods request regarding "pastures 3 East, 3 West and 5 of the Bennion Spring Allotment, on private ground [with t]he legal descriptions [] T32S R18W S17, 17, and 21").  Accordingly, because Plaintiff Winch failed to submit a legally valid request for removal, Plaintiffs claims regarding these private lands must fail as well.[19]

After culling Plaintiffs' factually and legally defective arguments regarding private lands, what is left is a small set of requests from Matt Wood and Jared and

---

[19] An adverse ruling in this case would not prevent Plaintiff Winch (or any other Plaintiff) from submitting a legally valid request to BLM, nor prevent Plaintiff Winch from filing suit against BLM if it were to fail to act on a legally valid request.  *See Lujan*, 497 U.S. at 894 (noting that a "case-by case approach . . . is understandably frustrating" but "is the traditional, and remains the normal, mode of operation of the courts").

Robert Holt. Pls.' Op. Br. 49. However, the record clearly reveals that BLM fulfilled several of these requests promptly, though Plaintiffs conveniently omit these facts. For example, on May 5, 2010, Robert Holt requested removal of wild horses from private lands, AR 005599, and on May 25, 2010 BLM noted that it had fulfilled that request, AR 003210. Similarly, the record reveals that BLM fulfilled a written request from Jared Holt in 2013. *See* AR 005645 (written request); AR 005647 (noting BLM removed horses in response).[20]

The four remaining requests that Plaintiffs cite are from Matt Wood and Jared and Robert Holt. On April 9, 2014, Robert Holt complained of 20 wild horses on private lands. AR 005567. On May 15, 2014, Mr. Wood complained of 8 horses on his private lands, AR 005528–29, and BLM responded on May 22, 2014 that it had received and was reviewing the request, AR 005559. On June 26, 2014, Jared Holt complained of "at least 20 wild horses" on private land, AR 005560, and on February 23, 2015, Mr. Holt again complained regarding the same parcel but described the presence of only "between three and five" wild horses, AR 005556. On March 31, 2015, the BLM authorized a roundup of "up to 50 horses from private lands outside and/or adjacent to the Bible Springs Complex (which

---

[20] BLM's documentation contains an apparent typographical error regarding the date of the document. The document is dated October 2010, but presents itself as pertaining to a removal that occurred in Fiscal Year 2013.

includes the Bible Spring, Blawn Wash, Four Mile, and Tilly Creek HMAs), the

North Hills HMA, and the Chloride HMA," AR 005651–52, 005665, which

encompasses the property in question, *see* AR 005667–68 (depicting project area).

BLM expressly took this action "to prevent damage to private property, resources,

corrals, and domestic horses." *Id.* Accordingly, the record reveals that BLM has

in fact authorized a removal of wild horses from the private lands than Mr. Wood

and the Holts described.

On this record, it is impossible for Plaintiffs to show that BLM has

unreasonably delayed action on any wild horses on private lands. Indeed, the

record reveals that BLM has consistently acted to remove wild horses from private

lands when it has received a valid request from a landowner. Moreover, in light of

the BLM's many other challenges in implementing the Wild Horse and Burro

program, the pace of its actions is eminently reasonable.

**C.   In Light Of The Complexity And Administrative Difficulties Inherent In BLM's Management Of Wild Horse Populations, The Pace Of BLM's Actions Is Reasonable.**

At heart, Plaintiffs' real complaint is that they believe there are too many

wild horses in Utah and that BLM is unreasonably delaying action to correct this

perceived problem. However, to determine whether an agency has unreasonably

delayed action, courts consider several factors, including the extent of the delay,

"the reasonableness of the delay in the context of the legislation authorizing

agency action," "administrative difficulties bearing on the agency's ability to resolve an issue," and "the complexity of the task envisioned by a court's remand order." *Qwest Commc'ns*, 398 F.3d at 1238–39.  Each of these factors indicates that BLM has not unreasonably delayed any wild horse management action in Utah.

<div align="center">

1.     *BLM acted promptly to implement its decisions.*

</div>

As discussed above, the record reflects that BLM has taken prompt action in each instance cited by Plaintiffs as ostensible examples of unreasonable delay. With regard to private lands, the record shows that where BLM has received a valid request to remove wild horses from private lands, it has generally acted quickly.  *E.g.* AR 003210 (showing that BLM acted on a removal request within 20 days).  At most, Plaintiffs can point to a delay of 10 months between a request for removal from Mr. Wood, AR 005528 (May 15, 2014), and a decision by BLM authorizing removal of wild horses from private lands, AR 005651 (March 2015). However, the record also reveals that BLM communicated with Mr. Wood within a day of receiving his request to inform him that the agency was considering how to respond.  AR 005559.  Moreover, the record also reflects that BLM must prioritize its actions in light of numerous practical considerations.  *E.g.* AR 011735 (showing BLM prioritizing gathers based on animal health concerns, safety, and the need to comply with court orders, as well as based on the limited availability of space in

<div align="center">

51

</div>

long-term holding facilities).  Finally, even with regard to this delay, the record

reflects that BLM *acted* by authorizing the removal of 50 wild horses from private

lands in March 2015—an authorization that addresses the number of wild horses

that Mr. Wood and Mr. Holt complained about.  AR 005652.  Thus, the record

shows prompt agency action to remove wild horses from private lands.

With regard to public lands, the record shows prompt agency action even

more clearly.  For example, the record reflects that BLM took action to implement

*all* the decision records on which Plaintiffs misguidedly rely within *at most* two

months.  *See* AR 016154 (decision made for Chokecherry HMA October 1, 2010);

AR 016231–32 (decision implemented January 4 to 19, 2010); *see also* AR 016242

(reflecting a 2013 roundup from the Swasey HMA two months after the decision).

BLM implemented each of its remaining decision records *even more promptly*.

*See*, *e.g.*, AR 003195 (showing action in the Frisco HMA within a month of the

decision); *see also supra* 22-30 (describing prompt action on each decision record).

In the Muddy Creek HMA, BLM implemented its decision record within *a mere 5*

*days*.  *See* AR 011005, 011123–24.  Thus, the record clearly establishes that any

delay by the BLM with regard to action on private or public lands on Utah has

been minimal.

2.    *The pace of BLM's action is reasonable in light of the complexity of its task under the WHA.*

BLM administers its National Wild Horse and Burro Program in order to protect and manage wild horses "as an integral part of the natural system of the public lands," 16 U.S.C. § 1331, and to "achieve and maintain a thriving natural ecological balance," *id.* § 1333(a).  The Supreme Court has identified this as a "broad statutory mandate" that is not even subject to the type of claim that Plaintiffs have brought due to its highly discretionary nature.  *SUWA*, 542 U.S. at 66–67.  The Tenth Circuit has confirmed that BLM has a great deal of discretion with regard to managing wild horses even when it faces overpopulations. *Wyoming*, No. 15-8041, at 12 (holding that the WHA "quite clearly affords the BLM with discretion to decide whether or not to remove excess animals"); *see also AWHPC v. Jewell*, No. 15-8033, slip op. at 5–6.  Moreover, when making its discretionary determinations regarding how to manage wild horses, BLM must undergo NEPA analysis to determine the environmental effects of its actions and must rigorously explore reasonable alternatives.  *E.g.* AR 011011 (environmental assessment for a wild horse gather); see also *AWHPC v. Jewell*, No. 15-8033, slip op. at 15–16 (recognizing that NEPA applies to such decisions).  Further, when considering how to manage wild horse populations, BLM considers numerous options, including "reduc[ing] population growth rates" through the "use of fertility control, adjustments in the sex ratio in favor of males, [or] a combination

53

of fertility control and sex ratio adjustment." AR 010816. In light of this complex, technical, and discretionary task, the minimal extent of delay reflected in the record is eminently reasonable.

       3.    *Extensive administrative difficulties affect BLM's administration of its National Wild Horse and Burro Program.*

BLM also faces indisputable administrative problems with implementing the removals of wild horses from the public and private lands of Utah. Indeed, the type of "administrative difficulties" that courts in the Tenth Circuit consider as a reasonable explanation for delayed agency action include "the practical difficulty in carrying out [a] legislative mandate, or need to prioritize in the face of limited resources." *Wyandotte Nation v. Salazar*, 939 F. Supp. 2d 1137, 1151 (D. Kan. 2013). As the record clearly illustrates, BLM continues to face budget shortfalls for its Wild Horse and Burro Program. *E.g.* AR 011475 ("The wild horse and burro program is anticipat[ing] a budget cut, while costs of running the program continue to increase."). BLM also faces a nationwide shortage of short-term and long-term holding facilities. *E.g.* AR 011735 (showing BLM explaining that "the biggest issue we currently have now is . . . NO place to put [wild horses because] . . . all facilities across the Bureau are full or over capacity") (emphasis in original). As a result, BLM's management "provides for the removal of *more wild horses than [its] nationwide holding facilities can accommodate.*" AR 012729 (emphasis added).

BLM has candidly and repeatedly explained these challenges to Plaintiffs. *E.g.*, AR 011475 (letter from BLM to Plaintiff Platt explaining budget and holding facility challenges); AR 011473 (similar letter to Plaintiff Winch); AR 005582 (similar letter to Plaintiff Wood). BLM is taking steps to add more capacity to its wild horse holding system. *E.g.* AR 012173 (soliciting bids as recently as May 2015); AR 012729 (reflecting an effort to provide for more holding facilities in numerous western states including Utah). However, the limited nature of BLM's budget for the National Wild Horse and Burro Program clearly demonstrates the precise type of administrative and practical difficulties and "need to prioritize in the face of limited resources" that this Circuit consider reasonable explanations for delayed agency action. *See Wyandotte Nation*, 939 F. Supp. 2d at 1151.

### 4. Plaintiffs' requested remedy would require this Court to supplant BLM as the manager of Utah's rangelands.

Finally, this Court should decline Plaintiffs' invitation to assume the role of manager of wild horses in Utah. As the Tenth Circuit has explained, "a court-imposed deadline for agency action constitutes an extraordinary remedy." *Qwest Commc'ns*, 398 F.3d at 1238–39. The remedy that Plaintiffs seek is all the more extraordinary because it would require this Court to assume BLM's congressionally appointed mantle of range manager and to make a whole host of complex, technical, highly fact-specific, discretionary determinations.

Thus, Plaintiffs' seemingly simple request for the Court to "enter an order compelling Defendants to immediately remove the excess wild horses" from public and private lands in Utah, Pls. Compl. 19–20, is in fact *far from simple*.  As described above, because BLM has already acted on the decision records on which Plaintiffs rely, any further removals of wild horses require *new* determinations that overpopulations exist in particular areas *and that removal is necessary to achieve a thriving natural ecological balance*—as the Tenth Circuit has clearly held now in two recent cases.  *Wyoming*, No. 15-8041, slip op. at 14; *AWHPC v. Jewell*, No. 15-8033, slip op. at 26-27.  Because BLM "quite clearly [has] discretion [] to decide whether or not to remove excess animals" or pursue other options such as fertility control, *Wyoming*, No. 15-8041, slip op. at 12, Plaintiffs' requested relief would require the Court to exercise this discretion instead of BLM.

Additionally, despite the fact that "there is nothing in the statute that obligates the BLM to make an immediate determination" that removal is necessary, *id.* at 15, Plaintiffs' requested relief asks this Court to order BLM to "immediately" remove wild horses, Pls.' Compl. 19–20.  As such, Plaintiffs' requested relief would, as a practical matter, require this Court to make myriad technical, fact-specific, discretionary determinations and likely to retain jurisdiction to monitor BLM's compliance.  In short, the requested relief

essentially asks this Court to step into BLM's shoes as manager of the public range in Utah.

This is precisely what the Supreme Court has admonished courts *not* to allow.  It has held that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives is not contemplated by the APA."  *SUWA*, 542 U.S. at 67.  Indeed, using the WHA as a paradigmatic example, the Supreme Court has interpreted the APA to foreclose precisely the type of claims that Plaintiffs have brought *specifically* to avoid cases that would make it "the task of the supervising court, rather than the agency, to work out compliance with [a] broad statutory mandate, injecting the judge into day-to-day agency management."  *Id.* at 66–67 (citing BLM's management of wild horses under the WHA as the type of discretionary action that must be left to the agency).  Therefore, because the Plaintiffs' requested relief here would do *precisely what the Supreme Court has said the APA does not allow*—namely, require this Court to manage rangeland in Utah through a bevy of technical, fact-specific determinations—this Court should find that BLM has not unreasonably delayed any agency action. *See also Qwest Commc'ns*, 398 F.3d at 1239. (noting that the complexity of the remedial order at issue is a factor in determining whether the agency's delay is "unreasonable" within the meaning of 706(1)).

## CONCLUSION

For all the reasons discussed above, this Court should find that Plaintiffs'

claims lack merit and enter judgment in favor of Defendants.

RESPECTFULLY SUBMITTED this 28th day of October, 2016.

<div style="margin-left: 3em;">

/s/ William Nicholson Lawton
William Nicholson Lawton (admitted *pro hac vice*)
(OR Bar 143685)
Katherine A. Meyer (admitted *pro hac vice*)
(DC Bar No. 244301)

MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave. NW Ste 210
Washington, DC 20016
(202) 588-5206

/s/ Joel M. Ban
(Utah Bar 10114)

BAN LAW OFFICE P.C.
234 E. 2100 S.
Salt Lake City, UT 84115

Counsel for Defendant-Intervenors American Wild
Horse Preservation Campaign, The Cloud
Foundation, Return to Freedom, John Steele, and
Lisa Friday

</div>

Date: October 28, 2016

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.   This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,631 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(b)

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally sized typeface using Microsoft Word, Times New Roman type style and size fourteen font.

3.    I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

/s/ William Nicholson Lawton
William Nicholson Lawton (admitted *pro hac vice*)
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave. NW Ste 210
Washington, DC 20016
(202) 588-5206

## <u>CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS</u>

I hereby certify that:

1.   all required privacy redactions have been made and, with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk, and

2.   the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, and according to the program are free of viruses.

/s/ William Nicholson Lawton
William Nicholson Lawton (admitted *pro hac vice*)
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave. NW Ste 210
Washington, DC 20016
(202) 588-5206

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of October, 2016, I electronically filed the

foregoing using the CM/ECF system, which will then send a notification of such

filing to all counsel of record.

<div style="margin-left: 40%;">

/s/ William Nicholson Lawton

William Nicholson Lawton (admitted *pro hac vice*)
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave. NW Ste 210
Washington, DC 20016
(202) 588-5206

</div>