IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WESTERN RANGELAND CONSERVATION ASSOCIATION, PEARSON RANCH, YARLDEY CATTLE CO., RUNNIN C FAMILY PARTNERSHIP LP, WINTCH & CO. LTD., MATTHEW WOOD, MARILYN WOOD, PLATT LIVESTOCK LLC, SAGE VALLEY HOLDINGS, ESCALANTE FARMS, LLC, DUSTIN HUNTINGTON, TERRIL HUNT, and MARK EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> RYAN ZINKE, in his official capacity as Secretary of the Interior; MICHAEL D. NEDD, in his official capacity as acting director of the U.S. Bureau of Land Management; EDWIN L. ROBERSON, in his official capacity as Utah State Director of the Bureau of Land Management; and UTAH BUREAU OF LAND MANAGEMENT, <br><br> Defendants, <br><br> and <br><br> AMERICAN WILD HORSE PRESERVATION CAMPAIGN, THE CLOUD FOUNDATION, RETURN TO FREEDOM, JOHN STEELE, and LISA FRIDAY, <br><br> Defendant-Intervenors. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' REQUEST FOR MANDATORY INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT AND DISMISSING THE ACTION** <br><br> Case No. 2:14-cv-00327-JNP <br><br> District Judge Jill N. Parrish |

Now before the court is Plaintiffs' demand for injunctive relief pursuant to 5 U.S.C. § 706(1) of the Administrative Procedure Act ("APA"). (*See* Docket Nos. 2, 51, 103).[1]

# INTRODUCTION

This lawsuit was initiated in April of 2014 by Plaintiffs Western Rangeland Conservation Association; Pearson Ranch; Yardley Cattle Company; Runnin C Family Partnership LP; Winch & Co. Ltd.; Joel Hatch; R. Larson Sheep Company LLC; Matthew Wood; Marilyn Wood; Platt Livestock LLC; Sage Valley Holdings; Escalante Farms, LLC;[2] Dustin Huntington; Terril Hunt; and Mark Evans against Defendants Sally Jewell, then-Secretary of the Interior; the United States Department of the Interior; Neil Kornze, then-Director of the United States Bureau of Land Management; and Juan Palma, then-Utah State Director of the Bureau of Land Management[3] (collectively, "Federal Defendants" or "BLM"). On August 27, 2014, the court

---

[1] In their complaint, Plaintiffs actually request declaratory, injunctive, and mandamus relief under the APA, 5 U.S.C. § 706(1), the Declaratory Relief Act, 28 U.S.C. § 2201, and the Mandamus Act, *id.* § 1361. Plaintiffs' briefing, however, only elaborates on claims under the APA. Moreover, the remedy available under 5 U.S.C. § 706(1) of the APA "technically precludes . . . [an] alternative request for a writ of mandamus, although the mandatory injunction is essentially in the nature of mandamus relief." *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) (citations omitted) (citing *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993); *Estate of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir. 1984)). For these reasons, the court addresses only Plaintiffs' claims under the APA.

Additionally, the court notes that the Tenth Circuit typically refers to the remedy provided by § 706(1) of the APA as a "mandatory injunction" to distinguish it from a writ of mandamus. *See, e.g.*, *Estate of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir. 1984). However, as noted above, "the mandatory injunction [available under the APA] is essentially in the nature of mandamus relief." *Mt. Emmons Mining Co.*, 117 F.3d at 1170; *see also Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) (explaining that § 706(1) "carried forward the traditional practice prior to its practice, when judicial review was achieved through use of . . . prerogative writs— principally writs of mandamus under the All Writs Act . . . ."). Indeed, the unlawful withholding or unreasonable delay of official action is evaluated under essentially the same standard whether a plaintiff seeks a writ of mandamus under the Mandamus Act or mandatory injunctive relief under the APA. *Yu v. Brown*, 36 F. Supp. 2d 922, 928–29 (D.N.M. 1999) ("[I]n evaluation claims of unreasonable agency delay which seek either mandamus or a mandatory injunction under the APA, or both, the Tenth Circuit applies the same principles and standards."). As a result, certain cases cited by the court in this opinion dealing with unreasonable delay of agency action use the term "mandamus" and refer to the issuance of mandamus. As the analyses for mandamus relief and mandatory injunctive relief under the APA are essentially the same, the court has left the term in place.

[2] The original complaint included Plaintiff Michael Christensen. (Docket No. 2). In an amended complaint filed January 30, 2015, he was replaced by Plaintiff Escalante Farms, LLC. (Docket No. 51).

[3] Since the initiation of this action, Ryan Zinke has replaced Sally Jewell as Secretary of the Interior, Michael Nedd has replaced Neil Kornze as acting Director of the United States Bureau of Land Management, and Edwin L.

granted a motion to intervene as defendants filed by the American Wild Horse Preservation Campaign, the Cloud Foundation, Return to Freedom, John Steele, and Lisa Friday (collectively, "Defendant-Intervenors") pursuant to FED. R. CIV. P. 24(a). (Docket No. 40).

Plaintiffs are holders of federal grazing permits issued pursuant to the Taylor Grazing Act, *see* 43 U.S.C. § 315b, which allow them to graze their livestock on public rangelands throughout central and southern Utah. Plaintiffs contend that BLM has failed to perform certain ministerial duties under the Wild Free-Roaming Horses and Burros Act of 1971 ("WHA"), 16 U.S.C. §§ 1331, *et seq.*, and claim that BLM's failure has adversely impacted their ability to utilize their grazing allotments. Specifically, Plaintiffs argue that BLM has failed to properly manage the excess population of wild horses that directly compete with livestock for forage and water on public lands and damage the rangeland ecosystem. Plaintiffs also allege that BLM has failed to properly remove excess wild horses present on lands owned by the State of Utah and private landowners. Thus, Plaintiffs ask this court to compel BLM to perform its statutory duties under the WHA to remove excess wild horses from both public and private lands.[4]

---

Roberson has replaced Juan Palma as the State Director of the Bureau of Land Management for Utah. Under FED. R. CIV. P. 25(d), each public officer's successor "is automatically substituted as a party" regardless of court order.

[4] The court pauses to note that all parties in this case, including amici, have submitted or relied upon affidavits and exhibits that have not been included in the administrative record. Ordinarily, courts reviewing final agency action under the APA are strictly limited to the administrative record and may refer to extra-record materials only in "extremely limited circumstances." *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007); *see also Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *Am. Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). However, where a court must decide whether an agency has "unlawfully withheld or unreasonably delayed" required action under 5 U.S.C. § 706(1), "there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000): *Sierra Club v. U.S. Dep't of Energy*, 26 F. Supp. 2d 1268, 1271 (D. Colo. 1998) ("Extra record evidence may be allowed in cases where an agency is being sued for failure to act if the record before the court is insufficient . . . to determine whether the agency unlawfully withheld compliance with a statutory mandate."). Thus, judicial review pursuant to § 706(1) is "not limited to the record as it existed at any single point in time" and may require evaluation of extra-record materials. *See Friends of the Clearwater*, 222 F.3d at 560.

Here, the submitted extra-record materials establish the current state of the range, BLM's conduct since the beginning of litigation, as well as equitable factors regarding the consequence of delayed removal, and are therefore critical to the court's determination of whether mandatory injunctive relief should issue in this case. Thus, the reasons for considering extra-record materials in this case are plainly analogous to many of the recognized

# I. THE WILD FREE-ROAMING HORSES AND BURROS ACT OF 1971

Plaintiffs' challenge centers on the duties imposed on BLM by the WHA, which delegates the management of free-roaming wild horses and burros to the Department of the Interior and BLM. Development and passage of the WHA was prompted by the rapid disappearance of wild horse and burro populations from western rangelands. *See* 16 U.S.C. § 1331. Congressional inquiry found that grazing land previously available to wild horses and burros was "fenced off for private use, while the animals were slaughtered for sport and profit." *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1425 (10th Cir. 1986). The once-prevalent herds of wild horses and burros were hunted to the verge of extinction, and the "remaining animals were driven to marginal, inhospitable grazing areas." *Id.*

To preserve these "living symbols of the historic and pioneer spirit of the West" from "capture, branding, harassment, or death," Congress enacted the WHA, which designated all wild free-roaming horses and burros as "integral part[s] of the natural system of the public lands," 16 U.S.C. § 1331, and entrusted their protection and management to the Secretary of the Interior and BLM, *id.* § 1333(a) (placing all wild horses and burros under the jurisdiction of the Secretary of the Interior and directing that the animals be protected and managed as "components of the public lands"). In essence, the Act is "a land-use regulation enacted by Congress to ensure the survival of a particular species of wildlife." *Mountain States*, 799 F.2d at 1428.

---

exceptions to the usual restriction to the administrative record. *Cf. Am. Mining Congress*, 772 F.2d at 626 (listing possible exceptions, including "the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials," "the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues," and "evidence coming into existence after the agency acted demonstrates that the actions were right or wrong"). For these reasons, and because there has been only scant objection to the court's use of these materials, the court considers the cited extra-record materials for purposes of this decision. *See Friends of the Clearwater*, 222 F.3d at 560; *Am. Littoral Soc'y v. U.S. EPA Region*, 199 F. Supp. 2d 217, 228 (D.N.J. 2002).

Several years after passage of the WHA, Congress found that its attempt to prevent the decline of wild horses and burros had worked far too well. By 1978, the wild horse and burro populations had rebounded and redoubled, and now threatened to disrupt the delicate ecological balance on western rangelands. *See Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1315–16 (D.C. Cir. 1982). A congressional report calling for amendments to the WHA explained:

> In the case of wild horses and burros in the Western States, Congress acted in 1971 to curb abuses which posed a threat to their survival. The situation now appears to have reversed, and action is needed to prevent a successful program from exceeding its goals and causing animal habitat destruction.

*Id.* at 316 (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)). Based on these findings, Congress amended the WHA

> to avoid excessive costs in the administration of the Act, and to facilitate the humane adoption or disposal of excess wild free-roaming horses and burros which because they exceed the carrying capacity of the range, pose a threat to their own habitat, fish, wildlife, recreation, water and soil conservation, domestic livestock grazing, and other rangeland values.

43 U.S.C. § 1901(a)(6). The 1978 amendments to the WHA "struck a new balance—or at least clarified the balance Congress intended to strike in 1971—between protecting wild horses and competing interests in the resources of the public ranges." *Am. Horse Prot. Ass'n*, 694 F.2d at 1316. As amended, the Act's central goal is not only to protect wild horse and burro populations, but to "achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Thus, BLM is tasked with harmonizing the protection of wild horses and burros and the preservation of other rangeland values and uses.

To that end, the WHA requires BLM to compile and maintain "current inventor[ies] of wild horses and burros on given areas of the public lands." *Id.* § 1333(b)(1); 43 C.F.R. § 4710.2. Inventories of wild horse and burro herds are used to designate appropriate herd management

areas ("HMAs"),[5] *see* 43 C.F.R. § 4710.3-1, and to "determine appropriate management levels" ("AMLs"), 16 U.S.C. § 1333(b)(1). "An AML is expressed as a population range with both an upper and lower limit, within which wild horses or burros can be managed for the long term." *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016) (quotations and alterations omitted). Where a given wild horse or burro population exceeds its designated AML, BLM must decide whether to bring the herd back within AML "by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)."[6] 16 U.S.C. § 1333(b)(1). "In this way, [the] AML is a vehicle used to move towards a thriving natural ecological balance, and a trigger by which the BLM is alerted to address population imbalance." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1063–64 (9th Cir. 2014) (alterations omitted). In sum, "[t]o comply with the Act's directive to manage wild horses 'in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands,' . . . the BLM (a) maintains a current inventory of wild horses in each HMA, (b) determines the [AML] of wild horses that each HMA can sustain, and (c) determines the method of achieving the designated AML." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 940 (10th Cir. 2016) (quoting 16 U.S.C. § 1333(a) and citing *id.* § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1); *see also Am. Wild Horse Pres. Campaign*, 847 F.3d at 1178.

Sections Three and Four of the Act delineate specific actions that BLM is required to undertake as part of its management of wild horse and burro populations. Section Three deals with wild horse and burro herds present on public lands and requires BLM to "immediately

---

[5] BLM also designates "herd areas" known as "HAs," which are generally *not* managed for wild horse populations. *See* 43 C.F.R. § 4710.4 ("Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas."). Thus, the AML of a given HA is typically zero.

[6] Though explicitly contemplated in the statute and associated regulations, *see* 16 U.S.C. § 1333(b)(2)(C), "Congress has barred the BLM from euthanizing healthy excess horses for which there is no adoption demand . . . by continually declining to appropriate funds for the destruction of these animals." *In Def. of Animals*, 751 F.3d at 1066 n.20 (citing Pub. L. No. 111-88, 123 Stat. 2904, 2907 (2009)).

remove excess animals from the range" once BLM determines (1) that a population of wild horses on a given HMA exceeds its established AML and (2) "that action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2); *see also Wyoming*, 839 F.3d at 944 (delineating the two-step process that triggers BLM's ministerial duty to "immediately remove" excess wild horses). Section Four requires BLM to arrange for the removal of wild horses and burros that stray off of public land and onto adjacent private land. *See* 16 U.S.C. § 1334.

## II. INTERACTION OF WHA WITH FLPMA AND NEPA

BLM makes management determinations and conducts necessary removals in compliance with both the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, *et seq.*, and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq.*; *see also Wyoming v. U.S. Dep't of Interior*, No. 14-cv-0248, 2015 WL 12916334, at *2 (D. Wyo. Apr. 21, 2015) (unpublished), *aff'd*, 839 F.3d 938 (10th Cir. 2016).

FLPMA directs BLM to "manage public lands under principles of multiple use and sustained yield" and, to that end, requires the development of both comprehensive resource inventories and broad, programmatic resource management plans for public lands. 43 U.S.C. § 1732(a); *S. Utah Wilderness All. v. Norton*, 542 U.S. 55, 58 (2004) (explaining that FLPMA mandates "a dual regime of inventory and planning"). BLM establishes HMAs, sets AMLs within those HMAs, and conducts all wild horse and burro management activities "in accordance with approved land use plans prepared pursuant to" FLPMA. *See* 43 C.F.R. §§ 4710.1, 4710.3-1; *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1178 (outlining BLM's interrelated management under the WHA and FLPMA).

NEPA requires BLM to "pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009) (citing 42 U.S.C. § 4331(b)). Thus, before conducting gathers, removals, or other management actions related to wild horse and burro populations on public lands, BLM prepares an environmental assessment ("EA") to evaluate potential environmental impacts, to outline the agency's proposed course of action and reasonable alternatives, and to provide for public comment on the agency's proposal. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1119 (D. Mont. 2016); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006); 40 C.F.R. §§ 1501.4, 1508.9 (describing the purpose and form of EAs generally). If adopted, the proposed course of action is authorized in a document known as a decision record ("DR").

## **BACKGROUND**

At issue in this case are eight HMAs, a single HA, and certain private lands encompassed within or lying adjacent to public lands. The eight HMAs under scrutiny here are known as Frisco, Four-Mile, Bible Springs, Sulphur, Choke Cherry, Muddy Creek, North Hills, and Swasey. Together, the boundaries of these HMAs encompass just shy of one million acres of public and private land. The lone HA at issue, known as Blawn Wash, covers nearly 63,000 additional acres. These arid rangelands make up large swaths of central and southern Utah and are home to a fragile and complex ecosystem that includes substantial herds of wild horses and burros, as well as numerous other species of wild animals and plants. The HMAs and HA at issue also provide forage and water for significant numbers of private livestock and therefore form an integral component of the local agricultural economy. Since the 1971 passage of the WHA and 1978 amendments thereto, BLM has been tasked with balancing these often conflicting interests. That conflict has bubbled under the surface or boiled over in many western states, including Utah, where the federal government manages a large percentage of available rangeland. The

situation has grown especially severe in recent decades, as BLM has struggled to keep apace of the ever-increasing wild horse and burro populations. Currently, the number of wild horses and burros present on Utah's rangelands is nearly triple the collective AML maximum for the region. Overpopulation is similarly severe across nine other western states. (*See* Docket No. 107-1, at 2).

Frustrated with the state of the range and BLM's management efforts, Plaintiffs initiated this lawsuit April 30, 2014 to compel immediate removal of excess wild horses from public and private lands. (Docket Nos. 2 (original complaint), 51 (first amended complaint)). The administrative record was filed on June 12, 2015, (Docket Nos. 65, 66), and updated on November 11, 2015 and May 16, 2016, (Docket Nos. 81, 94). Plaintiffs filed an opening brief, requesting mandatory injunctive relief under 5 U.S.C. § 706(1), on August 17, 2016. (Docket No. 103). Several amicus curiae briefs were filed on behalf of Plaintiffs by various parties, including the State of Utah, the Public Lands Council, Western AgCredit ACA, and Beaver, Iron, and Emery Counties, as well as certain associated conservation districts located in central and southern Utah. (Docket Nos. 102, 105, 107, 115). Federal Defendants responded on October 28, 2016. (Docket No. 117). Defendant-Intervenors responded the same day. (Docket No. 120). Plaintiffs replied to Federal Defendants and to Defendant-Intervenors on November 21, 2016. (Docket Nos. 122, 123). Federal Defendants filed a limited surreply on January 30, 2017. (Docket No. 135). The court held oral argument on the request for mandatory injunctive relief on April 11, 2017. (Docket No. 142). The court now considers the arguments of the parties under authority granted by 5 U.S.C. §§ 702, 706, and 28 U.S.C. § 1331.

## STANDARD OF REVIEW

Plaintiffs bring their claim for injunctive relief under § 706(1) of the Administrative Procedure Act ("APA"), which requires a reviewing court to "compel agency action unlawfully

withheld or unreasonably delayed."[7] *See* 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). To that end, Plaintiffs assert that BLM has "unlawfully withheld" and "unreasonably delayed" action to remove excess wild horses from public and private lands in violation of the WHA. *See* 16 U.S.C. § 1333(b)(2) (requiring removal of excess wild horses and burros from public lands upon certain triggering conditions); *id.* § 1334 (requiring BLM to "arrange to have [stray wild horses and burros] removed" from private lands upon request).

Although Plaintiffs insist that BLM has both "unlawfully withheld" and "unreasonably delayed" action under the WHA, (*see* Docket No. 122, at 13–25), the two terms are mutually exclusive. Each applies to a distinct statutory structure and is evaluated under a distinct standard. *See Forest Guardians v. Babbit*, 174 F.3d 1178, 1189 (10th Cir. 1999). Consequently, in order to properly evaluate the merits of Plaintiffs' claims, the court must determine whether BLM's alleged failure to remove excess wild horses under the WHA is properly characterized as an "unlawful with[olding]" or an "unreasonabl[e] delay" of agency action under the APA. *See* 5 U.S.C. § 706(1).

## I. ACTION "UNLAWFULLY WITHHELD" AND ACTION "UNREASONABLY DELAYED" UNDER 5 U.S.C. § 706(1)

---

[7] Plaintiffs briefly suggest that their claims *may* be reviewable under 5 U.S.C. § 706(2)(A), which requires a reviewing court to "hold unlawful and set aside agency action, findings and conclusions found to be . . .arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," but provide no further explanation. (Docket No. 103, at 14). Any claims Plaintiffs may have under § 706(2)(A) are therefore waived. *See* FED. R. APP. PROC. 28(a)(8)(A) (requiring that opening brief include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) ("Reviews of agency action in the district court must be processed as appeals. In such circumstances, the district court should govern itself by referring to the Federal Rules of Appellate Procedure."); *Harts v. Johanns*, 433 F. Supp. 2d 1251, 1255–56 (D. Kan. 2006) (declining to address constitutional claims under APA where plaintiff failed to raise the claims in opening brief).

The Tenth Circuit has articulated the distinction between action that is "unlawfully withheld" and action that is "unreasonably delayed" under § 706(1) as follows:

> [I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," *see* 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act.

> Thus, the distinction between agency action "unlawfully withheld" and "unreasonably delayed" turns on whether Congress imposed a date-certain deadline on agency action. . . . In our opinion, when an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time, § 706 leaves in courts the discretion to decide whether agency delay is unreasonable. However, when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline. If it withholds such timely action, a reviewing court must compel the action unlawfully withheld.

*Forest Guardians*, 174 F.3d at 1190.

Applying this standard to Sections Three and Four of the WHA, the court can find no "absolute" or "date-certain deadline" by which the agency must act upon removal determinations. *See id*. Although Section Three requires that BLM "immediately remove" excess wild horses and burros when certain conditions are met, it does not specify any deadline or delineate any timeframe for completion of required removals. *See Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (interpreting the 1978 Amendments to require that excess horses "be removed *expeditiously*" (emphasis in original)). Though obviously more urgent in tone, the command to "immediately remove" carries no more of a specific deadline than the "APA's general admonition that agencies conclude matters presented to them 'within a reasonable time.'" *See Forest Guardians*, 174 F.3d at 1190 (quoting 5 U.S.C. § 555(b)). Instead,

the term "immediately" provides a measure by which the reasonableness of any delay may be evaluated.

Similarly, Section Four imposes no "absolute" or "date-certain deadline" for removal actions from private lands. *See Forest Guardians*, 174 F.3d at 1190. The Act requires only that BLM "arrange to have [stray] animals removed" from private lands upon notice from affected landowners. *See* 16 U.S.C. § 1334. Moreover, BLM has interpreted the Act to require prompt action without a precise deadline. *See* 43 C.F.R. § 4720.2-1 (requiring authorized BLM officers to "remove stray wild horses and burros from private land *as soon as practicable*" (emphasis added)).

Because neither Section Three nor Section Four impose explicit statutory deadlines that would warrant the application of the "unlawfully withheld" standard, the court will treat BLM's alleged failures to act under those sections as action "unreasonably delayed" and apply the corresponding standard.[8] *See Forest Guardians*, 174 F.3d at 1190.

## II. STANDARD OF REVIEW FOR AGENCY ACTION "UNREASONABLY DELAYED" UNDER 5 U.S.C. § 706(1)

Although the Tenth Circuit has not definitively adopted a standard by which courts may evaluate the reasonableness of agency delay under 5 U.S.C. § 706(1), it has favorably cited to the District of Columbia Circuit's so-called *TRAC* factor test, *see Telecomms. Res. & Action Ctr. v.*

---

[8] Plaintiffs suggest that the WHA and BLM's own decision-making processes have established a "concrete deadline" for completion of removal actions, warranting application of the strict "unlawfully withheld" standard. (Docket No. 122, at 9–10). In essence, they argue that the Section Three's mandate to "*immediately* remove" excess animals implies that *any* delay in removal is intolerable. *See* 16 U.S.C. § 1333(b)(2) (emphasis added). As will be explained further below, such a read of the statute is at odds with existing interpretations of Section Three and the undeniable administrative and practical realities of gathering and removing wild animals from public lands. *See, e.g.*, *Am. Horse Prot. Ass'n*, 694 F.2d at 1316–17 (interpreting the command to "immediately remove" under Section Three to require BLM to act "expeditiously" and to align with a congressional expectation of "prompt administrative action to deal with wild horse overpopulations" (emphasis omitted)). Insofar as Plaintiffs suggest that BLM's own internal guidelines regarding the issuance of gather and removal decisions provide a de facto deadline for removal, (*see* Docket No. 122, at 15–16 (citing BLM handbook)), they have provided no authority that would indicate that such guidelines are legally binding or otherwise actionable under the APA.

*FCC*, 750 F.2d 70 (D.C. Cir. 1984) [*TRAC*], which is widely accepted as a touchstone for

evaluating such claims, *see Qwest Comm'ns Intern., Inc. v. FCC*, 398 F.3d 1222, 1238–39 (10th

Cir. 2005) (citing the D.C. Circuit's *TRAC* jurisprudence in the context of a claim of

"unreasonably delayed" agency action). The Tenth Circuit has emphasized that "a court-imposed

deadline for agency action constitutes an extraordinary remedy," *id.* at 1238–39 (citing *In re Int'l

Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992)), and has articulated the following

five factors (drawn from *TRAC* jurisprudence) for consideration:

> (1) [T]he extent of the delay, (2) the reasonableness of the delay in the context of
> the legislation authorizing agency action, (3) the consequences of the delay, and
> (4) administrative difficulties bearing on the agency's ability to resolve an issue.
> To this we might expressly add [(5)] consideration of the complexity of the task
> envisioned by a court's remand order.

*Id.* at 1239. The court will explain and apply this standard in more detail below.

## DISCUSSION

The court will now address the arguments of the parties under jurisdiction granted by 5

U.S.C. §§ 701–06 and 28 U.S.C. § 1331. First, the court must resolve two jurisdictional

challenges raised by Defendant-Intervenors. Second, the court will address Plaintiffs' claims

under Section Three of the WHA. Finally, the court will address Plaintiffs' claims under Section

Four of the WHA.

## I.     DEFENDANT-INTERVENORS' JURISDICTIONAL CHALLENGES

Before proceeding to the merits of Plaintiffs' claims, the court must address two

challenges to its subject matter jurisdiction raised by Defendant-Intervenors. They argue that all

of Plaintiffs' claims regarding the eight HMAs and single HA at issue are either moot or unripe,

and therefore this court lacks subject matter jurisdiction over the claims. The court addresses

Defendant-Intervenors' mootness argument first, then their ripeness argument.

## A. MOOTNESS OF CERTAIN CLAIMS UNDER SECTION THREE

First, Defendant-Intervenors argue that any claims regarding pre-2012 determinations[9] of the need to gather and remove wild horses are moot because those gathers and removals have been completed. They insist that "there is no point in ordering an action that has already taken place." (Docket No. 120, at 29 (quoting *So. Utah Wilderness All. v. Smith*, 110 F.3d 724, 728 (10th Cir. 1997) (alterations omitted)). If Plaintiffs' claims challenged the gathers or removals themselves, the court would be inclined to agree. *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006) (holding that challenges to completed gathers are moot and therefore not justiciable); *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013) (holding that a challenge to categorical exclusion based on previously completed gathers was moot). But Plaintiffs do not challenge the pre-2012 gathers and removals in and of themselves—instead, they argue that BLM has a current duty to remove wild horses because of findings and determinations in the EAs and DRs for the pre-2012 gathers. If no such duty exists, then Plaintiffs' claims fail as a matter of law, not as a matter of mootness. In other words, the question before the court is not whether claims regarding the pre-2012 gathers are moot, but whether Plaintiffs have stated a legally cognizable claim for injunctive relief. Accordingly, the court holds that these claims are not moot.

## B. RIPENESS OF CERTAIN CLAIMS UNDER SECTION THREE

In a similar vein, Defendant-Intervenors argue that Plaintiffs' claims regarding post-2012 determinations of the need for removal[10] are not ripe because BLM is still in the process of implementing those removals. They assert that each DR contemplated a "phased-in" removal

---

[9] These determinations are found in EAs and DRs authorizing the removal of excess wild horses from the Muddy Creek HMA, the North Hills HMA, Choke Cherry HMA, and Sulphur HMA.

[10] These determinations are found in EAs and DRs authorizing removal of excess wild horses from the Bible Springs Complex, the Frisco HMA, and the Swasey HMA.

approach that will not be complete for several years and urge that any decision regarding BLM's implementation of this approach would be premature. As with the mootness argument disposed of above, the court must disagree. Though Plaintiffs hint at challenges to the specific terms of the post-2012 DRs, (*see* Docket No. 123, at 21), the broad thrust of their challenge is that BLM's "phased-in" approach does not fulfill the WHA's mandate to "immediately remove" excess animals and, as a result, BLM is illegally delaying compliance with that mandate, (*see id.* ("[A] phased-in approach of six to ten years, on its face, does not satisfy Section 1333(b)(2)'s requirement of 'immediate removal.'")). This challenge need not wait for the completion of BLM's "phased-in" approach because Plaintiffs argue that the approach itself fails to fulfill BLM's duty under the WHA. *Cf. Envtl. Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970) ("At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review."). Whether BLM is under an obligation to "immediately" remove excess animals from certain HMAs and whether the agency's "phased-in" approach actually fulfills that obligation are not "abstract disagreements" the court must avoid. *See Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1275 (10th Cir. 2012). Thus, the court concludes that a ripeness analysis is inapplicable here.

As both of Defendant-Intervenors' jurisdictional challenges are unavailing, the court now turns to the merits of Plaintiffs' claims against BLM.

## II. PLAINTIFFS' CLAIMS REGARDING REMOVAL FROM PUBLIC LAND UNDER SECTION THREE OF THE WHA

First, the court addresses Plaintiffs' claims under Section Three of the WHA. As noted above, Section Three imposes a statutory duty on BLM to "immediately remove excess animals from the range" when certain conditions are met. *See* 16 U.S.C. § 1333(b)(2). The Tenth Circuit has recently delineated the conditions that trigger this statutory duty in *Wyoming v. United States*

15

*Department of Interior*, 839 F.3d 938 (2016). In that case, the State of Wyoming sued BLM, arguing that BLM had failed to remove excess wild horses from certain HMAs within the State's boundaries, unlawfully withholding or unreasonably delaying action required by the WHA. *See id.* at 942 (citing 5 U.S.C. § 706(1)). The State argued that because BLM had determined that wild horse populations exceeded the upper limit of the AML established for each HMA, the statutory duty under § 1333(b)(2) was triggered, requiring BLM to "immediately remove" excess wild horses from the overpopulated HMAs. *Id.* at 943–44. The Tenth Circuit rejected the State's argument as "contrary to the plain language" of the WHA and held that the Act affords the BLM discretion to decide how to handle overpopulations of wild horses on public lands. *Id.* at 944. The court noted that the Act directs BLM to maintain inventories of wild horse populations in order "to . . . make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals[,] . . . and [to] determine whether [AMLs] should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." *Id.* at 944 (internal quotations removed, alterations in original) (quoting 16 U.S.C. § 1333(b)(1)). This language "quite clearly affords . . . BLM with discretion to decide whether or not to remove excess animals." *Id*. The court concluded that this discretion is not extinguished when BLM determines that a particular wild horse population exceeds its assigned AML: "[C]ontrary to the State's argument, a determination that an overpopulation exists in a given HMA is not sufficient, standing alone, to trigger any duty on the part of the BLM." *Id.* Instead, BLM has a mandatory, non-discretionary duty to "immediately remove excess animals" only after BLM "determines . . . [1] that an overpopulation exists on a given area of the public lands *and* [2] that action is necessary to remove excess animals . . . ." § 1333(b)(2) (emphasis added); *see also Wyoming*, 839 F.3d at 944.

Although it was clear that an overpopulation of wild horses existed on the disputed HMAs, the court held that the State had failed to demonstrate that the second requirement was satisfied "because . . . BLM has not determined that action is necessary to remove the excess animals." *Wyoming*, 839 F.3d at 944. As a result, the court concluded that BLM was not obligated to remove excess wild horses under the WHA and therefore had not "unlawfully withheld or unreasonably delayed" an action it was required by law to take. *Id.* at 944–45.

Here, as in *Wyoming*, it is undisputed that wild horse populations exceed the respective AMLs of each of the eight HMAs and one HA at issue. Still, the parties differ as to whether BLM has determined that removal of excess animals is necessary on certain of the HMAs, i.e., whether a mandatory duty to remove the excess animals has been triggered. Plaintiffs assert that BLM has determined that removal of excess horses is necessary on each of the eight HMAs and one HA at issue. BLM concedes that it has determined that removal is currently necessary on five of the eight HMAs and one HA, but denies that any such determination has been made for the four remaining HMAs. More specifically, BLM acknowledges that, since 2014, it has determined that removal of excess horses is necessary in the Frisco, Four Mile, Bible Springs, and Sulphur HMAs, and the Blawn Wash HA. (Docket No. 117, at 10–11). Thus, BLM agrees that it has a statutory duty to remove excess horses from these areas.

By contrast, BLM insists that it has not determined that removal of current overpopulations is necessary in the Choke Cherry, Muddy Springs, North Hills, and Swasey HMAs. BLM argues that any previous determinations regarding the necessity of removal from those HMAs are no longer operative and cannot bind the agency. Plaintiffs disagree and insist that determinations made prior to 2014 regarding the necessity of removal from the four

remaining HMAs are sufficient to trigger BLM's statutory duty to "immediately remove" current overpopulations pursuant to Section Three.

The court will first address the adequacy of BLM's efforts to remove wild horses from Frisco, Four Mile, Bible Springs, and Sulphur HMAs, as well as the Blawn Wash HA, where BLM acknowledges a statutory obligation to remove under Section Three. The court will then address whether a statutory duty to remove exists in the Choke Cherry, Muddy Creek, North Hills, and Swasey HMAs and, if so, whether that duty has been adequately fulfilled.

### A. REMOVAL DETERMINATIONS FOR FRISCO, FOUR MILE, BIBLE SPRINGS, AND SULPHUR HMAs, AND BLAWN WASH HA

BLM concedes that it has a current duty under Section Three of the WHA to "immediately remove" excess wild horses from the Frisco, Four Mile, Bible Springs, and Sulphur HMAs, as well as the Blawn Wash HA. Plaintiffs claim that BLM has "unreasonably delayed" removal action in these areas such that mandatory injunctive relief is warranted under 5 U.S.C. § 706(1). As explained previously, such claims are typically evaluated under the multi-factor *TRAC* analysis as outlined in *Qwest Comm'n*, 398 F.3d at 1238–39. However, before proceeding to an application of the *TRAC* factors, the court must address two more fundamental issues. First, the court must define the duty imposed on BLM by Section Three of the WHA and, second, the court must decide whether BLM has in fact "delayed" execution of that duty.

### 1. THE DUTY IMPOSED ON BLM BY SECTION THREE OF THE WHA

Before evaluating BLM's removal efforts on the four HMAs and single HA at issue, the court must delineate the removal duty imposed by Section Three. As explained above, Section Three requires BLM to maintain current inventories of wild horse and burro populations on public lands. *See* 16 U.S.C. § 1333(b)(1). BLM uses these inventories to establish AMLs and to determine "whether and where an overpopulation exists" in a given area of the public lands. *Id.*

Once BLM determines that an overpopulation in fact exists in a given area, the agency has wide discretion in how it addresses that overpopulation. *See Wyoming*, 839 F.3d at 944. BLM uses available data to "determine whether [AMLs] should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1). Thus, BLM may address the identified overpopulation through removal or through other methods it deems more suitable. *See Wyoming*, 839 F.3d at 944 ("Subsection (b)(1)'s use of the phrase 'whether action should be taken to remove excess animals' quite clearly affords the BLM with discretion to decide whether or not to remove excess animals.").

However, under certain conditions, Section Three requires BLM to conclusively prioritize removal over other management activities. Specifically, when BLM identifies an overpopulation of wild horses in a given area *and* determines that action is necessary to remove that overpopulation, Section Three unequivocally requires that the agency address the identified overpopulation through removal. *See* 16 U.S.C. § 1333(b)(2). Though BLM indisputably has discretion "to determine whether action should be taken to remove excess animals" and "whether [AMLs] should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)[,]" 16 U.S.C. § 1333(b)(1); *Wyoming*, 839 F.3d at 944, that discretion evaporates once BLM determines "that action is necessary to remove excess animals," 16 U.S.C. § 1333(b)(2). A determination that removal of an identified overpopulation is "necessary" indicates that BLM cannot "achieve [or] maintain a thriving natural ecological balance on the public lands" without the removal. *See* 16 U.S.C. § 1333(a), (b)(2). Accordingly, once that determination is made, the statute explicitly and unequivocally directs that BLM "shall immediately remove excess animals from the range so as

to achieve appropriate management levels." *Id.* § 1333(b)(2). There is no discretion in this command; BLM must eschew other management techniques and address the overpopulation through removal.

Section Three also provides some indication of the urgency with which BLM must accomplish necessary removals: the statute directs that BLM must "*immediately* remove excess animals." 16 U.S.C. § 1333(b)(2) (emphasis added). The parties in this case dispute the practical significance of this language. Plaintiffs, seeking the rapid removal of excess animals from the range, insist that this language requires removal to within established AML "without delay." (Docket No. 122, at 13 (quoting *Immediate*, BLACK'S LAW DICTIONARY (10th ed. 2014))). By contrast, BLM argues that the lack of specific statutory deadlines indicate that "pace and timing of [BLM's] removals are discretionary." (Docket No. 117, at 19). BLM and Defendant-Intervenors emphasize that removal is a "process" and must proceed in phases until completion. (*See* Docket No. 117, at 19; Docket No. 120, at 50, 58).

Evaluation of these arguments turns on the practical meaning of one particularly vexing adverb—"immediately." The term is not defined in the Act, *see* 16 U.S.C. § 1332, so the court turns to the plain, ordinary meaning of the word to guide interpretation, *see Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407–08 (2011). As Plaintiffs assert, the plain meaning of the term suggests action that occurs "[w]ithout interval of time . . . [or] without delay."[11]

---

[11] Expression of congressional intent "lies in the ordinary meaning attached to the [otherwise undefined] word, which may be found by aid of commonly accepted dictionary definitions." *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998). Of particular note here, dictionaries roughly contemporary to the 1978 amendments to the WHA defined "immediately" in much the same manner. *See Immediately*, WEBSTER'S (THIRD) NEW INTERNATIONAL DICTIONARY 1129 (3d ed. 1971) ("[W]ithout interval of time [or] without delay."); *Immediately*, RANDOM HOUSE COLLEGE DICTIONARY 664 (1st rev. ed. 1980) ("[W]ithout lapse of time; without delay; instantly; at once."); *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1227–28 (10th Cir. 2014) ("Courts often begin an ordinary meaning analysis by consulting *contemporary* dictionary definitions." (emphasis added)). Current and more recent definitions of the term "immediately" or its adjectival equivalent "immediate" are substantively identical to contemporary definitions and are essentially consistent across various dictionaries. *See Immediate*, MERRIAM-WEBSTER DICTIONARY 357 (7th ed. 2016) ("[M]ade or done at

*Immediately*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). "[T]he word, without any very precise signification, denotes that action is or must be taken either instantly or without any considerable loss of time." *See Immediate*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). Thus, Congress' use of this term to govern necessary removal actions under Section Three evokes significant urgency and shuns delay.

Nonetheless, as BLM is quick to explain, an overly literal interpretation of the term belies practical reality. (Docket No. 117, at 19). Put simply, the physical removal of wild animals from the open range cannot be accomplished "instantly" or "at once"—the process necessarily entails *some* delay. For example, BLM generally cannot gather during certain months of the year, particularly during the spring foaling season, for fear of disrupting the targeted herd's reproductive cycles or general health. Conditions on the ground—including inclement weather, an unexpectedly scattered target herd, or the failure of skittish animals to respond to gather techniques—may also delay or disrupt removal efforts. Even when timing and conditions are right, BLM must carefully plan and execute the gather and removal so as to avoid eroding the target herd's physical health, social cohesion, or genetic viability. BLM must also comply with planning and public comment requirements under FLPMA and NEPA and retain contractors with the necessary skill and resources to safely, efficiently, and humanely execute the removals.[12]

Based on these practical realities, the court cannot interpret Section Three to require

---

once."); *Immediate*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Occurring without delay; instant."); *Immediately*, NEW OXFORD AMERICAN DICTIONARY 849 (2001) ("At once; instantly[;] . . . without any intervening time . . . ."); *Immediately*, AMERICAN HERITAGE DICTIONARY 902 (3d ed. 1992) ("Without delay.").

[12] The statute itself seems to contemplate such a process, directing BLM to take removal actions in a specific "order and priority, until all excess animals have been removed." 16 U.S.C. § 1333(b)(2). That "order and priority" entails careful evaluation of (1) the health and viability of individual animals, *id.* § 1333(b)(2)(A) (directing the Secretary to destroy "old, sick, or lame animals"); (2) the presence of an adoption demand for individual healthy excess horses, *id.* § 1333(b)(2)(B); (3) the qualifications of prospective adoptive parties, including their ability to ensure humane treatment and proper facilities, *id.*; and, finally, (4) determination of which individual healthy excess horses must be humanely destroyed, *id.* § 1333(b)(2)(C).

removal of excess wild animals without *any* intervening delay—such an interpretation would contravene the ultimate purposes of the WHA by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1178 (explaining that the WHA was "enacted by Congress to ensure the survival" of wild horses and burros); *In re Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 n.9 (10th Cir. 2001) (citing *United States v. Brown*, 333 U.S. 18, 27 (1948)) ("[C]ourts will reject an interpretation of a statute that produces an absurd result."). Section Three's mandate to "immediately remove" must therefore include some discretionary space in which BLM may plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties.

At the same time, the court cannot accept BLM's contention that the "pace and timing" of removals are entirely discretionary. (*See* Docket No. 117, at 19). The term "immediately" must mean *something*—its presence in the statute necessarily places some temporal limits on any discretion BLM has to plan and execute removal actions. The D.C. Circuit has explained that the term "immediately" indicates that Congress desired that "excess horses . . . be removed *expeditiously*" and decided that "*prompt* action was needed to redress . . . imbalance" in wild horse populations on public lands. *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316–17 (D.C. Cir. 1982) (emphasis added and in original). Indeed, the statute indicates that "immediate[]" removal action is required "so as to restore a thriving natural ecological balance to the range[] and [to] protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2); *Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) (citing *Am. Horse Prot. Ass'n*, 694 F.2d at 1317–19) (explaining that Section Three requires action, even when that action is based on incomplete knowledge of conditions on the ground, because "the endangered

and rapidly deteriorating range cannot wait"). Any unnecessary delay or lack of urgency in reducing the population to within AML would contravene these purposes by allowing excess wild horses to persist, propagate, and consume an imbalance of already scarce resources. With the viability of the range and the wild horses themselves in immediate peril as a result of overpopulation, BLM cannot postpone action to remove excess wild horses once it determines that such action is necessary.[13] To the extent that practical realities preclude truly "immediate" removal, BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively. Proper planning and execution would of course account for many of the practical realities that BLM has identified, including due analysis of circumstances on the ground, compliance with NEPA and FLPMA, and retention of experienced contractors.[14]

In sum, once BLM determines that an overpopulation exists in a given area and action is necessary to remove that overpopulation, Section Three demands that BLM address the overpopulation through removal and that the agency begin and complete removal as soon as logistically possible.

---

[13] Indeed, the 1978 amendments that added Section Three's duty to "immediately remove" clearly contemplated rapid intervention to avoid such degradation to both wild horse and rangeland health: "The Act envisions that intervention will be necessary to protect the [desired ecological] balance; in fact, it goes so far as to authorize both sterilization and euthanasia." *In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125, 1139 (E.D. Cal. 2010) (citing 16 U.S.C. § 1333(b)); *see also Am. Horse Prot. Ass'n*, 694 F.2d at 1316–17 (explaining that "Congress expected prompt administrative action to deal with wild horse overpopulations" and avoid damage to other rangeland values, and accordingly "broaden[ed] the means the Secretary may employ" to achieve those ends).

[14] As will be explained further below, the court concludes that certain broad administrative constraints that BLM has identified, including competing removal needs across multiple states, severe budget limitations, and shortage of space for removed animals, cannot erase the urgency that Section Three clearly demands. Unlike the practical realities inherent in the actual act of removal, such external administrative considerations have no effect on the fundamental nature of BLM's duty to "immediately remove" under Section Three. Instead, they are properly raised as possible justification for delay in executing that duty. *Cf. Forest Guardians*, 174 F.3d at 1192–93 ("While we appreciate the Secretary's objective and the difficult position in which Congress has placed him, we believe his impossibility argument is premature.").

## 2. WHETHER BLM HAS DELAYED EXECUTION OF ITS SECTION THREE DUTY

With this understanding of BLM's Section Three removal duty in mind, the court turns to BLM's efforts to fulfill that duty. Again, BLM acknowledges that it has a current duty under Section Three to "immediately remove" excess wild horses from the Frisco, Four-Mile, Bible Springs, and Sulphur HMAs, as well as the Blawn Wash HA. In each area, BLM has made the necessary determinations that an overpopulation of wild horses exists and that action is necessary to remove that overpopulation. (*See* AR001490 (Frisco 2012 DR); AR001350 (Bible Springs Complex 2014 DR, including Bible Springs HMA, Four-Mile HMA, and Blawn Wash HA)); (Docket No. 117-1, at 42 (Sulphur 2016 DR)). To address these findings, BLM has begun implementation of "a pilot management alternative that calls for a phased-in approach to reach AML over a six to ten year period by gradually removing excess animals, implementing fertility control, and adjusting sex ratios." (*See*, *e.g.*, AR001477 (explaining the plan as proposed for the Frisco HMA in 2012)). The initial removal actions contemplated by this approach are not meant to eliminate the identified overpopulation—they serve instead to reduce the number of animals present on the range to a targeted population level somewhere above the established AML. Full removal of any overpopulation would be achieved only after successive removal actions over approximately six to ten years. (*See, e.g.*, Docket No. 117-1, at 23 (spelling out BLM's 2016 plan to initially achieve a "targeted population of approximately 100 animals" in the Frisco HMA within several years, followed "additional phased-in gathers to achieve the low range of AML" over approximately five years)). During gathers, BLM plans to administer immunocontraceptives to mares, adjust the herd's sex ratio, and then release certain gathered animals back onto the range. Importantly, the post-gather population would remain above AML in anticipation of subsequent removals approximately every two years. Thus, the "phased-in" approach eschews

immediate removal to within AML in favor of longer-term management techniques and population controls that will eventually result in a population size within AML. Since 2012, BLM has adopted this approach in the Frisco, Four-Mile, Bible Springs, and Sulphur HMAs, as well as the Blawn Wash HA.

Plaintiffs argue that BLM's "phased-in" approach to removal over a six to ten year period in these areas consitutes an "unreasonabl[e] delay," *see* 5 U.S.C. § 706(1), of action that must be completed "immediately," *see* 16 U.S.C. § 1333(b)(2). In response, BLM and Defendant-Intervenors argue that BLM has not in fact delayed its ministerial duty to "immediately remove" excess animals from the range under Section Three. Instead, the defending parties suggest that BLM has wide discretion in how to implement Section Three's mandate and that the current "phased-in" approach to wild horse management fulfills BLM's statutory obligation to "immediately remove" excess animals: "Because the [WHA] imposes no specific timetable for removing horses after [BLM] has made the required removal determinations, especially when taking into account all the complex and competing factors surrounding removal actions, there has been no 'delay' in this case, much less unreasonable delay." (Docket No. 117, at 19; *see also* Docket No. 120, at 49–51). The court must reject BLM and Defendant-Intervenors' arguments on this point.

BLM's "phased-in" approach to removal fails to fulfill the agency's Section Three duty to "immediately remove" excess animals in at least two fundamental ways. First, the "phased-in" approach prioritizes gradual removal and other management techniques over prompt removal to within AML. As explained above, Section Three unequivocally requires BLM to address overpopulations through immediate removal of excess animals once the agency makes certain triggering determinations regarding an area of the public lands. Having made the requisite

determinations in the areas at issue, BLM cannot choose to address the identified overpopulation through gradual removals and the application of immunocontraceptives and adjustment of sex ratios[15]—the agency *must* address the overpopulation through immediate removal.

Second, the "phased-in" approach contemplates gradual, rather than "immediate[]" removal of excess animals. Though Section Three imposes no specific timetable for necessary removals, the statute clearly demands prompt removal and forbids unnecessary delay. BLM urges that a six-to-ten-year delay is necessary "due to limited resources [and] competing removal needs across [ten] western states," (Docket No. 117, at 19), but such broad administrative concerns cannot erase Section Three's demand for urgency. While it is clear that Section Three's mandate to "immediately remove" excess wild horses must account for the practical realities of the removal process, the fundamental nature of BLM's statutory duty cannot be altered by the agency's budgetary constraints. Here, the six-to-ten-year timetable of the "phased-in" approach is primarily attributable to these broader administrative constraints and not to the practical realities of removal.[16] Indeed, BLM acknowledges that the "phased-in" approach to removal is required because "[n]ationwide, short and long term holding space for excess wild horses removed from the range is limited." (*See, e.g.*, AR001351 (Bible Springs Complex 2014 DR)); (Docket No. 117, at 17; Docket No. 117-1, at 23). Further, the total numbers of animals removed over the life of the plan is at least partially contingent on "administrative factors (budget,

---

[15] These additional management techniques have no true reductive effect on the identified overpopulation; they only serve to stem future population growth and to reduce the numbers of excess horses that would have to be removed in future actions. (*See, e.g.*, AR001178–AR001179 ("The primary use of fertility control would be to maintain the population within AML once achieved.")).

[16] BLM's planning documents suggest that "[b]ased on past gather success . . . only 60-70% of the [wild horse] population can be gathered in a single year, thus requiring multiple gathers over more than a one year period in order to achieve AML." (AR001174). While this fact could be a practical reality justifying some delay in beginning and completing a removal action, there is no indication in the record that a delay of six to ten years is necessary to account for it.

adoptions, holding space, etc.).” (AR001174 (Bible Springs Complex 2014 EA)). Such

“administrative factors” do not give BLM license to redefine their statutory obligation under

Section Three. As explained above, BLM is required by law to remove excess animals to within

AML as soon as the actions necessary to complete removal can be safely and effectively carried

out. Removal that occurs gradually over nearly a decade does not fulfill that requirement.

In sum, the court finds that BLM’s “phased-in” approach to removal as adopted in the

Frisco, Four Mile, Bible Springs, and Sulphur HMAs, and the Blawn Wash HA does not fulfill

its statutory obligation to “immediately remove excess animals so as to achieve appropriate

management levels.” 16 U.S.C § 1333(b)(2). It follows that BLM has in fact “delayed” an action

it is required by law to take and that delay is subject to a reasonableness evaluation under 5

U.S.C. § 706(1).

### 3. WHETHER BLM HAS UNREASONABLY DELAYED EXECUTION OF ITS SECTION THREE DUTY

Having established that BLM has delayed execution of its Section Three duty to

“immediately remove” excess wild horses from the Bible Springs, Frisco, Four-Mile, and

Sulphur HMAs and the Blawn Wash HA, the court now evaluates whether BLM has

“unreasonably delayed” under 5 U.S.C. § 706(1). “Resolution of a claim of unreasonable delay is

ordinarily a complicated and nuanced task requiring consideration of the particular facts and

circumstances before the court.” *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d

1094, 1100 (D.C. Cir. 2003). The Tenth Circuit has indicated that courts evaluating claims of

“unreasonabl[e] delay” of agency action under § 706(1) should employ a close variation of the

*TRAC* factors articulated by the D.C. Circuit. *See Qwest Comm’ns*, 398 F.3d at 1238–39. These

factors are helpful to determine “whether the agency’s delay is so egregious as to warrant

mandamus” or mandatory injunctive relief. *See TRAC*, 750 F.2d at 79. As formulated by the

Tenth Circuit, the pertinent factors include "(1) the extent of the delay, (2) the reasonableness of the delay in the context of the legislation authorizing agency action, (3) the consequences of the delay, . . . (4) administrative difficulties bearing on the agency's ability to resolve an issue" and, finally, (5) "consideration of the complexity of the task envisioned by a court's remand order." *Qwest Comm'ns*, 398 F.3d at 1239. In evaluating these factors, the court is mindful that "[a]lthough there is no *per se* rule as to how long is too long, 'inordinate agency delay would frustrate congressional intent by forcing a breakdown of regulatory processes.'" *In re Int'l Chem.*, 958 F.2d at 1149 (quoting *Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987)).

In this case, the court finds that the first three factors weigh in favor of Plaintiffs' claims of unreasonable delay, but the balance of factors ultimately weighs against such a finding.

## 1. EXTENT OF DELAY AND REASONABLENESS OF DELAY IN THE CONTEXT OF THE WHA

The court will evaluate the first two *TRAC* factors together. The court must first "ascertain the length of time that has elapsed since the agency came under a duty to act," *Cutler*, 818 F.2d at 897, and then determine "the reasonableness of the delay . . . in the context of the statute which authorizes the agency's action," *In re Int'l Chem.*, 958 F.2d at 1149 (quotations omitted) (quoting *Pub. Citizen Health Research Grp. v. Autcher*, 702 F.2d 1150, 1158 n. 30 (D.C. Cir. 1983) (per curiam)). The latter determination "entails an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress." *Cutler*, 818 F.2d at 897. In other words, "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content" for an evaluation of reasonableness. *See TRAC*, 750 F.2d at 80. As explained below, the court finds that these two factors weigh in favor of Plaintiffs' claims of unreasonable delay.

The extent of BLM's delay in this instance is substantial. BLM's current obligation to "immediately remove" excess horses in the Frisco, Four-Mile, Bible Springs, and Sulphur HMAs, as well as the Blawn Wash HA arose as soon as the agency identified an overpopulation in each given area and determined that action was necessary to remove that overpopulation. *See Wyoming*, 839 F.3d at 944. BLM made these determinations for the Frisco HMA in September 2012, (AR001477), for the Sulphur HMA in July 2014, (AR002137), and for the Four-Mile HMA, Bible Springs HMA, and Blawn Wash HA in June 2014, (AR001350).[17] While it is not clear from the record exactly how long it would have taken BLM to complete removal to within AML in these areas consistent with its duty under Section Three, it appears that BLM has delayed completion of its duty for multiple years in each area and intends to delay for several years more. Such delay is inconsistent with Section Three's mandate, which provides a clear "indication of the speed with which [Congress] expects the agency to proceed," *see TRAC*, 750 F.2d at 80—BLM must "*immediately* remove excess animals from the range so as to achieve appropriate management levels," 16 U.S.C. § 1333(b)(2) (emphasis added). As explained above, this congressional command affords BLM no discretion to choose other management options or to unnecessarily delay implementation and completion of removal actions. BLM may only delay the necessary removals to the extent that delay is necessary to safely and effectively complete the removals. BLM's years-long failure to fulfill this obligation in the face of the law's requirement of prompt action weighs in favor of Plaintiffs' claims of unreasonable delay.

## 2. CONSEQUENCES OF THE DELAY

The court next turns to the third *TRAC* factor and evaluates the consequences of BLM's delay. *See TRAC*, 750 F.2d at 80. In general, the more drastic the consequences resulting from a

---

[17] Most recently, BLM made additional determinations as to the Sulphur HMA in a May 2016 DR that authorized a fresh round of gathers and removals. (Docket No. 117-1, at 40–42).

given delay, the less likely that such a delay will be found to be justifiable. For example, "[d]elays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Autcher*, 702 F.2d at 1157. An agency's delay may also produce intolerable regulatory repercussions: "[T]he court must also estimate the extent to which the delay undermines the statutory scheme, either by frustrating the statutory goal or creating a situation in which the agency is 'losing its ability to effectively regulate at all.'" *Envtl. Def. Fund v. U.S. Nuclear Regulatory Comm'n*, 902 F.2d 785, 789 (10th Cir. 1990) (quoting *Cutler*, 818 F.2d at 897–98). As explained below, the court finds that this factor also weighs in favor of Plaintiffs' claims of unreasonable delay.

The consequences of BLM's delay in this instance are significant. Most crucially, the delay undermines the very purpose of Section Three's mandate, which is to "maintain a thriving ecological balance between wild horse and burro populations, wildlife, livestock, and vegetation, and to protect the range from the deterioration associated with overpopulation of wild horses and burros." *Blake*, 837 F. Supp. at 460 (quoting H.R. Rep. No. 1737, 95th Cong., 2d Sess., 15 (1978)); *see also* 16 U.S.C. § 1333(a), (b)(2). In each area at issue in this section, BLM has made a determination that the current overpopulation of wild horses is causing and will continue to cause considerable harm to rangeland resources. The horses' overconsumption of already-scarce water and forage has negative effects on neighboring species and even on the land itself—BLM documents cite severe soil erosion, destruction of delicate riparian areas, and increased competition for resources among other wild animals and livestock as predictable consequences of prolonged overpopulation. Moreover, the continued existence of excess wild horses on the range threatens the horses themselves. Dehydration or starvation among individual horses is

likely inevitable[18] as competition for forage and water increases, and could be followed by the collapse of existing herd structures. Regardless of BLM's sincere efforts to mitigate such harm through partial removals and other management techniques, the fact remains that the consistent and unabated presence of overpopulations in the areas at issue severely taxes the rangeland ecosystem and is ultimately unsustainable. Indeed, BLM has openly acknowledged that its current wild horse management program is not on a "sustainable path." (*See* Docket No. 115-2, at 2, 14 (May 11, 2016 Letter from then-Director of BLM, Neil Kornze)). Given the pronounced drought conditions across the areas in question in recent years and the rapid reproduction rate of wild horses, this may very well be a "situation in which the agency is 'losing its ability to effectively regulate at all.'" *Envtl. Def. Fund*, 902 F.2d at 789 (quoting *Cutler*, 818 F.2d at 897–98).

There is also a tangible human cost associated with the continued presence of excess wild horses. Plaintiffs in this action rely heavily on rangeland forage and water to sustain their livestock and, by extension, their livelihood. As the federal government owns and manages huge swaths of the open rangeland in this region, available private land is scarce, expensive, and often already put to use for forage or otherwise unavailable for livestock grazing. Consequently, Plaintiffs and other ranchers must often rely on the sage grasses and freshwater springs dotting the HMAs and HA at issue to maintain their herds of cattle and sheep. Thus, the health of these areas is inextricably interwoven with the local agricultural economy and, as a result, the continued degradation of rangeland resources by excess wild horses has profound financial

---

[18] BLM has already recorded instances of wild horses dying from hunger or thirst in some of the areas at issue. (*See, e.g.*, AR001197 (recording the 2013 deaths of fourteen wild horses "due to lack of forage and/or water" in the Bible Springs Complex)).

consequence.[19] A pertinent example: The owners of the Wintch Ranch report they were forced to

sell over 300 head of cattle between 2013 and 2014 owing to the unavailability of sufficient

forage and water on the HA. Additionally, wild horses on the HA have repeatedly damaged or

destroyed fencing and water improvements installed by the Wintch owners on the HA,

necessitating repair and exacerbating drought conditions. Most significantly, the Wintch ranching

operation has not been able to utilize its full allotment of forage in Blawn Wash HA for nearly

twenty years because of competition with wild horse herds for forage and water. (Docket No.

103-2, at 2–5). Consistent with this report, BLM concluded in a 2014 EA concerning the Blawn

Wash HA and adjacent areas that "[w]ild horses, wildlife, and livestock compete directly for the

same cover, water, and forage resources" and that overgrazing of wild horses "reduce[s] forage

availability for livestock." (*See* AR001171). In certain other areas around the same time, BLM

found that wild horse populations were consuming more than 360% of their allocated forage due

to overpopulation, while livestock consumption peaked at a mere 78% of allotted forage.

(AR001490 (Frisco 2012 EA); *see also* AR001191–AR001192 (reporting a similar situation

under drought conditions in the Bible Springs Complex and Blawn Wash HA)). Grazing

permittees have been forced to "voluntarily" reduce or eliminate livestock consumption on their

allotments in order to avoid wholly depleting rangeland resources, all while wild horse

overconsumption continues largely unabated.[20] (*See, e.g.*, AR001192).

---

[19] Amicus Western AgCredit provides a stark example of potential economic harm. The institution reports that a significant number of its existing loans in the region are secured with liens on grazing permits granted under the Taylor Grazing Act and suggest that continued degradation of rangeland resources has and will continue to impair the value of these permits. Impairment of these permits could cause serious financial harm to lender and borrower alike: "Many of these customers could not survive economically if their grazing access on public lands is materially reduced." (Docket No. 107, at 3).

[20] Defendant-Intervenors seem to suggest that overgrazing of livestock is the primary cause of the deterioration of rangeland resources. (Docket No. 120, at 17–18). Regardless of the impact that livestock grazing may have on rangeland resources, it is clear from the record that "[y]ear-long [excess] wild horse grazing reduces forage availability for livestock" and "can reduce forage production, vigor, reproduction, and availability for several years." (*See, e.g.*, AR001494–AR001495 (describing interplay of wild horse and livestock demand for rangeland resources

The court acknowledges that BLM has made good-faith efforts to mitigate harm from identified overpopulations in each of the areas at issue. In fact, BLM has removed a number of excess horses from some of the areas at issue in recent months, (*see, e.g.*, Docket No. 117-1, at 29–37 (indicating BLM removed 113 head from the Frisco HMA in July 2016 and 158 head from Blawn Wash HA in August 2016)), and plans to remove more horses in the coming years, (*see* Docket No. 117, at 11 (indicating that BLM plans to conduct removal operations in each of the areas at issue in 2017 or early 2018)). Nevertheless, BLM acknowledges that significant overpopulation persists in each area and that the agency's current plans for removal and mitigation would allow overpopulations to remain for several years into the future. Given the grave nature of the consequences that flow from BLM's failure to completely remove identified overpopulations of wild horses, the court concludes that this *TRAC* factor weighs in favor of Plaintiffs' claims of unreasonable delay.

### 3. ADMINISTRATIVE DIFFICULTIES BEARING ON BLM'S ABILITY TO ADDRESS WILD HORSE POPULATIONS

The fourth *TRAC* factor requires this court to evaluate the "administrative difficulties bearing on the agency's ability to resolve an issue." *Qwest Comm'n*, 398 F.3d at 1239. Courts owe final agency action "considerable deference," *see People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 999 (10th Cir. 2017), and, to a certain extent, review of agency inaction is similarly circumspect. Accordingly, any court evaluating the

---

on the Frisco HMA and concluding that wild horse overconsumption degrades resources and negatively affects livestock)).

Defendant-Intervenors further suggest that Plaintiffs' grazing access is unfairly subsidized by taxpayers, the implication being that any hindrance to that access is therefore less egregious. (Docket No. 120, at 17–18). Regardless of what Plaintiffs pay for the right, they are indisputably entitled by law to graze their animals on these lands. Thus, any hindrance to their grazing access is still potentially a hindrance to a legal right and a tangible harm. More to the point, it cannot be seriously argued that access to public lands for grazing is somehow negligible in the grand scheme of Plaintiffs' economic fortunes. In fact, it is clear from the record that such access is very likely critical to the livelihood of many, if not all, individual Plaintiffs. This is more than enough to warrant careful review of the consequences of BLM's failure to remove excess wild horses from the areas at issue.

reasonableness of agency delay "should give due consideration in the balance to 'any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.'" *In re Int'l Chem.*, 958 F.2d at 1149–50; *Cutler*, 818 F.2d at 898 (explaining that courts should consider "the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency"). In delineating this factor, the *TRAC* court emphasized "the effect of expediting delayed action on agency activities of a higher or competing priority." 750 F.2d at 80. "Of course, these justifications become less persuasive as delay progresses, and must always be balanced against the potential for harm." *Cutler*, 818 F.2d at 898. As explained below, the court concludes that this factor weighs heavily against Plaintiffs' claims of unreasonable delay.

BLM's efforts to both successfully and sustainably manage wild horse populations pursuant to the WHA are hindered by nigh-insurmountable administrative obstacles. Among those obstacles, perhaps the greatest is the United States Congress. The WHA demands that BLM continually monitor and manage nearly 67,000 wild horses scattered across ten western states and periodically remove excess animals in the following "order and priority": First, BLM must humanely euthanize "old, sick, or lame animals," 16 U.S.C. § 1333(b)(2)(A); then BLM is to facilitate the adoption of healthy animals "for which [it] determines an adoption demand exists by qualified individuals," *id.* § 1333(b)(2)(B); and, finally, BLM must humanely euthanize any "additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist," *id.* § 1333(b)(2)(C). While subsection (b)(2)(C) clearly contemplates the humane destruction of healthy excess animals as an available population management tool, Congress has refused to appropriate any funds for euthanasia—in fact, Congress has categorically prohibited BLM from using any funds it does appropriate to BLM for

"the destruction of healthy, unadopted wild horses and burros in the care of [the agency] or its contractors." *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399 (Dec. 16, 2014); *In Def. of Animals*, 751 F.3d at 1066 n.20 (citing Pub. L. No. 111-88, 123 Stat. 2904, 2907 (2009)) ("Congress has barred the BLM from euthanizing healthy excess horses for which there is no adoption demand . . . by continually declining to appropriate funds for the destruction of these animals."). Thus, the agency is stuck in a statutory catch-22—Congress expects that BLM will comply with the Act's mandate to maintain wild horse populations within established AMLs, but has eliminated one of the critical mechanisms the Act provides in order to make such a mandate workable. While the court acknowledges that the mass destruction of healthy wild horses is understandably not a popular or perhaps even a palatable solution to overpopulation,[21] it may very well be the only way the statutory scheme, as written, can actually work. But Congress has effectively cut the statutory scheme off at the knees, forcing BLM to focus its disposition of removed horses almost exclusively on facilitating private adoption under subsection (b)(2)(B) and other methods. (*See* Docket No. 115-2, at 5 (indicating that BLM has adopted out more than 230,000 wild horses and burros removed from the range in the past forty years)).

Unfortunately, adoption demand has plummeted nearly 70% in recent years, (*id.*), and, as a result, a staggering chunk of BLM's wild horse management budget must be allocated to permanently board more than 50,000 unadopted animals in off-range corrals and pasturelands, (*see* AR015213 (indicating that boarding costs accounted for nearly 60% of BLM's wild horse budget in 2012)). Over a lifetime, each unadopted horse will require approximately $50,000 for

---

[21] The court notes that a recent budget proposal from the current presidential administration reportedly contemplates some destruction of healthy wild horses and even their sale for slaughter. The above discussion is in no way meant to stake out a position on such a charged and potentially controversial matter of policy. The court intends only to illustrate the practically intractable management demands imposed on BLM by the statutory scheme and current congressional policies.

adequate care and upkeep, placing current projected costs for boarding unadopted animals in the multi-billion dollar realm. Moreover, the off-range facilities used to house these animals are currently at or nearing capacity, and suitable additional facilities are often prohibitively expensive or difficult to procure. These practical realities restrict BLM's removal efforts to approximately 3,500 wild horses per year, a number roughly equivalent to the total number of animals that "leave the system annually through adoption, sale, and natural mortality." (Docket No. 115-2, at 2). Given these administrative obstacles, BLM concedes that "removing wild horses from the range is simply not a sustainable management option." (Docket No. 117, at 17). Unlike the previous three factors, these practically overwhelming administrative difficulties weigh strongly against a finding of unreasonable delay.[22]

Of course, such administrative obstacles "must always be balanced against the potential for harm." *Cutler*, 818 F.2d at 898. In evaluating that balance, the court notes that the D.C.

---

[22] Plaintiffs and certain amici insist that "BLM's alleged lack of funding is a creature of its own making." (Docket Nos. 115, at 17; 122, at 17). They further argue that this court may not consider budgetary constraints as a justification for shirking mandatory, nondiscretionary statutory duties under *Forest Guardians*, 174 F.3d at 1192. (Docket Nos. 122, at 21; 115, at 18–19). The court must disagree on both points. As to the first point, there is plainly insufficient information available in the record or in the parties' filings to adequately evaluate whether BLM has somehow mismanaged or misappropriated its budget. Even if there were some indication of mismanagement, this court is ill-equipped to evaluate such concerns and the present parties and amici are ill-equipped to make such arguments. *See In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("[E]ven if the [agency's] request [for budget cuts] reflected unsound judgment—a matter on which courts are completely unqualified to pass—the problems that flow from it are not ones that we can fix by reshuffling the agency's files."). Glancing over BLM's budget requests from the past several years or Monday-morning-quarterbacking their budget allocations for this year lends no true insight into the complex interplay of administrative factors inherent in congressional appropriations and agency budgeting. *See id.* From available information, the court cannot say that BLM's funding constraints in wild horse and burro management are somehow self-inflicted.

As to *Forest Guardians*, the court believes Plaintiffs and amici misunderstand the import of that case. Under *Forest Guardians*, this court may not refuse to compel mandatory agency action once it has determined that the action is either "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1)—even where an agency pleads inadequate resources to complete the compelled action. *Forest Guardians*, 174 F.3d at 1190–92. However, before such a duty to compel arises, this court must first decide that the agency action has indeed been either "unlawfully withheld or unreasonably delayed" under § 706(1). *See id.* at 1189 & 1189 n.14 (explaining "that *if* the Secretary unlawfully withheld agency action or unreasonably delayed it . . . , we must compel the Secretary to perform the mandatory duties required by the ESA" (emphasis added)). Indeed, this court's evaluation of whether the agency's delay is in fact unreasonable *requires* evaluation of agency resources and other administrative limitations. *See Qwest Comm'n*, 398 F.3d at 1239 (indicating that courts evaluating the reasonableness of agency delay under § 706(1) should consider "administrative difficulties bearing on the agency's ability to resolve an issue").

Circuit has emphasized "the importance of 'competing priorities' in assessing the reasonableness of an administrative delay." *Mashpee Wampanoag*, 336 F.3d at 1100 (quoting *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (1991)). The *Mashpee Wampanoag* court noted that a previous panel had denied mandamus relief, "even though all the other factors considered in *TRAC* favored it, where 'a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain.'" *Id.* (quoting *In re Barr Laboratories*, 930 F.2d at 75). Here, BLM must balance wild horse populations and rangeland health not only in Utah, but across ten western states. This juggling act requires maintenance of wild horse populations that are collectively more than 200% above the population limits set in BLM land-use plans and rising. Removing even a substantial portion of that overpopulation across the intermountain west is clearly outside of BLM's budgetary and logistical reach. Instead, BLM reports that it must prioritize removal efforts in areas with the "most pressing and urgent needs at any given time," (Docket No. 117, at 8). Prioritizing Plaintiffs' demands for removal would simply force BLM to alter determinations it has already made about the "most pressing and urgent needs" for removal in Utah and in nine other states containing rangelands burdened by excess wild horses. The court is hesitant to disrupt BLM's balancing of "competing priorities" within the wild horse and burro program, especially where granting relief in this case would simply shift the harm of overpopulation from one region to another. *See Mashpee Wampanoag*, 336 F.3d at 1100. "The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for [this court] to hijack." *See In re Barr Laboratories*, 930 F.2d at 76.[23] Because BLM's delay in this instance evidently

---

[23] The court acknowledges that the Tenth Circuit has rejected some of the D.C. Circuit's legal reasoning in the *Barr Laboratories* case. *See Forest Guardians*, 174 F.3d at 1190–91. However, this court believes that the Tenth Circuit's

stems from limited resources allocated among "competing priorities," and complete removal is hindered by the practical and administrative obstacles outlined above, the court concludes that the fourth *TRAC* factor weighs heavily in the agency's favor despite the significant harm inherent in delay.

Additionally, the court notes that, in certain cases, "the good faith of the agency in addressing the delay weighs against" a finding of unreasonable delay. *See Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 119–20 (D.D.C. 2005) (citing *In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988)). There is no indication here that BLM staff are "just 'twiddling their thumbs'" as to their management responsibilities. *See Wyandotte Nation v. Salazar*, 939 F. Supp. 2d 1137, 1153 (D. Kan. 2013) (quoting *Mashpee Wampanoag*, 336 F.3d at 1100–01). Instead, BLM has made genuine, though inadequate, efforts to mitigate the harm caused by wild horse overpopulations and has devised what it believes is the best approach available given its limited resources. While these efforts clearly do not fulfill the statutory requirements of the WHA, they indicate that BLM has not wholly abandoned its management responsibilities. Thus, the situation here does not indicate a true "breakdown of regulatory processes." *See In re Int'l Chem.*, 958 F.2d at 1149 (quoting *Cutler*, 818 F.2d at 897 n.156) (internal quotations omitted). In

---

skepticism of that case was limited in scope. The *Forest Guardians* court explicitly rejected the assertion, upheld in *Barr Laboratories*, that a court may refuse to compel agency action once it has determined that the agency's delay is unreasonable or that the agency has unlawfully withheld action, even when the agency claims inadequate resources to comply with a mandatory injunction. *See id.* at 1272–73 ("[5 U.S.C. §] 706 requires that a reviewing court "shall compel agency action . . . unreasonably delayed," and despite [the *Barr Laboratories*] court's contrary conclusion, we believe that once a court deems agency delay unreasonable, it must compel agency action."). However, while it is clear that the Tenth Circuit has rejected *Barr Laboratories*' application of the "limited resources" defense to agency action that is *already* determined to be "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1), the court believes that the Tenth Circuit would not oppose the consideration of limited agency resources in evaluating the preliminary inquiry of the reasonableness of agency delay. *See Qwest Comm'n*, 398 F.3d at 1239 (indicating that courts evaluating the reasonableness of agency delay under § 706(1) should consider "administrative difficulties bearing on the agency's ability to resolve an issue"). The court finds the reasoning of *Barr Laboratories* both apt and useful to evaluate the reasonableness of BLM's delay in this instance.

sum, the agency's good faith efforts to mitigate harm, though legally insufficient, also weigh against a finding of unreasonable delay.

### 4. COMPLEXITY OF THE TASK ENVISIONED BY REMAND TO BLM

Finally, the court turns to evaluation of "the complexity of the task envisioned by a . . . remand order" in this case.[24] *See Qwest Comm'n*, 398 F.3d at 1239. While the Tenth Circuit has not had occasion to elaborate on the import of this factor, the court can infer that such an inquiry requires evaluation of the logistical implications of a mandatory injunction for both the targeted agency and the court. In making such an inquiry, the court is mindful that the Supreme Court has interpreted 5 U.S.C. § 706(1) circumspectly, so as to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). In other words, evaluation of this factor requires frank acknowledgement of the fact that mandatory injunctive relief is necessarily disruptive of agency priorities and programming. Moreover, the issuance of such relief often requires the district court—ill-equipped to evaluate either agency priorities or programming—to wade into the administrative murk by ordering specific agency action and monitoring compliance. Consequently, "it is clear that a court-imposed deadline for agency action constitutes an extraordinary remedy." *Qwest Comm'n*, 398 F.3d at 1238–39; *In re Int'l Chem. Workers*, 958 F.2d at 1149 ("[I]n extraordinary circumstances, this court will review claims of unreasonable

---

[24] The court sees some conceptual dissonance in considering "the complexity of the task envisioned by a court's remand order" when determining the reasonableness of an agency's delay in carrying out its lawful obligations. Such an inquiry seems more closely tied to a court's prudential concerns than to the agency's conduct. Perhaps the Tenth Circuit intended this factor to serve as a virtual "tie-breaker" where, as here, the balance of the *TRAC* factors leaves the court with an extremely close call to make. In such a situation, a finding that a remand order compelling the agency to act would be unduly disruptive would serve to reinforce the analysis of the agency's administrative concerns (the fourth *TRAC* factor). That is certainly the case here, where the court's analysis below reinforces and supplements its previous determination that the agency faces significant administrative obstacles.

agency delay."); *Wyandotte Nation*, 939 F. Supp. 2d at 1151 (citing *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir. 2009)) ("A mandatory injunction is a drastic remedy that should be reserved for the most extraordinary circumstances.").

Here, Plaintiffs request that this court "enter [an] order compelling [BLM] to immediately remove . . . excess wild horses" from four HMAs and one HA. (Docket No. 103, at 59). As should be obvious given the above analysis, such a seemingly simple command is in fact loaded with complexity. First, the task itself would require the mobilization of significant resources and the restructuring of long-term plans and programming already underway in each of these areas and in nine other states.  As explained above, practical and administrative realities preclude BLM from removing more than approximately 3,500 wild horses across ten states in any given year. By the court's count, requiring the immediate removal of excess wild horses in the four HMAs and single HA at issue would involve the removal of well over half of BLM's yearly limit. In fact, likely more than 1,000 animals would have to be removed from the Sulphur HMA alone. (*See, e.g.*, Docket No. 117-1, at 40–41 (indicating that the estimated wild horse population of Sulphur HMA is well over 1,000 animals and more than 383% of the established AML)). An order from this court compelling removal would force BLM to focus its limited resources to a disproportionate degree on these specific areas of Utah. Such a broad reallocation of resources would undoubtedly necessitate the wholesale reevaluation of established long-term removal plans not only in Utah, but also across nine other western states. Removal plans for other states and other HMAs would be disrupted and meaningful rangeland management goals throughout the western United States could be frustrated.[25] Thus, while Plaintiffs technically seek to compel

---

[25] Additionally, as part of compliance with any order to remove excess horses in these areas, BLM would be required under NEPA to evaluate the potential environmental consequences of planned removal operations. *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.4. The resulting NEPA documentation would almost certainly spawn further

a "discrete . . . action that [BLM] is required to take," *SUWA*, 542 U.S. at 64 (emphasis omitted), an order from this court compelling that "discrete action" could have much broader detrimental implications.

Further, should BLM fail to comply with the court's order (and such a scenario is likely given the practical and administrative obstacles already discussed) or if BLM simply does not comply as quickly as Plaintiffs believe is warranted, this litigation would likely devolve into protracted contempt proceedings. Such proceedings would again delve into an ultimately superficial debate about BLM's budget and require the court to nickel-and-dime the agency's nuanced resource allocations. More fundamentally, the success of a given removal operation is largely tied to mercurial conditions on the ground—inclement weather, the horses' fluctuating resistance to various baiting and trapping methods, and even the day-to-day movement of individual horses can affect the scope and outcome of a removal. The court would be forced to closely scrutinize these conditions in order to evaluate the pace and scope of BLM's efforts and, further, to appraise BLM's expert opinions on scattered horses on any given day of a removal operation, the genetic viability of a particular herd, why a certain proportion of horses cannot be removed in one roundup, the effectiveness of helicopter sweeps versus water-baiting, and so on. These are calls the court is simply not equipped to make. As explained previously, BLM has no discretion under Section Three to address identified overpopulations of wild horses that must be removed in any other way than immediate removal. *See Wyoming*, 839 F.3d at 944. Nevertheless, BLM retains limited discretion to decide how to achieve immediate removal both safely and effectively. An order to remove here would inject this court into that narrow gap of discretion in a manner amounting to "undue judicial interference" with BLM's management of removal

---

litigation initiated by parties such as Defendant-Intervenors (who typically oppose significant removal operations of any kind), further exacerbating delays and undermining removal efforts.

operations. *Cf. SUWA*, 542 U.S. at 66; *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) (quoting *Utah Envtl. Cong, v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008)) ("The deference we give agency action 'is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.'").

Based on the foregoing, the court concludes that the final factor weighs heavily against a finding of unreasonable delay in this case.[26]

### 5. BALANCE OF FACTORS

The court acknowledges that Plaintiffs are justifiably frustrated with the current state of the range and the seeming inability of BLM to deal with identified overpopulations of wild horses on lands that are meant to be managed sustainably for multiple uses. The court realizes that Plaintiffs sincerely believe that BLM has inexcusably fumbled its compliance with a mandatory statutory duty. More importantly, the court acknowledges the significant economic strain placed on Plaintiffs by the continued degradation of the range. At the same time, the court cannot ignore the profound administrative and practical obstacles facing BLM as it juggles practically unworkable statutory responsibilities on a shoestring budget. Though it is a decidedly close call, the court finds that these practical realities, coupled with the inadvisability of this court injecting itself into wild horse and burro management in any significant capacity, weigh decisively against a finding of unreasonable delay or the issuance of injunctive relief in this case. Accordingly, the court holds that BLM has not "unreasonably delayed" removal action under

---

[26] Although the court is permitted to retain jurisdiction over a matter to monitor an agency's good-faith progress even when declining to issue mandatory injunctive relief, *see Mashpee Wampanoag*, 336 F.3d at 1102, there is little reason to retain jurisdiction in this case. Plaintiffs have not requested such relief and the court believes it is unlikely to be able to provide further effectual relief given the above analysis. Accordingly, in addition to declining issuance of a mandatory injunction, the court declines to retain jurisdiction over this matter. *See In re Barr Laboratories*, 930 F.2d at 76 (denying mandamus and refusing to retain jurisdiction over a case involving agency action where the court could not grant effectual relief).

Section Three in the Bible Springs HMA, the Four-Mile HMA, the Frisco HMA, the Sulphur HMA, or the Blawn Wash HA, *see* 5 U.S.C. § 706(1), and declines to compel BLM to act in these areas.

**B. REMOVAL DETERMINATIONS FOR CHOKE CHERRY, MUDDY CREEK, NORTH HILLS, AND SWASEY HMAs**

The court now turns to the Plaintiffs' claims regarding the Choke Cherry, Muddy Creek, North Hills, and Swasey HMAs. BLM asserts that it is not currently obligated by law to remove excess wild horses from these areas. While BLM "acknowledges that the horse numbers in these four areas still exceed the appropriate management levels," (Docket No. 117, at 16), the agency nonetheless insists that the duty to immediately remove excess horses has not been triggered because BLM has not made a corresponding determination that removal is necessary. *See Wyoming*, 839 F.3d at 944 (holding that a duty to "immediately remove" arises only after BLM determines that an overpopulation exists *and* that action is necessary to remove excess animals); *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir. 2002) ("[F]or a claim of unreasonable delay to survive, the agency must have a statutory duty in the first place."). In response, Plaintiffs assert that BLM has previously determined that excess animals must be removed from each HMA in pre-2014 gather EAs and DRs. BLM argues that these determinations do not trigger a *current* duty to remove because the removal actions those documents contemplated are complete.

In essence, BLM argues that where it determines that an overpopulation exists on a given HMA, decides that a removal action is necessary to achieve AML, and subsequently removes the excess horses to reach that end, its obligation to remove under § 1333(b)(2) is satisfied. The court must agree with this general principle. A contrary approach to BLM's duty under § 1333(b)(2) would contravene the plain language of the statute and the Tenth Circuit's

interpretation of that language in *Wyoming*. Section Three specifically requires BLM to make determinations based on "*current*" inventories of wild horse populations and other "information *currently* available" to BLM, indicating that the WHA contemplates recurring determinations of both overpopulation and the necessity of removal in order to achieve AML. *See* 16 U.S.C. § 1333(b)(2) (emphases added). Further, the statute affords BLM significant discretion to decide how to address an overpopulation once it is discovered. *See Wyoming*, 839 F.3d at 944 (finding that the Act "quite clearly affords the BLM with discretion to decide whether or not to remove excess animals"); 16 U.S.C. § 1333(b)(1) (indicating that where BLM determines an overpopulation exists, it has discretion to decide "whether action should be taken to remove excess animals . . . and [to] determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)"). This statutory structure indicates that once BLM has fully addressed an overpopulation through the removal of excess animals and thereby achieved the relevant AML, its determinations regarding that specific instance of overpopulation do not compel the agency to address *future* overpopulations in precisely the same manner. In other words, a determination of overpopulation in a given HMA generally must be accompanied by a corresponding determination that removal of *that specific overpopulation* is necessary in order to trigger a duty to remove under 16 U.S.C. § 1333(b)(2).[27] A plaintiff cannot lift a determination of

---

[27] Plaintiffs cite to *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205 (D.D.C. 2015) for the proposition that previous determinations of overpopulation and the need to remove in an EA remain operative, even after the removals contemplated in that EA are complete. However, Plaintiffs fail to account for the fact that, in that case, BLM clearly made *new* determinations regarding overpopulation and the need to remove and supported those new determinations with environmental impacts analysis compiled in the previous EA. The *Colorado Wild Horse* court held only that the environmental impacts analysis from the previous EA was sufficient to satisfy NEPA requirements for a new removal. *See* 130 F. Supp. 3d at 216–17 (holding that tiering to a previously compiled removal analysis was sufficient to justify a new removal where BLM concluded that the environmental impacts from the proposed removal were not substantially different from those evaluated in the previous analysis). The court did not hold, and the case certainly does not suggest, that previous determinations of overpopulation and the need to remove somehow perpetually bind the agency to remove, even after the removals contemplated in a particular EA are complete and the

44

the need for removal from a previously completed removal process and cobble it together with a current determination of overpopulation in order to compel a removal of that overpopulation.

Applying this general principle to the facts of this case, the court finds that no current duty to remove exists as to the Choke Cherry, Muddy Creek, or North Hills HMAs, but concludes that BLM is still obligated to remove excess animals from the Swasey HMA. Each individual HMA is addressed below.

### 1. CHOKE CHERRY HMA

As to the Choke Cherry HMA, Plaintiffs argue that BLM has not yet fulfilled its duty to immediately remove an overpopulation slated for removal in a 2010 gather EA and DR and, as a result, BLM is currently obligated to remove an existing overpopulation on the HMA. The court disagrees.

Based on an aerial population survey conducted in late 2009, BLM determined that an overpopulation of wild horses existed in the Eagle Complex, which included the Choke Cherry HMA and two other adjacent HMAs. BLM estimated that the population of wild horses on the Choke Cherry HMA was somewhere near seventy-nine head,[28] which exceeded the established AML of thirty head, and concluded that the excess of forty-nine horses should be removed in

---

relevant AML has been achieved. This is also true as to a similar case cited by Plaintiffs for the same proposition. *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 2:15-cv-00118-CW, 2015 WL 803169, at *3–*4 (D. Utah Feb. 25, 2015) (unpublished) (holding that BLM did not act arbitrarily or capriciously in tiering to previous analyses because environmental impacts contemplated in those analyses were "directly relevant to the present [proposed removal] action").

[28] BLM appears to have erroneously swapped the estimated population of the Choke Cherry and Mt. Elinore HMAs at one point in the EA. One table prepared by BLM lists the estimated populations at seventy-nine head for Choke Cherry HMA and at eighty-five for Mt. Elinore HMA, while the next page interchanges the population totals between the two HMAs. (*Compare* AR016161 *with* AR016162). While it is not entirely clear from the record, the court believes that the seventy-nine head figure is the appropriate estimate for the Choke Cherry HMA because BLM proposed the removal of forty-nine head from the HMA in order to achieve the AML of thirty. This suggests that BLM believed that the estimated population of Choke Cherry HMA was seventy-nine, since the removal of forty-nine horses would leave the desired AML of thirty horses on the range. In any event, it appears that BLM removed fifty-seven animals from the Choke Cherry HMA, which would achieve the AML regardless of whether the estimated population were seventy-nine or eighty-five. (*See* AR 016231). Moreover, BLM concluded that the post-removal population of Choke Cherry HMA was within AML. (AR010664).

order to "maintain AML ranges for the HMAs, [to] protect rangeland resources from further deterioration associated with excess wild horses within the HMAs, and to restore a thriving natural ecological balance and multiple use relationship on the public lands consistent with the provisions" of Section Three. (AR016164). Accordingly, BLM proposed a removal of a total of 748 excess wild horses from the three HMAs, including forty-nine from the Choke Cherry HMA. (AR016161, AR016166). BLM also proposed to gather additional mares that were to be treated with the immunocontraceptive PZP-22 and released back to the range. BLM adopted the proposal and authorized the gather and removal in a DR dated October 21, 2010. (AR016151–AR016154).

Putting the removal plan into motion in early 2011, BLM conducted a pre-gather population survey which estimated the population on the three HMAs at 995 head. (AR016228). Conducted between January 4 and 19, 2011, the gather resulted in the removal of 817 horses from the three HMAs, including fifty-seven from the Choke Cherry HMA. (AR016228, AR016231). BLM estimated that the remaining wild horse population on the Choke Cherry HMA was at the established AML of thirty head. (AR010664). The total post-removal herd size within the three HMAs was estimated at 178 head, a number within the overall AML for the Eagle Complex. (AR016228, AR016232).

Plaintiffs argue that the 2011 removal action did not fulfill BLM's duty to remove wild horses and that the agency is still obligated to remove excess wild horses from the Choke Cherry HMA. Citing a subsequent BLM report, they assert that "only 49 [horses] were removed" from the HMA in 2011, not the fifty-seven reported by the agency. (Docket No. 122, at 30 (citing AR010644)). This argument is unavailing. Whether BLM actually removed forty-nine or fifty-

seven horses from the Choke Cherry HMA is ultimately irrelevant,[29] because BLM concluded that the Eagle Complex generally and the Choke Cherry HMA specifically were within AML after the removal action was complete. (AR016232, AR010664). Thus, BLM achieved the ultimate purpose of the gather and removal action, which was to bring the Eagle Complex and the Choke Cherry HMA within established AMLs.

Because the documented overpopulation on the Choke Cherry HMA was fully addressed by the removal action in 2011, Plaintiffs cannot now rely on the determinations made prior to the completed action to support their claim that BLM is *currently* obligated to remove horses from the HMA. Consequently, Plaintiffs have failed to establish that BLM has made an operative determination of a need to remove the current overpopulation of wild horses on the Choke Cherry HMA. Until such a determination is made, BLM has no current duty to remove wild horses from the Choke Cherry HMA under Section Three. *See Wyoming*, 839 F.3d at 944.

## 2. MUDDY CREEK HMA

Plaintiffs likewise argue that BLM has not fulfilled its duty to immediately remove an overpopulation slated for removal from the Muddy Creek HMA in 2009 and the agency is therefore obligated to remove the current overpopulation on the HMA. Again, the court disagrees.

After population surveys conducted in March 2008 and June 2009, BLM found that the wild horse population on the Muddy Creek HMA was likely between 188 and 194 head—well in excess of the established AML maximum of 125 head. To address this overpopulation and to

---

[29] Upon evaluation of the record, the court believes that the agency more likely removed fifty-seven horses from the HMA during the 2011 gather. The document cited by Plaintiffs is an essentially unlabeled, possibly incomplete report from several years after the removal action took place, which may or may not include all of the horses actually removed in 2011. (*See* AR010644). The final narrative of the gather and removal action unequivocally states that fifty-seven horses were removed from the Choke Cherry HMA. (AR016231). But the court need not conclude definitively which report is accurate because, in any event, the HMA was within AML after the removal.

"move resources towards a thriving ecological balance [in] the area," BLM completed an EA that advocated the gather of 130 wild horses from the Muddy Creek HMA, the permanent removal of 100 of the gathered horses, and the return of remaining gathered mares to the range after treatment with immunocontraceptives. (AR011015, AR011018–AR011019). In July 2009, BLM issued a DR that adopted the EA's proposed gather plan and authorized the permanent removal of 100 excess wild horses. (AR011006). Between July 12 and 14, 2009, BLM put the gather plan into effect, gathering a total of eighty-seven horses and permanently removing them from the HMA. (AR011123–AR011124).

Plaintiffs insist that the findings contained in the 2009 EA and DR triggered a duty to "immediately remove" excess wild horses under Section Three of the WHA and that the July 2009 gather of eighty-seven horses did not fulfill that duty. Plaintiffs seem to argue that because BLM only removed eighty-seven of the 100 wild horses it was authorized to remove, the removal is incomplete and BLM is still obligated to remove the overpopulation that currently exists on the Muddy Creek HMA. (*See* Docket No. 122, at 29). This argument ignores the ultimate purpose of the July 2009 gather, which was "to achieve and maintain wild horse [AML]" on the Muddy Creek HMA, not simply to remove 100 horses. (AR011007). In its final report on the July 2009 gather, BLM determined that approximately seventy-five horses remained on the HMA after the gather was complete, a total that accorded with the low-end of the established AML. This result fulfilled the purpose of the gather and satisfied BLM's statutory duty to immediately remove excess animals from the HMA "so as to achieve appropriate management levels." *See* 16 U.S.C. § 1333(b)(2).

Although BLM acknowledges that an overpopulation of wild horses currently exists on the Muddy Creek HMA, the findings contained in the 2009 EA and DR are no longer operative

and cannot compel the agency to act to remove that overpopulation. In sum, Plaintiffs have failed to establish that a current duty to immediately remove wild horses under Section Three exists for the Muddy Creek HMA.

### 3. NORTH HILLS HMA

Plaintiffs also argue that BLM has failed to fulfill its duty to immediately remove an overpopulation of horses on the North Hills HMA that was slated for removal in December 2010. Once again, the court must disagree.

Based on an aerial survey conducted in January 2010, BLM determined that the population of wild horses on the North Hills HMA was approximately 250 head, far surpassing the established AML upper limit of sixty head. (AR001654). BLM determined that the removal of 210 horses was necessary "to achieve and maintain a population size within the established AML, protect rangeland resources from further deterioration associated with the current overpopulation, and restore a thriving natural ecological balance and multiple use relationship on public lands consistent with the provisions" of Section Three. (AR001654–AR001655). The EA also provided that an additional survey conducted closer to the proposed gather would be needed "to more accurately determine the population of wild horses" on the HMA and to "adjust the number of excess wild horses that would be gather[ed], removed, and treated with population controls in order to reach the lower AML." (AR001660).

In November 2010, BLM issued a DR approving the proposed gather and removal of 210 wild horses from the HMA. (AR001743–AR001746). Shortly thereafter, BLM conducted another aerial survey and concluded that the actual population of the HMA was approximately 137 head. (AR003205). The BLM gathered and permanently removed ninety-seven of those horses from the range between December 2 and 3, 2010. (AR003205–AR003206). This removal

left the post-gather population on the HMA at approximately forty horses, (AR003205), matching the low end of the HMA's established AML, (AR001743).

Plaintiffs again insist that this gather and removal was insufficient to fulfill BLM's duty to "immediately remove" excess animals under Section Three of the WHA because BLM failed to remove the 210 animals outlined in its proposal. (Docket No. 122, at 28–29). Again, this argument ignores the actual purpose of the removal action, which was to bring the wild horse population within the established AML, not simply to remove 210 animals. (*See* AR001654–AR001655). The argument also fails to account for the actual conditions on the ground in the HMA at the time of the 2010 gather, i.e., that the actual population of wild horses was significantly smaller than previous surveys had indicated. Directly before the gather, BLM determined that the original estimated population of 250 head was no longer accurate and that the actual population was closer to 137 head. (AR003205). Thus, in order to bring the current population on the HMA to the lower end of the established AML, BLM needed to remove only ninety-seven animals, not the 210 originally contemplated by the EA and DR. The removal of ninety-seven horses achieved the stated objective of the gather and obviated any duty to remove under Section Three.

Plaintiffs also argue that the 2010 EA and DR committed BLM to conduct additional removals in 2012 and 2013, which did not occur. (Docket No. 122, at 28–29). This argument is also unavailing. While the EA contemplated additional follow-up gathers and removals, BLM indicated that these actions would only take place if the stated objectives of the proposed gather and removal were not promptly achieved:

> If gather efficiencies do not allow for the attainment of the Proposed Action during the fall/winter of 2010/2011, the Color Country District will return to the North Hills HMA in 2012 or 2013 to remove any additional wild horses necessary[] in order to achieve the low range of AML and allow the BLM to

> gather a sufficient number of wild horses so as to implement the population
> control component of the proposed action . . . .

(AR001660). As explained above, BLM achieved the low end of the AML during the 2010 gather, obviating any need to return to finish the job. Moreover, the EA indicated that any follow-up gathers or removals would be dependent on new population inventories conducted after the 2010 gather, (AR001660), as well as additional NEPA analysis, (AR001692). Such contingent proposals did not establish that an overpopulation of wild horses would actually exist or that removal would actually be necessary in 2012 or 2013. The mere suggestion that BLM could return for additional gathers depending on evaluation of subsequent population totals does not in any way trigger BLM's obligation to "immediately remove" excess animals under Section Three.

In sum, the overpopulation identified in the 2010 EA and DR was fully addressed by December 2010 removal operation. Thus, Plaintiffs have failed to establish that BLM has determined that removal of the current overpopulation on the North Hills HMA is necessary. Until BLM determines that removal of excess horses on the North Hills HMA is currently necessary, Section Three does not obligate BLM to make any removals there. *See Wyoming*, 839 F.3d at 944.

### 4. SWASEY HMA

Finally, Plaintiffs argue that BLM is currently obligated to remove excess wild horses from the Swasey HMA. They assert that BLM determined both that an overpopulation existed on that HMA and that action to remove excess animals was necessary in a 2012 gather EA, but that BLM has thus far failed to fulfill the statutory duty triggered by those determinations. On this count, the court must agree.

Based on an aerial survey conducted in 2011, BLM estimated the population of the Swasey HMA was approximately 350 head, well beyond the established AML upper limit of 100

head. (AR011479, AR011491). BLM prepared an EA in November 2012 that determined that removal of these excess horses was necessary "in order to achieve and maintain a population size within the established AML, protect rangeland resources from further deterioration associated with the current overpopulation, and restore a thriving natural ecological balance and multiple use relationship on public lands in the area consistent with" Section Three of the WHA. (AR011480). BLM acknowledged that "250 excess wild horses exist within the HMA and need to be removed." (AR011479). Despite these specific determinations, BLM proposed and approved the removal of only 162 wild horses from the HMA, leaving a post-removal population of 188 head—a number still well above the established AML upper limit of 100 head. (AR011491 (EA proposal), AR016233 (DR approval)). Neither the EA nor the DR proffer any explanation for the inconsistency between BLM's findings and BLM's approved plan, and neither document appears to provide for further removals.

After execution of the planned gather in February 2013, BLM reported that only 160 horses—and not the identified excess of 250—were actually removed from the Swasey HMA pursuant to the removal plan. (AR016243). Subsequent population estimates suggested that the population on the range was left at approximately 160 head after the 2013 removal, a number in excess of the established AML. (AR010668). The wild horse population increased to 180 head by 2014, (AR010670), and again to 216 head by 2015, (AR010672). To date, the only subsequent removal from the Swasey HMA appears to have occurred in May 2014, where one horse was removed. (AR010645).

BLM asserts that the removal of 160 wild horses from the Swasey HMA in February 2013 fulfilled its duty to "immediately remove" excess animals under Section Three because the removal achieved the specific management goals contemplated by the 2012 EA and DR. While it

is true that BLM only proposed and authorized the removal of "approximately 162 horses," it also specifically determined that "250 excess wild horses exist within the HMA and need to be removed." (AR011479). In other words, BLM concluded that an overpopulation of approximately 250 horses existed on the HMA and that action was necessary to remove animals in excess of the established AML upper limit of 100 head.[30] These specific determinations clearly triggered a duty under Section Three to "immediately remove" the identified excess wild horses from the HMA. *See* 16 U.S.C. § 1333(b)(2). Contrary to BLM's argument, this statutory duty is keyed to the number of animals that *must be removed in order to achieve AML*, not to the number the agency plans to remove or actually removes. *See Wyoming*, 839 F.3d at 944 (explaining that a duty to immediately remove under Section Three is triggered by a determination "that an overpopulation exists in a given HMA" and "that action is necessary to remove excess animals" to within AML). Once BLM determines that removal is necessary in order to achieve AML, the agency cannot attempt to achieve AML through other means or otherwise shirk immediate removal of excess animals to within AML.

Had BLM explained that an overpopulation of approximately 250 horses existed within the HMA, then determined that removal of only 160 or so horses was necessary "to achieve and maintain a population size within the established AML," (*see* AR011480), that would be fully within the agency's statutory discretion to "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)," *see* 16 U.S.C. § 1333(b)(1); *Wyoming*, 839 F.3d at 944 (explaining that Section Three "quite clearly affords the BLM with discretion to

---

[30] The term "excess" as used in the WHA carries a particular connotation when used to describe wild horses or burros. The Act defines "excess animals," in pertinent part, as "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

decide whether or not to remove excess animals"). But that is not the determination that BLM made here. Instead, BLM determined that all animals in excess of the upper limit of the established AML for the Swasey HMA "need[ed] to be removed," (AR011479), but made only partial provision for their removal. The court can find no clear explanation in the record for BLM's decision to remove less than the number of excess wild horses that the agency determined should be removed from the HMA in order to achieve AML. Because BLM failed to fully address its own determination that horses above the upper limit of the AML must be removed, the court finds that BLM did not fulfill its statutory duty under Section Three to "immediately remove excess animals from the range so as to achieve appropriate management levels" on the Swasey HMA. *See* 16 U.S.C. §1333(b)(2). And, since BLM has not taken any further steps to address the continuing overpopulation on the Swasey HMA, a duty to immediately remove excess wild horses is still operative and binds the agency to act.

Unlike the other three HMAs discussed in this section, Plaintiffs have established that BLM has a current duty to remove excess horses from Swasey HMA and have properly identified a "discrete action that [BLM] is required to take" under 5 U.S.C. § 706(1). *See SUWA*, 542 U.S. at 64 (emphasis omitted). As a result, the question before the court regarding the Swasey HMA is identical to the question answered above regarding the four HMAs and single HA in the previous section, i.e., whether BLM has "unreasonably delayed" the removal action it was required to take under Section Three. *See* 5 U.S.C. § 706(1). And the analysis is much the same. Although the delay here is somewhat greater than the HMAs and HA previously analyzed, the Swasey HMA is not so unique that an evaluation of the *TRAC* factors would tip in favor of a mandatory injunction. Accordingly, for the reasons discussed in the previous section, the court holds that BLM has not "unreasonably delayed" required removal action in the Swasey HMA.

### III. PLAINTIFFS' CLAIMS REGARDING REMOVAL FROM PRIVATE LANDS UNDER SECTION FOUR OF THE WHA

Finally, the court addresses Plaintiffs' claims under Section Four of the WHA. Section Four provides for the removal of wild horses and burros that stray onto private land: "If wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall or agent of the Secretary, who shall arrange to have the animals removed." 16 U.S.C. § 1334. Associated regulations require private landowners to submit written notification of wild horses on their land to BLM representatives. 43 C.F.R. § 4720.2-1. The notification must include a count of the animals present on the property, the date the animals were sighted, a legal description of the property, and "any special conditions that should be considered in the gathering plan." *Id.* Once the written request has been proffered to BLM, an agency representative "shall remove stray wild horses and burros from [the] private lands as soon as practicable." *Id.*

Here, Plaintiffs argue that BLM has not adequately responded to their written requests to remove wild horses that have strayed onto their lands pursuant to Section Four. Plaintiffs assert that BLM has thus far responded to their written requests for removal by attempting to coax stray horses off the private lands and back onto public land through opened gates, (Docket No. 103, at 58), and by herding stray horses back onto public lands with helicopter sweeps, (Docket No. 122, at 34–35). Plaintiffs insist that this does not fulfill BLM's ministerial duty to "arrange to have the animals removed" under Section Four. Instead, "Plaintiffs contend that the 'duty' under Section [Four] is to 'remove' [the animals] from private land and not merely to 'move' [the animals] off private land onto the adjacent HMA." (Docket No. 122, at 34). Plaintiffs seem to suggest that Section Four requires BLM to prevent stray horses from ever returning to private lands once removed. (*See* Docket No. 103, at 58–59).

The court can find no support for Plaintiff's interpretation.[31] Even a cursory reading of the statute indicates that moving horses off of private land and onto an adjacent HMA satisfies BLM's removal duty under Section Four. That section requires only that BLM "arrange to have [stray] animals removed" when they are found on private land.[32] *See* 16 U.S.C. § 1334. The section does not specify the location to which the animals will be removed, the speed with which removal must occur, or even how the removal is to be accomplished. Further, Section Four "does not charge the BLM with the duty to 'prevent' wild horses from straying" in the first instance. *Fallini v. Hodel*, 783 F.2d 1343, 1345–46 (9th Cir. 1986). Thus, even if the horses stray back onto private lands after being removed to adjacent public lands, BLM has not shirked any duty under the WHA. *See id.* Wild horses are, after all, wild. Their movement across artificial boundaries between private and public lands is likely unavoidable, even where fencing or other physical barriers may be present. Section Four clearly anticipates this problem and provides a remedy for private land owners who find wild horses have strayed onto their land, but it does not purport to provide any permanent solution. Thus, the court is not convinced that BLM's general

---

[31] Plaintiffs' argument depends almost entirely on *Am. Wild Horse Pres. Campaign v. Jewell*, No. 14-cv-0152-NDF, 2015 WL 11070090, at *7 (D. Wyo. Mar. 3, 2015) (unpublished), *overruled by* 847 F.3d 1174 (10th Cir. 2016) ("Section [1334]'s unqualified mandate is the removal of free-roaming horses that stray from public lands onto privately owned lands, not the movement of horses from private lands to adjacent public lands."). Plaintiffs' reliance on that case is misplaced. The court notes that the district court's reasoning in *American Wild Horse Preservation Campaign* was essentially limited to the fact pattern present in that case—a unique arrangement of public and private land in a checkerboard pattern that severely complicated removal of stray horses from private lands. Such an arrangement is not present in this action. And, more crucially, the case and much of its reasoning regarding Section Four was overruled on appeal by the Tenth Circuit. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1186–89.

[32] To avoid confusion, the court pauses to note that it does not agree with BLM's suggestion that it need not actually *remove* stray horses, only "*arrange*" for their removal. (Docket No. 117, at 24). This is a distinction without a difference. While Section Four's removal mandate does not carry the same urgency as the corresponding removal mandate in Section Three, there is no indication in the language of Section Four that BLM can simply throw up its hands if the initial arrangements it makes for removal are unsuccessful. *See* 16 U.S.C. § 1334. Indeed, BLM's own regulations require that "the authorized officer . . . *remove* stray wild horses and burros from private lands as soon as practicable." 43 C.F.R. § 4720.2-1 (emphasis added). Thus, Section Four and associated regulations plainly require that BLM *remove* stray animals from private land upon proper notification from the land owner. Nothing in the court's analysis should be read to indicate otherwise.

practice of removing horses from private lands by moving them back onto adjacent public lands somehow falls short of Section Four's mandate.

Insofar as Plaintiffs argue that BLM has unreasonably delayed in fulfilling its ministerial duty to remove horses from private land, (Docket No. 103, at 59), they have failed to support that argument with evidence in the record. Plaintiffs have not pointed to any tangible delay, let alone unreasonable delay, in the BLM's response to the requests for removal of wild horses from private lands.[33] In fact, Plaintiffs have only requested that the court compel removal "to the extent that removal requests . . . remain[] unfulfilled." (*Id.*). Plaintiffs have not demonstrated or even alleged that completed attempts to move stray horses off private lands were unsuccessful. Most importantly, because many of the requests at issue were made years ago, the court does not know whether the stray horses at issue are still present on private land or have long since returned to adjacent public lands. The court only knows that BLM has affirmatively worked with landowners to remove stray horses from private land and has actually removed at least sixty-one horses in response to written requests. Plaintiffs have not persuaded this court that these responses were unreasonably delayed or otherwise inadequate. *Cf. Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) ("When courts consider . . . challenges [under the APA], an agency's decision is entitled to a presumption of regularity, and the challenger bears the

---

[33] To the extent that Plaintiffs allege that BLM has delayed removal of wild horses from lands owned by the State of Utah School & Institutional Trust Lands Administration ("SITLA"), the court is not convinced that Plaintiffs have any statutory standing to demand removal from those lands. *See Catron Cty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) ("In addition to Article III standing requirements, a plaintiff seeking judicial review pursuant to the APA must . . . demonstrate that its claims fall within the zone of interests protected by the statute forming the basis of its claims."); *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997) ("[I]f the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue."). Section Four does not provide any rights to grazing permittees or the like—instead it plainly provides a remedy only to "the *owners*" of private lands where wild horses or burros are found. *See* 16 U.S.C. § 1334 (emphasis added).

In any event, SITLA, the owner of the state lands in question, has already asserted its rights under Section Four and a lawsuit regarding its claims was recently dismissed pursuant to a settlement agreement. Plaintiffs have not pointed to any injury beyond that already addressed in that case and have therefore failed to demonstrate that injunctive relief is necessary. Moreover, Plaintiffs cannot rely on any purported delay in removal from SITLA lands to buttress their own claim for injunctive relief under Section Four.

burden of persuasion." (quoting *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011)); *Utah Native Plant Soc'y v. U.S. Forest Serv.*, No. 2:16-cv-56-PMW, 2017 WL 822098, at *8 (D. Utah Mar. 2, 2017) (unpublished) (citing *Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)) (placing the burden of persuasion on those challenging agency inaction).

While the court is sensitive to Plaintiff's obvious frustration with the manner and speed of BLM's response to their requests for removal, the court notes that Section Four does not prescribe any particular method or timeframe for BLM's removal efforts from private land. *See* 16 U.S.C. § 1334. And although relevant regulations require the BLM to respond to landowners' requests for removal "as soon as practicable," *see* 43 C.F.R. § 4720.2-1, the lack of specific evidence in the record regarding the current status of the relevant requests precludes the proper evaluation of any delay. The court declines to issue a generalized order that does nothing more than admonish BLM to obey the law. *Cf. SUWA*, 542 U.S. at 66–67 (cautioning against the issuance of "general orders compelling compliance with broad statutory mandates"); *Midland Pizza, LLC v. Southwestern Bell Tel. Co.*, 277 F.R.D. 637, 640–41 (D. Kan. 2011) ("An injunction simply requiring defendant to obey the law . . . is too vague to satisfy Rule 65.").

## CONCLUSION

The court concludes that Plaintiffs' demand for mandatory injunctive relief under the APA, 5 U.S.C. § 706(1), must be **DENIED**.

As this denial resolves the administrative review before the court, the above-captioned action is **DISMISSED** in its entirety.

The clerk of court is further **ORDERED** to close this docket.

IT IS SO ORDERED.

Signed this, the 11th day of July, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge